ORIGINAL

FILED
HARRISBURG

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

APR 06 2001

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

OSama Allan,
  Petitioner

    VS.

Janet Reno, US Attorney General
  Respondent

)
)
)
)
)
)
)
)
)

Case No. 1: CV-00-1460

PETITIONERS' MEMORANDUM OF
LAW IN SUPPORT OF
EMERGENCY MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

## INTRODUCTORY STATEMENT

Petitioner, an applicant for asylum, withholding of removal and protection under the UN

Convention Against Torture from Palestine, seeks temporary injunctive relief and/or a preliminary

injunction from removal from the United States before this court has entered a decision on his

pending petition for habeas corpus.  Grant of the underlying motion for a stay of removal is

necessary "to preserve the status quo during the course of litigation in order to prevent irreparable

injury to the moving party and in order to preserve the ability of the court to render complete

relief," *Federal Leasing, Inc. v. Underwriters at Lloyds,* 487 F. Supp. 1248, 1259 (D. Md.

1980), *aff'd,* 650 F.2d 495 (4th Cir. 1981).  Petitioner's petition for habeas corpus has been

pending before this court for some time, but no decision has yet been rendered.  The parties have

filed briefs outlining their respective position on the merits of the litigation. Petitioner has

asserted that the Respondent violated his right to due process in its improper adjudication of his

applications for seeking protection from persecution and torture.  In light of the fact that the

Petitioner asserts that his life and liberty are at great risk upon his return to Palestine or Israel

Petitioner asks that this court stop Respondent's attempt to remove him from the United States

prior to the entry of a final decision in these proceedings or until this Court has an opportunity to rule on their request for preliminary injunctive relief.

## The Statement of Emergent Need

Counsel has been informed by Petitoner's family that Respondent will attempt to effectuate Petitioner's removal today, April 6, 2001. Petitioner's removal is imminent. Should Petitioner be removed from the United States prior to adjudication of the underlying claim in these proceedings, these proceedings will be moot and Petitioner's life and liberty will be at great risk as Petitioner believes that he will be tortured and/or killed upon his return to Israel and/or Palestine. Reapplication and appeal are not meaningful options as Petitioner will be out of the United States and the consequences of the denial of the motion for stay of removal will be harsh severe and permanent to the Petitioner. Thus, the denial of the instant motion will result in irreparable harm to the Petitioner.

## The Legal Standard

To obtain a temporary restraining order and/or a preliminary injunction, the Petitioner must establish (1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) greater injustice to Petitioners if the injunction is denied than harm caused by granting the injunction; and (4) no substantial disservice to the public interest. *Tepper v. Miller*, 82 F.3d 989, 992-93 n.3 (11th Cir. 1996); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982 (11th Cir. 1995); *Shatel Corp. v. Maota Lumber and Yacht Corp.*, 697 F.2d 1352, 1354-1355 (11th Cir. 1983); *Canal Authority v. Callaway*, 489 F.2d 567 (5th Cir. 1974).

This standard is not rigidly applied by assigning a fixed quantitative value to each of the four factors. Rather, a flexible scale – which balances each consideration and arrives at the most

equitable result, given the particular circumstances of each case – is used. *Texas v. Seatrain International, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). "It is the threat of harm that cannot be undone which authorizes exercise of this equitable power to enjoin before the merits are fully determined." *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975).

An injunction is especially appropriate when, as here, it would preserve the status quo ante. *Northeastern Florida Chapter of Assoc. of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 12844 (11th Cir. 1990) ("The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.").

### A.    Substantial Likelihood Exists That Petitioner Will Prevail on the Merits

#### 1.    Respondent's Failed to Process Petitioner's Applications for Protection From Persecution and Torture

A fundamental principle of federal law is that a federal agency must follow its own rules. *Morton v. Ruiz*, 415 U.S. 199, 233-235 (1974) ("[W]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.") Likewise in *Simmons v Block*, 782 F.2d 1545 (11th Cir. 1986), in rejecting the FmHA's reliance on an internal policy which conflicted with its published regulations, the court found that:

> The failure of an agency to follow its own regulations constitutes arbitrary and capricious conduct. *Boyd v. Secretary of Agriculture*, 459 F.Supp. 418 (D.S.C.1978).  The courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself. *U.S. v Heffner*, 420 F.2d 809, (4th Cir. 1969)...

*Id.*, at 1550.  Moreover, courts have continuously held that these principles apply to INS as much as any other agency. "[I]t is clear...that agency deviation from its own regulations and procedures

3

may justify judicial relief...[citations omitted]", *Haitian Refugee Center v Smith,* 676 F.2d 1023,

1041 (5th Cir. Unit B 1982). *See also Jean v Nelson,* 727 F.2d 957 (11th Cir. 1984), *aff'd* 472

U.S. 846, 105 S.Ct. 846, 86 L.Ed.2d 664 (1985); *Nicholas v. INS,* 590 F.2d 802, 809, (9th Cir.

1979), (court held that INS violated its own regulation regarding the processing of a noncitizen's

request for immigration records); *Louis v. Nelson,* 544 F.Supp. 973 (S.D.Fl. 1982); *Tefel v. Reno,*

972 F.Supp. 608 (S.D.Fl. 1997).

The Petitioner asserts that the Respondents failed to adequately adjudicate his application

for relief from removal as important evidence in support of his application and Petitioner's

testimony regarding his past experiences in Israel was not adequately considered. Examples of

past persecution experienced by Petitioner at the hands of Israeli agents was ignored.

The BIA failed to adequately adjudicate evidence available from the US Department of

State regarding the status of Palestinians such as Petitioner in Israel and their treatment at the

hands of Israeli officers. Any such mistreatment would clearly occur on account of the

Petitoner's race, religion (Muslim), nationality, social group and imputed political opinion ( in

opposition to the Israeli security forces). *Matter of Accosta,* 19 I & N Dec. (BIA 1985) The

available evidence established that it was more likely than not that Petitoner would be persecuted

and tortured. As such, Respondent was compelled, by international law ( Protocol On the Status

of Refugees and the Geneva Convention) , domestic statute (Immigration and Nationality Act

section 208) and regulation (8 CFR section 208) to grant Petitoner's request for protection,

irrespective of his prior criminal conviction.

    **2.**    **The Defendants' Violation of Their Own Regulations and Congressional Statutes Is Also a Violation of the Administrative Procedures Act 5 USC§ 701 *et seq.***

Courts have consistently held that policies or practices of the INS which fail to follow the statutory or regulatory law violate the Administrative Procedures Act (APA), 5 USC§ 701, *et seq., Jean v. Nelson, supra.; Haitian Centers Council, Inc. v. Sale,* 823 F.Supp. 1028 (E.D.N.Y. 1993). The current policy and practice of the defendants violates the APA, 5 USC § 701, et seq., in that it constitutes an agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right", 5 USC§ 706(2)(A). Specifically, the current policy and practice violates the APA in that it is in violation of each of the following statutes and regulations.

A violation by an agency of its own regulations also constitutes a violation of the Administrative Procedures Act in that the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". 5 USC § 706(2)(A). As stated in *Raymond Proffit Foundation v. U.S. Environmental Protection Agency,* 930 F.Supp. 1088, (E.D.Pa. 1996),

Where judicial review includes actions taken pursuant to agency regulations, validly promulgated regulations have the force of law. *Frisby v. United States Dep't of Hous. & Urban Dev.*, 755 F.2d 1052, 1055 (3d Cir. 1985). When an agency fails to act in compliance with its own regulations, such actions are "not in accordance with law." *Id.* at 1055-56 (citations and quotations omitted).

*Id.* at 1104.

**C.**    **Plaintiffs Will Suffer Greater Injustice If Injunctive Relief Is Denied than Any Harm Caused by Granting Such Relief**

The irreparable harm that Petitioner Allan will suffer if an injunction does not issue is well-documented above and in Petitioner's reply to the Respondent's brief. Respondents will suffer little or no harm if the injunction sought by Petitioner is granted since the Respondent will merely be prevented from immediately proceeding with Petitoner's removal until such time as this court can adjudicate his pending petition for habeas relief. That application has been pending since August, 2000 and is unlikely to remain undecided for much longer. Inasmuch as Respondent has not effectuated Petitioner's removal to date it can not reasonably argue that a minor delay in Petitioner's removal will result in harm, especially in light of the Petitioner's asserted fear of persecution, torture and death should he be sent to Israel or Palestine, his constitutional claim and his likely success on the merits of the underlying petition for habeas corpus.

In determining whether to issue an injunction, the Court should balance the Petitioner's likelihood of success with the relative threatened hardship. *Florida Medical Assoc. v. U.S. Dept. of Health, Education and Welfare*, 601 F.2d 199 (5th Cir. 1979); *Louis v. _____*, 530 F.Supp. 924 (S.D.Fla. 1981). It is not necessary that plaintiffs be able in an abbreviated proceeding, to prove with certainty eventual success....[T]he importance and nature of the

6

[likelihood of success] requirement can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of interlocutory relief and the relative balance of the threatened hardship. *State of Texas v. Seatrain International*, 518 F.2d 175, 180 (5th Cir. 1975) (citing *Canal Auth. of State of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974)).

Here, the balance of hardships tips sharply in favor of the plaintiffs. In the underlying habeas action, Respondent relies upon a jurisdictional argument that has been rejected by the US Court of Appeals for the Third Circuit time after time, after time after time. [See, *Steele v. Blackman*, No. 00-3116 (January 2, 2001- Third Circuit)]. Respondent attempts to dismiss Petitioner's constitutional claims by citing *Abdoulaye v. Ba*, No. 1-CV-00-0136 (July 24, 2000- US District Court for the Middle District Of Pennsylvania) The *Ba* case has no applicability in these proceedings because the alien in that case did not have a criminal conviction and was found to be eligible to seek a petition for review to address his constitutional and other claims. For that reason, the district judge transferred the action to the US Court of Appeals for the Second Circuit to permit consideration of the alien's claims under a petition for review.

In this circuit, however, it is clear that the Petitioner has no right to request judicial review via a petition for review. Respondent also alleges that since Petitioner has claimed his detention to be unlawful, his constitutional claims are without merit. First, Petitioner does assert that his detention is unlawful because he has been detained pending removal based on purported authorization from a BIA decision that violates his constitutional right to due process. Inasmuch as those arguments were the Respondent's only arguments presented in its defense in this appeal, Respondent can not win. Respondent has challenged the constitutionality of his detention and even if he did, such challenge is not required for this court to have jurisdiction to consider a

7

habeas petition on behalf of a criminal alien.    Petitioner is very likely to prevail in these proceedings.

Further, this court denied Petitioner's prior motion for stay of removal because Petitioner could not assert facts sufficient to establish that Petitioner's removal was imminent.    That is not the case at this time as Counsel has been informed by Petitioner's family that Respondent has informed Petitioner that he would be removed today and has begun preparations for his immediate removal from the United States.

The court also noted that Petitioner had not submitted a copy of the decision from the immigration judge denying Petitioner's request for relief.  Petitioner has since obtained and filed a copy of that document with this court and it is available for review.

Absent an injunction, Petitioner will suffer real, immediate, and lasting harm, including persecution, torture and death.

**D.**    **Granting Plaintiffs Injunctive Relief Will Not Disserve the Public Interest**

The public interest in enforcing federal law, the balance of equities in this case, and the fact that Petitioner will be irreparably injured in the event that injunctive relief is denied, all show that granting Petitioner's Motion here will not disserve the public interest, but will enhance the public interest by respecting our national commitment to the protection of human rights, the rights guaranteed under our constitution to individuals such as the Petitioner and our obligations under international law.

WHEREFORE, Petitioner requests that the instant motion be GRANTED.

Sincerely,

Sandra Greene, Esquire
140 Roosevelt Ave., #202
York, PA  17404
717-812-9080
717-843-0417 (FAX)

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a true and correct copy of the foregoing was served upon Larry Selkowitz, Asst. US Attorney by hand delivery at 228 Walnut Street, 2nd Fl., Harrisburg, PA 17108 on April 6, 2001.

Sandra Greene, Esquire
140 Roosevelt Ave., #202
York, PA  17404
717-812-9080
717-843-0417 (FAX)

## AI country reports and visits

**Report**

• Republic of Ireland: Submission to the Committee to Review the Offences Against the State Acts and Other Matters (AI Index: EUR 29/001/99)

**Visit**

AI delegates visited Ireland in June and met the Minister of Justice.

# ISRAEL AND THE OCCUPIED TERRITORIES

**STATE OF ISRAEL**
**Head of state:** President Ezer Weizman
**Head of government:** Ehud Barak (replaced Binyamin Netanyahu in July)
**Official languages:** Hebrew, Arabic
**Death penalty:** abolitionist for ordinary crimes

Official permission for torture and ill-treatment ended in September when the High Court ruled that various interrogation techniques used by the General Security Service (GSS) were unlawful. Scores of Palestinian administrative detainees were released during 1999, but 14 Palestinians were still held in administrative detention at the end of the year. Hundreds of Palestinians were tried before military courts whose procedures failed to comply with international standards for fair trial. At the end of 1999 there were about 1,500 Palestinian political prisoners; more than 300 were released during the year under peace agreements. Israeli security forces killed at least eight Palestinians in circumstances suggesting that they were unlawfully killed. On the basis of a policy that discriminated against Palestinians, houses in the West Bank were demolished because their owners had been unable to secure building permits. At least 29 Lebanese nationals were held in Israel, including 16 held in administrative detention. More than 150 Lebanese nationals were held without charge or trial at the end of 1999 in Khiam Detention Centre in Israeli-occupied south Lebanon. Incidents of ill-treatment by members of the security services in Israel and the Occupied Territories were frequently reported. At least six conscientious objectors were imprisoned for refusing to perform military service.

## Background

In May Ehud Barak, of the One Israel party, was elected Prime Minister. Parliamentary elections also took place. A coalition government assumed power in July.

After resuming talks in August, Israel and the Palestine Liberation Organization (PLO) signed the Sharm al-Shaykh memorandum in September, agreeing to resume final status negotiations. In accordance with the agreement, in September and October Israel released 309 Palestinian political prisoners and 41 other Arab political prisoners, and redeployed its troops in certain areas of the West Bank. Palestinians' freedom of movement continued to be severely restricted. Israel maintained the border closures between Israel and the West Bank (excluding East Jerusalem) and between Israel and the Gaza Strip. In October Israel opened a safe passage route to facilitate travel by Palestinians between the West Bank and Gaza Strip. Attacks were carried out on Palestinians by armed Israeli settlers and on settlers by armed Palestinians.

The military conflict between the Israel Defence Force (IDF) and the South Lebanon Army (SLA) on the one hand and *Hizbullah* on the other continued. In July the Prime Minister announced Israel's intention to withdraw from Israeli-occupied south Lebanon within one year. The SLA had withdrawn from the Jezzine salient in south Lebanon in May and June.

Israel's large population of migrant workers, including women trafficked for prostitution from the Commonwealth of Independent States, continued to be the target of human rights abuses. Hundreds were held in detention for extended periods pending deportation and there were reports of police brutality against them.

## Torture

Torture and ill-treatment continued to be officially permitted and systematically used by the GSS to interrogate security detainees until September, when the High Court of Justice ruled that such interrogation methods were unlawful. The GSS immediately ceased to use the specified techniques, which included *tiltul*, violent shaking; *shabeh*, where detainees were shackled to low sloping chairs in contorted positions for extended periods and forced to listen to loud, distorted music; *gambaz*, where detainees were forced to crouch for extended periods; excessive tightening of handcuffs; and sleep deprivation. In October the ministerial committee overseeing the GSS set up a professional committee to investigate the implications of the Court's decision. In October draft legislation was submitted to the parliament (*Knesset*) to empower the GSS to use physical force during interrogations in certain circumstances.

## Ill-treatment

There were many reports of Palestinians being beaten and otherwise ill-treated at checkpoints, during demonstrations or immediately after arrest. There were also reports of beatings of migrant workers by the police and other officials in public places and during searches of their homes.

In May members of the Border Police beat Ziad 'Ali Taamra, a driver aged 21, at a checkpoint near Bethlehem, injuring his legs, stomach and chest. The Israeli army admitted, after an initial investigation, that it appeared that the officers had used "unreasonable force". The Department for Investigation of Police Misconduct recommended their prosecution. No charges had been brought against them by the end of 1999.

An inspector from the Ministry of Trade and Industry beat two illegal migrant workers from China with a metal rod one metre in length in August after he found them trapped in a commercial vehicle in Tel Aviv.

## Administrative detention

Scores of Palestinian administrative detainees were released, including Usama Barham, who had been held without charge or trial since 1994. At the end of 1999, 14 Palestinians remained in administrative detention. An additional 16 Lebanese nationals remained in administrative detention. Nine were held beyond the expiry of their prison sentences and seven were held without charge or trial, including two detainees held incommunicado. They were held to exchange for Israeli nationals who had "disappeared" in Lebanon or for information concerning them. The Supreme Court had not ruled on appeals against their continued detention by the end of the year. Five other Lebanese administrative detainees were released in December.

'Abdallah 'Abdallah al-Khatib, a 27-year-old Palestinian, was held in administrative detention at the end of 1999. He had been arrested and placed under administrative detention in July 1998. During appeals neither he nor his lawyer had been allowed to examine the evidence against him.

Ghassan Fares al-Dirani, a Lebanese national aged 30, was held in administrative detention at the end of 1999. He had been detained without charge or trial since his arrest in Lebanon in 1987. He was reported to be in poor physical and mental health.

## Unfair trials

Hundreds of Palestinians were arrested and tried in military courts for offences such as membership of illegal organizations and stone-throwing. Many were detained incommunicado for days without being brought before a court. Confessions extracted under torture frequently formed the main evidence against them. In August the military government lowered the age at which Palestinian children could be tried in military courts and imprisoned, from 14 to 12 years. The courts increased the tariff sentence for stone-throwing by children from four weeks' to four months' imprisonment.

Su'ad Hilmi Ghazal, a Palestinian school student from Sebastiya village who was arrested in December 1998 at the age of 15, was still in detention at the end of 1999, pending trial on charges of assaulting an Israeli. She was held with adult prisoners at Neve Tirza Prison.

## House demolitions

At least 39 Palestinian houses in the West Bank were demolished because their owners had been unable to obtain building permits from the Israeli authorities. The policy of house demolitions discriminated against Palestinians and appeared to be aimed at stopping Palestinian development in parts of the West Bank under Israeli control.

## South Lebanon

During 1999, 23 Lebanese and two Israeli civilians were reportedly killed as a result of the military conflict in south Lebanon. Most civilians were killed as a result of deliberate or indiscriminate attacks.

In June, at least eight Lebanese civilians were killed in Israeli air raids directed against Lebanese infrastructure. The raids were a retaliation for the killing of two Israeli civilians in rocket attacks by *Hizbullah* and were followed by further *Hizbullah* shelling of northern Israel.

As well as at least 29 Lebanese nationals detained in Israel, more than 150 Lebanese nationals, including children, were detained without charge or trial at the end of 1999 in Khiam Detention Centre in Israeli-occupied south Lebanon. Torture and ill-treatment were used routinely at the prison and in other SLA detention centres. Israel continued to deny responsibility for the administration of the prison and maintained that its militia ally, the SLA, was exclusively responsible. In September the IDF admitted that GSS officers visited the prison and had assisted in training SLA interrogators, and that the salaries of prison staff were paid by Israel.

## Extrajudicial executions and unlawful killings

Israeli security forces frequently used excessive force or opened fire on Palestinians in circumstances where the lives of the security forces were not apparently in danger. Eight Palestinian civilians were killed in circumstances suggesting that they may have been extrajudicially executed or otherwise unlawfully killed.

In January the Border Police used excessive force when they opened fire in 'Isawiyeh in East Jerusalem on Palestinians demonstrating against house demolitions. Zaki 'Ubayd, aged 28, was killed after a rubber-coated metal bullet fired at close range struck him in the neck. In August the Department for Investigation of Police Misconduct recommended that two Border Police officers be prosecuted in connection with the death, but by the end of 1999 the District Attorney's office had not brought charges against them.

## Conscientious objectors

Israel continued to imprison conscientious objectors who refused to perform military service. Military courts sentenced at least six conscientious objectors to imprisonment and nearly all of them served multiple sentences. They were prisoners of conscience.

In June a military court sentenced Walid Muhammad Naffa', a Druze conscientious objector from Beit Jann, to five months' imprisonment for desertion. This was his 11th prison sentence for refusing to serve in the IDF on grounds of conscience. He was released in September and exempted from military service on grounds of "unsuitability".



## Impunity

Most members of the security forces who used torture or ill-treatment, carried out unlawful killings or committed other violations enjoyed impunity for their actions. In those cases where members of the security forces were convicted of human rights violations, light sentences were imposed.

✎ In November 1997 an IDF soldier fired in the direction of a group of three children, killing 'Ali Jawarish, aged eight. The soldier's life did not appear to be in danger. In February the Military Advocate General's office concluded that the soldier had behaved appropriately and that no further action would be taken.

## Intergovernmental developments

The UN Special Rapporteur, appointed pursuant to Commission on Human Rights Resolution 1993/2A "to investigate Israel's violations of the principles and bases of international law", visited areas under the Palestinian Authority's jurisdiction. Israel continued to refuse to cooperate with the Special Rapporteur. In an oral statement to the UN Commission on Human Rights in March, AI reiterated its concerns that Israel had violated international human rights treaties in the name of "security".

In February the UN General Assembly requested the High Contracting Parties to the Fourth Geneva Convention to hold a conference to discuss enforcement measures against Israel for failure to implement the Convention in the Occupied Territories. The conference took place in July. Israel and the USA did not attend. The conference was adjourned with no date set for its resumption.

## AI country reports and visits

**Reports**

- Israel: The price of principles – imprisonment of conscientious objectors (AI Index: MDE 15/049/99)
- Israel and the Occupied Territories: Demolition and dispossession -- the destruction of Palestinian homes (AI Index: MDE 15/059/99)

**Visits**

AI delegates visited Israel in January to conduct research on conscientious objectors, in April and May to research the trafficking of women from the Commonwealth of Independent States to Israel, and in May and June to investigate house demolitions in the West Bank.

# ITALY

**ITALIAN REPUBLIC**
**Head of state:** Carlo Azeglio Ciampi (replaced Oscar Luigi Scalfaro in May)
**Head of government:** Massimo D'Alema
**Capital:** Rome
**Population:** 57.5 million
**Official language:** Italian
**Death penalty:** abolitionist for all crimes
**1999 treaty ratifications/signatures:** Rome Statute of the International Criminal Court

There were further allegations of ill-treatment inflicted by law enforcement and prison officers. Conditions in some prisons reportedly amounted to cruel, inhuman or degrading treatment. Criminal proceedings opened into alleged ill-treatment were often subject to lengthy delays. By the end of 1999, no one had been committed for trial as a result of criminal investigations opened into the allegations which came to light in 1997 and 1998 of the ill-treatment, torture and unlawful killing of Somalis by members of the Italian armed forces participating in a multinational peace-keeping operation in Somalia in 1993. Several criminal proceedings were under way in connection with human rights violations committed against Italian citizens by members of the Argentine security forces in the 1970s and 1980s and as a result of past collaboration between the security forces of several South American countries. Three men imprisoned in 1997 following possibly unfair trial proceedings for participation in a politically motivated murder were granted a judicial review. Parliament approved a constitutional amendment introducing, in principle, strengthened fair trial guarantees for defendants in criminal proceedings. Enabling legislation to allow its practical application was still under parliamentary consideration at the end of 1999.

## Alleged ill-treatment by law enforcement officers

There were a number of allegations of gratuitous and deliberate violence inflicted on detainees by law enforcement officers; at least one detainee died in disputed circumstances. The allegations concerned both Italian and foreign nationals, but a high proportion of the allegations received by AI continued to concern foreign nationals, many from Africa and a number of Roma. Some were reluctant to make official complaints because they feared repercussions. The government argued that, according to official figures emerging from surveys conducted by one law enforcement agency in previous years, allegations of ill-treatment by foreigners were in fact a small proportion of the total number of such allegations. It stated that "foreign citizens, especially those from outside the Community who are less familiar with the

OSAMA MAHOUD ALLAN
A 42516624
3-18-99

**ADC**

May 20, 1999

Mr. J. Scott Blackman
District Director of INS
1600 Callowhill Street
Philadelphia, PA 19130

4201 Connecticut Ave., N.W.
Suite 300
Washington, DC 20008
Tel: (202) 244-2990
Fax: (202) 244-3196
e-mail: adc@adc.org
http://www.adc.org

Re: Osama Mahmoud Allan
　　Docket No. 95-00578-03
　　BOP # 18987-050
　　Alien No. A42 516 624

Alex Odeh (1944-1985)
Hon. James Abourezk, *Chair Emeritus*
Naila Asali, *Chairperson*
Hala Maksoud, *President*

**Board of Directors**
Olfet Agrama
Alham Alsammarae
Mazin Irani
Albert Mokhiber, *Vice-Chair*
Adnan Mourany
Safa Rifka, *Treasurer*
George Saba
Mariam Said
Ahmad Sbaiti
George Younan

**Advisory Committee**
Rep. John Conyers (D-MI)
Rep. Patricia Danner (D-MO)
Rep. Nick Joe Rahall (D-WV)
Muhammad Ali
\*Naim Assed
\*Halim Awde
\*Naim Ayoub
Hon. George Bashara
Noam Chomsky
Hon. Ramsey Clark
Sabri El-Farra
Richard Falk
\*Cheryl Faris
Hon. Paul Findley
Yvonne Haddad
Hassan Hammami
\*Farouk Hamouda
Al Joseph
Casey Kasem
Tawfiq N. Khoury
Anthony J. Mansour
Hon. Herb Mocol
Hon. Mary Rose Oakar
Talat Othman
Michael Saba
Edward Said
Archbishop Philip Saliba
Richard Shadyac
Jack Shaheen
Hisham Sharabi
Stephen P. Yokich
Joe Yusif

\**Honorary Board Members*

Dear Mr. Blackman:

I am the Director of Legal Services of the American-Arab Anti-Discrimination Committee (ADC). ADC is a non-sectarian, non-partisan organization dedicated to protecting the civil rights of Americans of Arab descent. ADC was founded in 1980 by former Senator James Abourezk to combat racism, discrimination, and stereotyping of Americans of Arab descent.

Osama Mahmoud Allan contacted ADC and has requested a letter of support for his Application for Asylum and for Withholding of Removal. Mr. Allan informed ADC that he has been labeled by the INS as a native of Jordan and a stateless citizen. Therefore, Mr. Allan is now facing deportation proceedings to Jordan. Mr. Allan's birth certificate is from Jordan only because when he was born in 1965 the West Bank was officially under Jordanian rule. In 1967 Israeli forces took control of the West Bank. Today, the land is under a Israeli rule with some Palestinian influence. Mr. Allan has no family or contacts in Jordan. There is no justification to send Mr. Allan to Jordan. All living members of his family reside in the United States.

Deportation to Israel is not an option. Mr. Allan fears for his life in Israel. He believes that if he is sent back to Israel he will face certain bodily injury or death. He asserts that he will be expected to either collaborate with Israeli forces which will place him in danger, or be forced to join an opposition movement which will also put his life in danger. Mr. Allan claims that he witnessed his cousin and four friends die at the hands of Israeli forces. He has also been subjected to imprisonment and torture by Israeli forces. The last time Mr. Allan went back to the West Bank was in 1991 to bury his mother. Mr. Allan had no intentions of ever returning to the horrific lifestyle guaranteed to him in the Israeli controlled territories.

Recycled Paper. ADC's contribution to future generations
Contributions/Dues to ADC are not deductible for federal income tax purposes



4201 Connecticut Ave., N.W.
Suite 300
Washington, DC 20008
Tel: (202) 244-2990
Fax: (202) 244-3196
e-mail: adc@adc.org
http://www.adc.org

Alex Odeh (1944-1985)
Hon. James Abourezk, *Chair Emeritus*
Naila Asali, *Chairperson*
Hala Maksoud, *President*

**Board of Directors**
Olfet Agrama
Alham Alsammarae
Mazin Irani
Albert Mokhiber, *Vice-Chair*
Adnan Mourany
Safa Rifka, *Treasurer*
George Saba
Mariam Said
Ahmad Sbaiti
George Younan

**Advisory Committee**
Rep. John Conyers (D-MI)
Rep. Patricia Danner (D-MO)
Rep. Nick Joe Rahall (D-WV)
Muhammad Ali
*Naim Assed
*Halim Awde
*Naim Ayoub
Hon. George Bashara
Noam Chomsky
Hon. Ramsey Clark
Sabri El-Farra
Richard Falk
*Cheryl Faris
Hon. Paul Findley
Yvonne Haddad
Hassan Hammami
*Farouk Hamouda
Al Joseph
Casey Kasem
Tawfiq N. Khoury
Anthony J. Mansour
Hon. Herb Mocol
Hon. Mary Rose Oakar
Talat Othman
Michael Saba
Edward Said
Archbishop Philip Saliba
Richard Shadyac
Jack Shaheen
Hisham Sharabi
Stephen P. Yokich
Joe Yusif

*Honorary Board Members*

On behalf of Mr. Osama Allan, we humbly request your approval of his Application for Asylum and for Withholding of Removal. If there is anything more I can do or if you have any questions concerning Mr. Allan please do not hesitate to contact me. Thank you for your attention to this letter.

Very truly yours,

Kamal Nawash
Legal Director

cc: John Crosson, INS
   Osama Allan

OSAMA ALLAN    3-16-44
A42 516 624

## AFFIDAVIT

I OSAMA ALLAN do swear that the following is true to the
the best of my recollection, and hereby state these facts in
support of my refugee status and plea for asylum in the United
Sates of America:

Since the war in 1967 the area in which I live has been under
Israeli control. As my birth records reflect, I was born in Palesti
and have been raised under the conscientous mind set of; tradition
beliefs, customs, and values significant to my social and moral li
style and Political opinions, which reflect my Palestinean heritag
It is these intricately woven aspects of my life which makes me pr
of my heritage, but put my life in danger in my home land. It is
because of my traditional beliefs and customs, and my political vi
that put my life in danger in my homeland. Subsequent to the begin
of the war and Israeli control of our land, we have been constantl
persecuted by the Israeli Government. Many Palestineans have died
the hands of Israeli troops who limit what we can do, where we can
and what times we can travel from place to place. There is very lit
freedom for those who call themeselves; or are known as Palestine
I have personally witnessed my cousin and four of my best friends
at the hands of the Israelis, but my worst encounter came when the
was an attack on my own life. In 1988 a group of Israeli soldiers
me badly beacause I was traveling too late at night. I tried to ex
plain to them that I was only returning from visiting a sick frien
however they showed me no mercy. I still have the marks on my legs
which bear witness to the viscious attack. There are many such ran
attacks on Palestineans in the now called "West Bank" area where I
from. Individuals are attacked for being in "Jewish Areas", being o
too late in the evening or too early in the morning, and many othe
sanctioned liberty denying strongholds the Israeli's decide to inv
upon us. Many individuals on both side are killed year after year.
particular men who are in my age group and appear strong and healt
are attacked and killed, because these are the groups of us who ch
to demonstrate againts the opressions and injustices we suffer at
hands of Israeli domination. However there is no way for the Israe
to distinguish who is and who isn't a demonstrator, therefore they
target anyone from my age group, in particular who looks the part,
kill or mame them. This is very likely to happen, after one of the

have died in an attack, In Aljeeb the village where I live there are 4,000 Palestineans and approximately 6,000 to 7,000 Jewish Israeli's occupying the land surrounding my village. The area is very unsettled due to the tense atmosphere created by the constant rejection and rebellion of members of my race who share similiar political views as a result of the oppression and injustiices that have occurred from the forceful occupation of Palestinean land by the Israeli's. This has created a turbulent and hostile enviroment consisiting of constant uprisings of Israelis and Palestineans againts each other on a day to day - week to week basis year after year. In light of the fact that most Israeli civilians who are able, carry weapons, and carry out random attacks on Palestineans there are laws that disallow Palestineans to own or carry weapons. Althoug injustices and oppressions occur daily with no end in sight, and no matter who you are young, old, male, or female you are likely to be the subject of injury or death our cries for relief go unheared and unanswered. Because it is only left up to those who are strong to protect the weak, wanting or unwanting, and because I am in the mind set as well as age that would make me of no choice, but to defend my weaker cohabitants. For these reasons I feel that If I return to my homeland of Palestine now called "West Bank" I will be returning to my death. Finally I would like to add that I have an inherited share in my parents' land in the West Bank, which comes to $120,000 U.S. Dollars, however I'd rather give up my share of the inheritence in order to save my life, and remain here in the United States.

Respectfully Submitted,

This 3-16 day of March 1999

Osama Allan

OSAMA MAHOUD ALLAN
A 42 516 624
3-18-99

**Sayer K. Abbed**
**Date of Birth:** December 5, 1976
**Place of Birth:** Danville, Illinois, United States of America
**Permanent Address:** 202 East 8th St., Gridley, IL 61744
**Occupation:** Senior Business Major at Eureka College in Eureka, Illinois
**Ph. #:** (309)747-3026

March 12, 1999

To whom it may concern,

I, Sayer K. Abbed, do solemnly swear that the following information is true to the best of my recollection. I am Osama Allan's nephew, and I am very concerned with the possible threat to my uncle's life. I have recently been informed by my mother, that my Uncle Osama may be forced to return to the West Bank. Many people do not understand the great dangers that await my uncle if he is forced to return to the West Bank.

I had the chance to visit Palestine in the summer of 1995, for one full month. I had heard many stories from my parents and other relatives of how bad it was for them to live in Palestine. I decided as my high school graduation gift, I would visit my grandparents and relatives in Palestine, and live the experience for myself.

At first glance, I saw a peaceful and beautiful country, but as time went on, I began to experience these same horrifying stories that I heard about back in the States. The country has been under Israeli country since the 1967 war, and ever since, Palestinians have been prisoners in their own homes.

The Israelis are very strict on the Palestinians, for example, in order for a Palestinian to leave the town in which their home is located, they must have a certain colored pass. If a Palestinian is caught outside of their area, they will be beaten and thrown in to jail with no questions asked. I had the misfortune of witnessing this happen, a cab driver that was driving me around was caught outside of his area, several Israeli soldiers beat him down with no questions asked. It was so brutal that I could not believe he could still walk after that incident. This was only one incident, but there were others, and I do not feel that my Uncle would be treated any differently. It is so hard for me to put what I have experienced in words, until a person has experienced it for themselves, they do not understand the danger that is put on the Palestinians lives.

It is very difficult for someone to live a happy life in Palestine, while still under Israeli control. The Israelis will attack an individual for being out too late or in the "wrong" part of town. They see strong, young Palestinian men walking down the street, they will attack them in fear of problems in the future. Since my uncle is a young, strong man, he would be placed in that same category, and he would have his life put in danger.

My uncle has the potential to get married, raise a family, and make an honest living for himself in the United States of America. But if it is decided that he has to return to the West Bank, than you would be destroying all of this, and my uncle would be struggling to live a life in fear of his life.
I ask of you, please don't destroy my uncle's life and our lives by putting his in danger. Causing my mother and our family to live a life of worry wondering when will be the last time we hear from him. Knowing that if he lives in the United States, he could have all the opportunities that we have had and many more.

Sincerely yours,

*[signature]*

Sayer K. Abbed

*O. A M A   M A H J U L   A L L A N*

*A 42 516 624*

*3-18-99*

**Sayer K. Abbed**
**Date of Birth:** December 5, 1976
**Place of Birth:** Danville, Illinois, United States of America
**Permanent Address:** 202 East 8th St., Gridley, IL 61744
**Occupation:** Senior Business Major at Eureka College in Eureka, Illinois
**Ph. #:** (309)747-3026

March 12, 1999

To whom it may concern,

I, Sayer K. Abbed, do solemnly swear that the following information is true to the best of my recollection. I am Osama Allan's nephew, and I am very concerned with the possible threat to my uncle's life. I have recently been informed by my mother, that my Uncle Osama may be forced to return to the West Bank. Many people do not understand the great dangers that await my uncle if he is forced to return to the West Bank.

I had the chance to visit Palestine in the summer of 1995, for one full month. I had heard many stories from my parents and other relatives of how bad it was for them to live in Palestine. I decided as my high school graduation gift, I would visit my grandparents and relatives in Palestine, and live the experience for myself.

At first glance, I saw a peaceful and beautiful country, but as time went on, I began to experience these same horrifying stories that I heard about back in the States. The country has been under Israeli country since the 1967 war, and ever since, Palestinians have been prisoners in their own homes.

The Israelis are very strict on the Palestinians, for example, in order for a Palestinian to leave the town in which their home is located, they must have a certain colored pass. If a Palestinian is caught outside of their area, they will be beaten and thrown in to jail with no questions asked. I had the misfortune of witnessing this happen, a cab driver that was driving me around was caught outside of his area, several Israeli soldiers beat him down with no questions asked. It was so brutal that I could not believe he could still walk after that incident. This was only one incident, but there were others, and I do not feel that my Uncle would be treated any differently. It is so hard for me to put what I have experienced in words, until a person has experienced it for themselves, they do not understand the danger that is put on the Palestinians lives.

It is very difficult for someone to live a happy life in Palestine, while still under Israeli control. The Israelis will attack an individual for being out too late or in the "wrong" part of town. They see strong, young Palestinian men walking down the street, they will attack them in fear of problems in the future. Since my uncle is a young, strong man, he would be placed in that same category, and he would have his life put in danger.

My uncle has the potential to get married, raise a family, and make an honest living for himself in the United States of America. But if it is decided that he has to return to the West Bank, than you would be destroying all of this, and my uncle would be struggling to live a life in fear of his life.
I ask of you, please don't destroy my uncle's life and our lives by putting his in danger. Causing my mother and our family to live a life of worry wondering when will be the last time we hear from him. Knowing that if he lives in the United States, he could have all the opportunities that we have had and many more.

Sincerely yours,

*Sayer K. Abbed*

**Sayer K. Abbed**

OSAMA MAHMOUD ALLAN

A42 516 624

3-16-99

MARCH 8, 1999
BILAL   ALLAN
63 MONTCLAIR AVE.
PATERSON, N.J 07503
POB,PATERSON N.J U.S.A

TO WHOM IT MAY CONCERN.
    I BILAL ALLAN DO SWEAR THAT THE FOLLOWING IS TRUE TO THE BES
OF MY RECOLLECION I HERBY STATE THESE FACTS IN SUPPORT
OF MY UNCLE OSAMA ALLAN REFUGEE STATUS AND PLEA FOR ASYLUM IN
THE UNITED STATES OF AMERICA.
    I WAS BORN IN THE U.S,BUT LIVED MAINLY IN THE WEST BANK.IT
IS AQUPPIED BY ISREALIES,I USED TO LIVE IN FEAR WHEN I WAS
THERE,SOLDERS USED TO BEAT ON ME AND MY FRIENDS BECAUSE OF AN
APPRISE THAT HAPPENED ON THE OTHER SIDE OF TOWN,OR BECAUSE WE
FORGOT OUR PERSONAL IDS AT HOME.THEY KILLED MY BEST FRIEND AND
INJURED SEVERAL OTHERS BECAUSE THEY WHERE APPOSED TO THE
OCCUPATION.IN PALESTINE WE HAVE NO RIGHTS WHETHER WE'RE MUSLIM
OR CHRISTIANS,JUST BECAUSE WE BELIEVE IN AN INDEPENDENT
PALESTINE.THE DISCRIMINATION ,THE PERSECUTION AND THE KILLING
OF INNOCENT WILL NOT STOP UNTIL JEWS RECOGNIZE US AS AN
INDEPENDENT AND SOVEREIGN NATION ,TILL THEN THERE WILL INJUSTI
AND PERSECUTION.AND IT DOESN'T LOOK LIKE THEY WILL BE GRANTING
US OUR FREEDOM ANY TIME SOON.
MY UNCLE MADE A MISTAKE ,AND HE PAID FOR IT ,SO PLEASE DON'T
YOU CORRECT A MISTAKE WITH ANOTHER,BY DEPORTING HIM TO A HOSTI
ENVIRONMENT,AND PLEASE GRANT HIM ASYLUM TO THIS GREAT COUNTRY.

                          YOURS TRULY
                          *Bilal Allan*
                          BILAL ALLAN

OSAMA MAHMOUD ALLAN
A42 516 624

3-16-99


3/09/99

TAYSER M. ALLAN
60 BROADWAY
PATERSON N.J 07501.
POB , JORDAN


     I TAYSER M.ALLAN, SWEAR THAT THE FOLLOWING IS TRUE,TO THE
BEST OF MY RECOLLECTION HEREBY STATE THESE FACTS IN SUPPORT
OF MY BROTHER OSAMA ALLAN'S REFUGEE STATUS,AND PLEA FOR ASYLUM
IN THE UNITED STATES OF AMERICA.
     I SPENT MOST OF MY LIFE OUTSIDE MY NATIVE LAND "PALESTINE"
I WENT TO BRAZIL THEN CAME HERE TO THE U.S.A , WHEN I LEFT
PALESTINE IT WAS UNDER JORDANIAN CONTROL,WHEN I WENT BACK AFTER
1967,I FOUND MY COUNTRY UNDER JEWISH AQUPATION ,I SAW MY PEOPLE
BEING PERSECUTED,WRONGULY SENT TO PRISON,AND AT TIMES
KILLED,BECAUSE OF THEIR RESISTANCE TO THE OCCUPATION.MORE THEN
THIRTY YEARS HAVE PAST,AND THE STORIES OF
OPPRETION,DISCRIMANATION,AND MURDER CONTINUE TO THIS DAY.ALTHOGH
I GO VISIT MY NATIVE LAND ONCE EVERY SEVERAL YEARS ,I CAN'T
STAY THEIR FOR MORE THEN THREE WEEKS,BECAUSE I'M CONSTANLEY
HARASSED BY ISRAELI SOLDERS FOR MY ID,AND BECAUSE OF MY ETHNIC
AND RELIGIOUS BACKROUND,AND I'M NOT THE ONLY ONE THAT IS
OPPRESSED,
FOR I AM THERE FOR SHORT PERIOD OF TIME,IT IS MY PEOPLE WHO
HAVE TO ENDURE IT.THERFORE I ASK YOU,TO PLEASE CONSIDER MY
BROTHER'S PLEA FOR ASYLUM TO THE UNITED STATES,BY GRANTING HIM
ASYLUM,AND don't LET HIM BE ONE OF THE VICTIMS OF OPPRESSION.


                              YOURS TRULY

                              Tayser Allan .
                              TAYSER ALLAN.

OSAMA MAHMOUD ALLAN

A42 516 624

3-16-99

MARCH 9, 1999
NACER M.ASSAF
63 MONTCLAIR AVE.
PATERSON, N.J 07503
POB,PATERSON N.J U.S.A

TO WHOM IT MAY CONCERN.
   I NACER ASSAF DO SWEAR THAT THE FOLLOWING IS TRUE TO THE BEST
OF MY RECOLLECION I HERBY STATE THESE FACTS IN SUPPORT
OF MY UNCLE OSAMA ALLAN REFUGEE STATUS AND PLEA FOR ASYLUM IN
THE UNITED STATES OF AMERICA.
   I WAS BORN IN THE U.S.A,THEN TRAVELD TO PALESTINE,OR WHAT
IS KNOWN TODAY AS "THE WEST BANK",AND RESIDED THERE FROM 1979
TO THE YEAR 1988,THATS WHEN I CAME BACK HOME TO THE U.S.WHILE
I WAS IN PALESTINE, I WITNESSED THE PERSECUTION OF MANY YOUNG
PALESTIEANS,BY SO CALLED ISRAELI SOLDERS, BECAUSE OF THEIR ETHNIC
AND RELIGIOUS BACKROUND. SOLDERS BEAT,OR SHOOT AT YOU FIRST,AND
ASK QUESTIONS LATER.EVEN JEWISH CIVILIANS HAVE THE RIGHT TO
SHOOT AT A PALESTINEAN,OR EVEN RUN HIM OVER WITH HIS CAR,WHITHOUT
FACING ANY CIRRUS CHARGES.FOR A COUNTRY THAT CLAIMS IT'S BASED
ON DEMOCRACY,IT's A DISCOURSE TO SEE HOW JEWS IN THAT PART OF
THE WORLD TREAT OTHER ETHNIC GROOPS,TREATING THEM AS IF THEY
WHERE OUTLAWS,CRIMINALS,OR EVEN AT TIMES AS ANIMALS.
ALTHOUGH THE U.N AND OTHER HUMAN RIGHTS GROUPS SUPPORT THESE
FACTS,NOBODY IS DOING ANYTHING TO STOP THESE HUMAN RIGHTS
VIOLATIONS.PALESTINE IS NOT A PLACE FOR ANY YOUNG MAN TO LIVE
IN,FOR I HAVE WITNESSED AND HEARD MANY TERRIFYING TALES OF
TORTURE AND MURDER IN COLD BLOOD ON THE HANDS OF ISREALY
SOILDERS,OR ISREALY CIVILIANS.THREE OF MY PARENTS NEIGHBORS
WHERE MURDERED,ONE OF WHOM WAS A YOUNG PREGNANT WOMAN,SHOT BY
A SOILDER WHILE SHE WAS CLEANING HER FRONT YARD,AND OUR YOUNG
NEIGHBOR IN HIS EARLY TWENTYS,WAS SHOT WHILE HE WAS ON HIS WAY
TO MAKE PRAYER AT THE MOSQUE.THESE ARE JUST A FEW OF MANY
TERRIFYING TALES OF EVERY DAY LIFE IN PALESTINE.
ON THE BEHALF OF MY UNCLE OSAMA ALLAN'S FAMILY AND FRIENDS,
WE WISH THAT YOU WILL CONSIDER HIS PLEA FOR ASSYLUM,AND GRANT
IT TO HIM.

                                        YOURS TRULY
                                        NACER M.ASSAF

OSAMA MAHOUD ALLAN
A42 516 624
3-18-99

**Samah Allan/Abbed**
**Place of Birth:** El Jeeb Ramallah, West Bank, Israel
**Permanent Address:** 202 East 8th St., Gridley, IL 61744
**Ph. #:** (309) 747-3026

March 12, 1999

To whom it may concern,

I, Samah do swear that the following information is true to the best of my recollection. I am Osama Allan's older sister. I am going to make my story short. Everything you heard from Osama Allan and what my son Sayer Abbed wrote in his letter is all true. I, myself witnessed my friend's brother waiting for a bus to go to school, he was run over by a Jewish Army jeep and was left dead on the sidewalk. My cousin was run over by a Jewish cement truck and left behind a 1 ½ yr old son, a two month old daughter, and a young wife. In May of 1998 a Jewish Army bus pushed my cousin's van off the road with four of her children and her female friend with her 4 yr old daughter all in the van. My cousin's 13 yr old son, 8 yr old daughter both died and their 6 yr old daughter is still in a coma until today. That is just a few events of what we experienced.

There is not enough time to tell you all that we have been through, until today. We do not have any freedom back in Jerusalem especially young people like my brother. If any Palestinian would leave Israel for one year they could not go back and live there, even if they were born in Palestine we lose our citizenship. It I up to you please, your honor he suffered enough. God bless you.

Sincerely,

*Samah Abbed*

Samah Allan/Abbed