
**ORIGINAL**
s to U


4-10-01
sc

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Osama Allan,
    Petitioner,

    vs.                No. 1:CV-00-1460

Janet Reno, US Attorney General
    Respondent.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED**
HARRISBURG, PA

APR 09 2001

MARY E. D'ANDREA, CLE
Per _____
        Deputy Clerk

### Petitioner's Additional Evidence In Support Of Stay Of Removal

1. Country Reports on Human Rights Practices (2000) Israel, *US Department of State*
2. Country Reports on Human Rights Practices (2000) Occupied Territories, *US Department Of State*

Sandra Greene, Esquire
140 Roosevelt Ave., #202
York, PA 17404
(717)812-9080

Certificate Of Service

I hereby certify that I caused to be served upon Larry Selkowitz, Asst. US Attorney, a true and correct copy of this document by hand delivery on April 9, 2001 at 228 Walnut Street, 2nd Floor, Harrisburg, PA   17108.

Sincerely,

Sandra Greene, Esquire



# U.S. DEPARTMENT OF STATE

Home | Contact Us | FOIA | Privacy Notice | Archive | Search

About the State Department | Press & Public Affairs | Travel & Living Abroad

Countries & Regions | International Topics & Issues | History, Education & Culture

Business Center | Other Services | Employment

## Israel (for information on occupied territories, see occupied territories report)

### Country Reports on Human Rights Practices -2000
**Released by the Bureau of Democracy, Human Rights, and Labor
February 2001**



Israel 1/ is a parliamentary democracy with a multiparty system and free elections. There is no Constitution; a series of "basic laws" provide for fundamental rights. The legislature, or Knesset, has the power to dissolve the Government and limit the authority of the executive branch. Labor and One Israel party leader Ehud Barak was elected Prime Minister in May 1999 and took office in July 1999 at the head of a broad centrist coalition Government. On December 9, following the breakdown of his coalition, Barak resigned as Prime Minister; prime ministerial elections were scheduled to be held on February 6, 2001. The judiciary is independent.

Since its founding in 1948, Israel has been in a state of war with most of its Arab neighbors. It concluded a peace treaty with Egypt in 1979 and with Jordan in 1994, and a series of agreements with the Palestinians beginning in 1993. As a result of the 1967 war, Israel occupied the West Bank, the Gaza Strip, East Jerusalem, and the Golan Heights. The international community does not recognize Israel's sovereignty over any part of the occupied territories. Throughout its existence, Israel has experienced numerous terrorist attacks.

An historic process of reconciliation between Israel and the Palestinians began with the Madrid Conference in 1991 and continued with the September 1993 signing of the Israeli-Palestinian Declaration of Principles (DOP). In September 1995, Israel and the Palestine Liberation Organization (PLO) signed the Interim Agreement on the West Bank and the Gaza Strip. In January 1997, the parties concluded the Hebron Protocol and in October 1998, Israel and the PLO signed the Wye River Memorandum. In September 1999, the Israeli Government and the PLO signed the Sharm el-Sheikh Memorandum. The parties held intensive working-level talks between March and June and met at Camp David in July; however, the Government and the PLO did not reach an agreement. Internal security is the responsibility of the Israel Security Agency (the ISA -- formerly the General Security Service, or GSS, and also known as Shin Bet, or Shabak), which is under the authority of the Prime Minister's office. The police are under the authority of the Minister of Internal Security. The Israel Defense Forces (IDF) are under the authority of a civilian Minister of Defense. The IDF includes a significant portion of the adult population on active duty or reserve status and plays a role in maintaining internal security. The Foreign Affairs and Defense Committee in the Knesset reviews the activities of the IDF and the ISA. Some members of the security forces committed serious human rights abuses.

Israel has an advanced industrial economy, and citizens enjoy a relatively high standard of living, with a per capita income of over $17,000. Unemployment remained at about 9 percent during the year, but was substantially higher in the country's peripheral regions and among lower-skilled workers. The country's economic growth has been accompanied by an increase in income inequality. The longstanding gap in levels of income within the Jewish population and between Jewish and Arab citizens continues. The 14 towns with the highest unemployment rate in the country all are populated by Arab citizens. A heavy reliance on foreign workers, principally from Asia and Eastern Europe, is a source of social problems. Such workers generally are employed in agriculture and the construction industry and constitute about 6 percent of the labor force. Since the implementation of an economic stabilization plan in 1985, the country has moved gradually to reduce state intervention in the economy through privatization of several state-owned companies and through deregulation. State-owned companies continue to dominate such fields as electricity generation and transmission, oil refining, shipping, and international air travel. However, individuals generally are free to invest in private interests and to own property. The Government owns and manages 77 percent of the country's land area, and as a matter of policy it does not sell land. The Jewish National Fund (JNF), an organization established in 1897 for the purchase and management of land for the Jewish people, owns 8 percent of the country's land area, including a

considerable amount transferred directly from the Government, and manages another 8 percent on behalf of the Government. Foreigners and citizens of all religions are allowed freely to purchase or lease the 7 percent of land not controlled by the Government or the JNF. In March the High Court of Justice ruled that the Government's use of the JNF to develop public land was discriminatory, since the JNF's statute prohibits the sale or lease of land to non-Jews.

The Government generally respects the human rights of its citizens; however, its record worsened late in the year regarding its treatment of non-Jewish citizens. Historically, Israel's main human rights problems have arisen from its policies and practices in the occupied territories and from its fight against terrorism. However, in October police used excessive force to disperse demonstrations in the north of the country that coincided with the outbreak of violence in the occupied territories, killing 13 Arab citizens and injuring over 300 (see Sections 1.a., 1.c., and 1.g. of the annex for a discussion of casualties in the occupied territories). There also are credible reports that police failed to protect Arab lives and property in several incidents in which Jewish citizens attacked the homes of Arab citizens. A landmark decision by the High Court of Justice in September 1999 prohibited the use of a variety of abusive practices, including violent shaking, painful shackling in contorted positions, sleep deprivation for extended periods of time, and prolonged exposure to extreme temperatures. Since the September 1999 ruling, domestic and international NGO's have been unable to substantiate sporadic allegations that security forces tortured detainees. There were numerous credible allegations that police beat persons in detention. Detention and prison conditions, particularly for Palestinian security detainees held in Israel do not provide inmates with sufficient living space, food, and access to medical care. Following the IDF withdrawal from its self-declared "security zone" in southern Lebanon in May and the concurrent collapse of the South Lebanon Army (SLA), all of the prisoners from the Al-Khiam prison in southern Lebanon, where Lebanese guards routinely committed abuses, were released. The Government continued to detain without charge Palestinians, some of them for lengthy periods; the number of such detainees increased following the outbreak of violence in September. In April an Israeli High Court ruling declared illegal the holding of Lebanese detainees as "bargaining chips" in Israeli prisons. Subsequently, authorities released 13 Lebanese prisoners, all of whom had been held without charge, or had already completed their terms. At year's end, there were approximately 20 Lebanese prisoners in custody, two of whom -- Sheikh al-Karim Obeid and Mustafa Dirani -- were held without charge. Legislation that would enable Obeid and Dirani to be held as "members of enemy forces not entitled to prisoner-of-war status" passed a first reading during the year. Following the outbreak of violence in September, the Government detained without charge hundreds of persons in Israel, the West Bank, and Gaza, and imposed severe restrictions on the movement of persons and some restrictions on the movement of goods between Israel and the West Bank and Gaza and between cities in the West Bank and Gaza—i.e., closure, which has been in effect to varying extents since 1993 (see Section 2.d. of the annex).

The Government continued to fund shelters and crisis centers; however, violence and discrimination against women persists. Discrimination against the disabled persists. The Government made little headway in reducing institutionalized legal and societal discrimination against Israel's Christian, Muslim, and Druze citizens, who constitute just over 20 percent of the population, but do not share fully the rights provided to, and obligations imposed on, the country's Jewish citizens. Prior to October, the Government did not take tangible steps to improve the situation of the country's non-Jewish citizens, which was one of the main factors that contributed to large Israeli Arab demonstrations in October. The demonstrations and clashes between the police and Israeli Arabs brought renewed attention to the different treatment accorded to the Jewish and Arab sectors of the country. In October the Government approved a $975 million economic assistance plan for Arab citizens to be phased in over 4 years; however, some human rights groups criticized the plan as inadequate. The Knesset did not approve the plan by year's end. Trafficking in women for the purpose of forced prostitution is a continuing problem. In June the Government passed a law that prohibits the trafficking of persons for the purpose of prostitution.

In early October, there were many instances of societal violence between Arab and Jewish citizens, which coincided with violent events in the country.

RESPECT FOR HUMAN RIGHTS

Section 1    Respect for the Integrity of the Person, Including
         Freedom From:

a.    Political and other Extrajudicial Killing

There were no reports of political killings during the year.

In October police used excessive force to disperse demonstrations in the north of the country that coincided with the outbreak of violence in the occupied territories (see Sections 1.a., 1.c., and 2.b. of the annex), killing 13 Arab citizens and injuring 300 with a combination of live ammunition and rubber-coated steel bullets (see Sections

Israel (for information on occupied territories, see occupied territories report)

1.c. and 2.b.). Demonstrators did not have firearms; however, some demonstrators reportedly threw rocks and firebombs. International and domestic human rights groups assert that police used rubber-coated metal bullets and live ammunition against demonstrators who posed no imminent danger of death or serious injury to security forces or others.

On September 28, opposition leader Ariel Sharon visited the Temple Mount (Haram al-Sharif) in Jerusalem. On September 29, Palestinians held large demonstrations and threw stones at police in the vicinity of the Western Wall. Police used rubber-coated metal bullets and live ammunition to disperse the demonstrators, killing 4 persons and injuring about 200 (see Sections 1.a. and 1.c. of the annex). In response to this violence, Palestinians held demonstrations throughout the occupied territories and Israel. On October 1, Israeli Arab leaders called a general strike, which received widespread support from Arab citizens, thousands of whom demonstrated throughout the country. On October 1, police used live ammunition and rubber-coated metal bullets to disperse demonstrations in Um-al-Fahem, killing two persons and injuring hundreds of others. On October 2, police killed six persons and injured numerous others during demonstrations in Jat, Nazareth, Arrabe, and Sakhnin. Police also used live ammunition and rubber bullets to disperse demonstrations in other towns and villages in the north of the country, injuring hundreds of demonstrators. On October 3, police killed three persons during demonstrations in Nazareth and Kfar Manda.

In October and November, coinciding with violence in Israel and the occupied territories, there were numerous violent incidents along the Israel-Lebanese border. On October 7, IDF personnel reportedly killed 2 persons and injured 25 during demonstrations along the border. On October 9, the IDF reportedly fired live ammunition on a group of about 500 Palestinian demonstrators who were throwing rocks and Molotov cocktails, and trying to cross the border into Israel; IDF personnel reportedly killed 1 person and injured 10.

On October 21, Prime Minister Barak proposed establishing a commission of examination to study the violence that occurred in early October. However, Israeli Arab leaders rejected Barak's offer and demanded that the Government establish a legal commission of inquiry, which would operate independently of the Government, have subpoena power, and automatically bestow immunity on anyone who testified before it. On November 8, in response to pressure from both Arab and Jewish citizens, Barak announced the establishment of the Legal Commission of Inquiry, which reportedly is to have considerable ability to collect information. The Commission is headed by a High Court justice, and its members include an Arab judge from a Nazareth court, and a professor from Tel Aviv University. In December the Legal Commission of Inquiry began its investigation; however, it did not reach any conclusions by year's end.

There also are credible reports that police failed to protect Arab lives and property in several incidents in which Jewish citizens attacked Arab citizens. On October 7, a group of about 200 Israeli Jews attacked Arab homes in Nazareth Illit (Upper Nazareth), including the home of an Arab Member of the Knesset. On October 8, a group of about 1,000 Israeli Jews attacked Arab homes in Nazareth. The attackers allegedly targeted Arab citizens due to their anger over the Hizballah kidnaping of three IDF soldiers and the attack on Joseph's Tomb in the West Bank in early October (see Sections 1.b. and 2.c. of the annex). Many of the Arabs exited their homes and attempted to defend themselves and their property (see Section 5). Police reportedly arrived at the scene late, did not take action beyond inserting themselves between the two groups, and fired live ammunition, rubber bullets, and tear gas at the Arab citizens. Two Israeli Arabs were killed and approximately 50 others were injured in these incidents. International and domestic human rights groups reported that the police were responsible for the deaths and injuries; however, some residents of Nazareth reported that some members of the Jewish crowd had firearms. Large crowds of Jews also attacked Arab homes, businesses, and two mosques in other areas of the country (see Sections 1.c. and 5). Arab protesters also attacked Jewish-owned businesses and at least one synagogue (see Sections 1.c. and 5).

During the year, 22 Israelis died and 244 were injured in terrorist attacks carried out by Palestinian groups or individuals in Israel and the occupied territories (also see Sections 1.a. and 1.c. of the annex). For example, on November 1, a car bomb in Jerusalem killed two Israelis and injured eleven others, including four children. Palestinian Islamic Jihad claimed responsibility for the attack. On November 22, a car bomb in Hadera killed three Israelis and injured 61. Palestinian Islamic Jihad also claimed responsibility for this attack.

b.  Disappearance

On October 10, Hizballah guerrillas kidnaped three IDF soldiers. At year's end, the soldiers were believed to be held in Lebanon.

Israel (for information on occupied territories, see occupied ......

c. Torture and Other Cruel, Inhuman, or Degrading
Treatment or Punishment

Laws and administrative regulations prohibit the physical abuse of detainees; however, security forces sometimes abused Palestinians suspected of security offenses. A landmark decision by the High Court of Justice in September 1999 prohibited the use of a variety of abusive practices, including violent shaking, painful shackling in contorted positions ("Shabbeh"), sleep deprivation for extended periods of time, and prolonged exposure to extreme temperatures. Since the September 1999 ruling, domestic and international NGO's have been unable to substantiate sporadic allegations that security forces tortured detainees.

Prior to the High Court's 1999 decision, laws and administrative regulations prohibiting the physical abuse of detainees were not enforced in security cases. The head of the ISA was empowered by government regulation to authorize security officers to use "moderate physical and psychological pressure" (which included violent shaking) while interrogating detainees. These practices often led to excesses. In November 1999, the Attorney General issued revised guidelines that denied blanket immunity from prosecution for interrogators; however, it remains theoretically possible that the State could decline to prosecute interrogators who used prohibited methods in cases of extreme urgency.

In October police used live ammunition and rubber-coated metal bullets to disperse demonstrators in the north of the country, killing 13 Arab citizens and injuring over 300 (see Sections 1.a. and 2.b.). Demonstrators reportedly did not have firearms; however, in some cases they reportedly threw rocks and firebombs. On October 1, police beat severely a woman who screamed at a police officer during a demonstration. The incident was videotaped and broadcast on domestic and international television.

There were numerous credible allegations from human rights groups that police beat persons in detention; reports of such beatings increased in October following demonstrations and the numerous subsequent police arrests of suspected or actual participants in the demonstrations (see Section 1.d.). For example, on October 26, police arrested an Arab citizen, Amneh Aqayleh, on suspicion of participating in demonstrations in Nazareth. Police brought Aqayleh to the Kishon detention center for interrogation where they reportedly beat him. Police also reportedly arrested and beat some Jewish demonstrators. For example, according to Amnesty International police arrested and beat Yoav Bar following a demonstration in Wadi Nisnas, breaking his hand, two of his ribs, and two of his teeth. According to Amnesty International, police also reportedly arrested and beat youths following demonstrations in the north of the country (see Section 1.d.).

According to local and international human rights NGO's, in some cases police reportedly delayed ambulances and medical personnel from entering Arab villages to treat persons who were injured during the clashes (see Section 2.d.). According to police officials, the streets often were too crowded and volatile for the ambulances to enter the villages safely. According to some observers, local leaders broadcast requests over mosque loudspeakers that demonstrators return home in order to clear the way for ambulances.

In early October, police failed to protect Arab lives and property when a group of approximately 1,000 Jewish citizens attacked Arab Israeli homes in Nazareth. Police fired live ammunition, rubber bullets, and tear gas at Arab citizens. Two persons were killed and 50 persons were injured (see Sections 1.a. and 5).

During the year, 244 Israelis were injured in terrorist attacks carried out by Palestinian groups or individuals in Israel and the occupied territories (see Sections 1.a. and 1.c. of the annex).

Conditions vary in incarceration facilities in Israel and the occupied territories, which are administered by the Israeli Prison Service (IPS), the IDF, or the national police. IPS prisons, which generally house Israeli citizens convicted of common crimes, usually provide inmates with sufficient living space, food, and access to medical care. In general, IPS inmates are not subject to physical abuse by guards, and prisoners receive basic necessities. Inmates receive mail, have television sets in their cells, and receive regular visits. Prisoners receive wages for prison work and benefits for good behavior. Many IPS prisons have drug treatment, educational, and recreational programs. The IPS established a national police unit to investigate allegations of offenses committed by guards, including complaints about the use of force against inmates.

Since the closure in 1995 of the main IDF detention camps in the occupied territories, all security detainees (i.e., those detained and held without charge by security forces) from the occupied territories who are held for more than a few days are transferred to facilities within Israel. During the year, security detainees usually were held in the IDF's Megiddo prison, in IPS facilities, and in special sections of police detention facilities. Prisoners

Israel (for information on occupied territories, see occupied territories.)

incarcerated for security reasons are subject to a different regimen, even in IPS facilities. They often are denied privileges given to prisoners convicted on criminal charges such as furloughs and some family visits. According to the Government, security detainees may receive financial assistance from the Palestinian Authority (PA), food from their families, and medical supplies from the ICRC and other aid organizations. Security detainees include some minors. Detention facilities administered by the IDF are limited to male Palestinian detainees and are guarded by armed soldiers. The total number of Palestinian prisoners held by Israel, approximately 1,354 at the beginning of the year, reached 1,832 by year's end. The number of administrative detainees (held without charge or trial) was between 10 and 15 at year's end, including one Israeli Arab (see Section 1.d.). Under the terms of the Sharm el-Sheikh Memorandum, the Government released a total of 350 Palestinian security prisoners in 1999 (in addition to the 250 prisoners released in late 1998 pursuant to the Wye River Accords). On May 1, Palestinian prisoners throughout the country began a hunger strike to protest prison conditions and their continued incarceration. Following negotiations with government and PA officials, the prisoners agreed to suspend the hunger strike on May 31. The Government agreed to remove prisoners from solitary confinement and to allow family members to visit inmates, and the prisoners agreed to refrain from planning terrorist attacks from prison.

Conditions at the Russian Compound, which is run by police and houses a combination of security and common prisoners and detainees in Jerusalem, were criticized in 1997 as "not fit to serve as lock-up" by High Court of Justice President Aharon Barak. Conditions in other IDF facilities have improved in some respects. For example, inmates are given more time for exercise outside their cells. Nevertheless, recreational facilities remain minimal, and there are strict limitations on family visits to detainees. Visits were prevented for long periods of time during closures.

Conditions at some national police detention facilities are poor. Such facilities are intended to hold criminal detainees prior to trial but often become de facto prisons. Those held include some security detainees and some persons who have been convicted and sentenced. Inmates in the national police detention facilities often are not accorded the same rights as prisoners in the IPS system. Moreover, conditions are worse in the separate facilities for security detainees maintained both in police facilities and in IPS prisons.

In 1996 the Government began a reform program for the country's detention facilities. To date, there have been some improvements, including the opening of a model detention center near Netanya; however, problems, including dilapidation and overcrowding persist. The 1997 Arrest and Detention law provided for the right to live in conditions that would not harm the health or dignity of the detainee, access to adequate health care, the right to a bed for each detainee, and access to exercise and fresh air on a daily basis. The Government has made significant strides towards implementing this legislation, though problems remain.

Children's rights groups have expressed particular concern over the separate sections of holding facilities set aside for the detention of children. Overcrowding, poor physical conditions, lack of social workers, and denial of visits by parents are among the key problems. In addition to some Israeli minors held in criminal cases, there are juveniles among Palestinian detainees. Children's rights activists had recommended the construction of a separate detention facility for children, and after a prolonged legal battle, separate prison facilities were built for Arab and Jewish children.

All incarceration facilities are monitored regularly by various branches of the Government, by members of the Knesset, by the International Committee of the Red Cross (ICRC), and by human rights groups (see Section 1.d. of the annex).

In September 1999, the Government acknowledged that it trained, debriefed, and paid the salaries of the Lebanese administrators and staff of the Al-Khiam prison in southern Lebanon, where prisoners allegedly were tortured routinely. Following the IDF withdrawal from its self-declared "security zone" and the concurrent collapse of the SLA, all of the prisoners in Al-Khiam were released.

d. Arbitrary Arrest, Detention, or Exile

The law prohibits arbitrary arrest of citizens, and the Government generally observes this prohibition. Defendants are considered innocent until proven guilty and have the right to writs of habeas corpus and other procedural safeguards. However, a 1979 law permits administrative, or preventive, detention (i.e., without charge or trial), which is used on occasion in security cases. In such cases, the Minister of Defense may issue a detention order for a maximum of 1 year, though such orders may be extended. Within 24 hours of issuance, detainees must appear before a district judge who may confirm, shorten, or overturn the order. If the order is confirmed, an automatic review takes place after 3 months. Detention orders were confirmed in all cases during the year. Detainees have the right to be represented by counsel and to appeal detention orders to the High Court of Justice; however, the security forces may delay notification of counsel with the consent of a judge. According

Israel (for information on occupied territories, see occupied ...

to human rights groups and legal experts, there were cases in which a judge denied the Government's request to delay notification of counsel. At detention hearings, the security forces may withhold evidence from defense lawyers on security grounds. The Government also may seek to renew administrative detention orders. However, the security services must "show cause" for continued detention, and, in some instances, individuals were released because the standard could not be met.

In felony cases and in ordinary security cases, a district court judge may postpone for 48 hours the notification of arrest to the detainee's attorney. The postponement may be extended to 7 days by the Minister of Defense on national security grounds or by the police inspector general to conduct an investigation. Moreover, a judge may postpone notification for up to 15 days in national security cases.

The 1997 Arrest and Detention Law more narrowly defined the grounds for pretrial detention in criminal and security cases and reduced to 24 hours the length of time a person may be held without charge; however, this law does not extend to administrative detention cases. Human rights groups allege abuse of detention orders in cases in which they assert that the accused did not pose a clear danger to society. Children's rights activists have recommended separate legislation to define when and how a child may be arrested and how long children may be detained. According to media reports and children's rights groups, during and following the violence in the north, police sometimes beat youths while arresting them (see Sections 1.c.).

Most of the protections afforded to Israelis are not extended to Palestinian detainees, who fall under the jurisdiction of military law even if they are detained in Israel. With IDF redeployment in the West Bank, detention centers there were closed in 1995. As a result, all Palestinian detainees held for longer than 1 or 2 days are incarcerated in Israel (see Section 1.d. of the annex).

Police arrested hundreds of persons mainly in the north of the country in connection with the demonstrations and disturbances that began in September; approximately two-thirds of the persons arrested were Arab citizens and about one-third were Jewish citizens. According to domestic and international human rights organizations, police continued to arrest Arab citizens whom they suspected of participating in the disturbances over a month after the demonstrations ended. On October 26, the Northern Police Commander announced to the press that his office compiled a list of hundreds of persons who participated in the demonstrations and that the police intended to arrest many of them. According to human rights organizations, police lacked any evidence against a significant number of Israeli Arabs that they arrested. There also were credible reports that police tricked some Israeli Arabs into confessing that they threw stones during demonstrations. Many of the persons arrested, including some minors, also reportedly were held without bail until the end of criminal proceedings against them. Several detainees brought appeals to the High Court of Justice; however, the Court upheld this practice on the grounds that calm had not yet returned to the country. According to Amnesty International, at least 10 Arab citizens detained in connection with the disturbances in October were denied access to counsel for up to 1 week.

In December for the first time since 1994, the Government placed an Israeli Arab, Jhasan Athamnah, in administrative detention where he was being held on secret evidence at year's end.

At year's end, the Government held 1,832 Palestinians in custody. Those held were a mixture of common prisoners, administrative detainees, and security detainees. The Government continues to deny the ICRC access to one Lebanese citizen, Mustafa Dirani (held without charge since 1994). The Government granted the ICRC access to Sheikh Obeid (held without charge since 1989) for the first time in December 1999, and allowed the ICRC four additional visits during the year. However, following the October kidnaping of IDF soldiers by Hizballah guerrillas (see Section 1.b.), the Government suspended ICRC access to Sheikh Obeid. In May 1998, the High Court of Justice ruled that the Government was entitled to continue holding them for use in a possible exchange of hostages to obtain the return of an Israeli who still may be held by hostile forces. The High Court's ruling stressed that national security needs took precedence over the detainees' individual rights under Israeli and international law. However, in April the High Court declared illegal the detention of individuals to be used as "bargaining chips;" the Government subsequently released 13 Lebanese prisoners. However, Obeid, Dirani, and approximately 18 other Lebanese prisoners remained in custody at year's end; the former are administrative detainees, and the latter have been charged and convicted of crimes. The Government claims that Obeid and Dirani are security threats and attempted to pass legislation that would allow the continued detention without charge of "members of enemy forces not entitled to prisoner-of-war status." The bill had passed a first reading by year's end. Two legal advisors to the Knesset criticized the bill, claiming that it contravened domestic and international laws.

Six Iraqis, held since they attempted to enter the country illegally from Jordan, were deported to Holland, Sweden, and Finland, where they obtained refugee status.

Israel (for information on occupied territories, see occupied territories report)

The law prohibits forced exile of citizens, and the Government respects this prohibition in practice.

e.    Denial of Fair Public Trial

The law provides for an independent judiciary, and the Government respects this provision. However, in the past the judiciary routinely acquiesced to the Government's position in security cases. The September 1999 landmark High Court of Justice decision barring the use of torture (see Section 1.c.) marked a major change in this practice, as did the April ruling prohibiting the holding of detainees for use as "bargaining chips." The judiciary generally provides citizens with a fair and efficient judicial process.

The judicial system is composed of civil, military, religious, labor relations, and administrative courts, with the High Court of Justice as the ultimate judicial authority. The High Court of Justice is both a court of first instance (in cases involving government action) and an appellate court (when it sits as the Supreme Court). Each of the cited courts, including the High Court of Justice, have appellate courts or jurisdictions.

The law provides for the right to a hearing with representation by counsel, and authorities observe this right in practice. A regional and national system of public defenders operated by the Ministry of Justice was inaugurated in 1996 and now employs about 700 attorneys through 5 regional offices. Under the system, economically disadvantaged persons who face sentences of 5 years or longer, and all persons who are accused of crimes with sentences of 10 years or longer receive mandatory legal representation. Judges also have discretionary power to appoint an attorney in all cases. Since the system was implemented, representation has increased to about 70 percent. All nonsecurity trials are public except those in which the interests of the parties are deemed best served by privacy. Cases involving national security may be tried in either military or civil courts and may be partly or wholly closed to the public. The prosecution must justify closing the proceedings to the public in such cases, and the Attorney General determines the venue. Adult defendants have the right to be represented by counsel even in closed proceedings but may be denied access to some evidence on security grounds. Under the law, convictions may not be based on any evidence denied to the defense. In addition, convictions may not be based solely on a confession by the accused, although in practice security prisoners have been sentenced on the basis of the coerced confessions of both themselves and others.

According to human rights organizations, the legal system often imposes far stiffer punishments on Christian, Muslim, and Druze citizens than on Jewish citizens. For example, human rights advocates claim that Israeli Arabs are more likely to be convicted of murder (which carries a mandatory life sentence) than Jewish Israelis. The courts reportedly also are more likely to detain Arab-Israelis until the conclusion of proceedings. The Government notes that the judicial system is independent and disputes the charge that the court system systematically discriminates against non-Jewish citizens. According to press reports, following the demonstrations that took place in September and October, 66 percent of those arrested were Arab Israelis, and 84 percent of those detained until the conclusion of proceedings as late October were Arab Israelis (see Section 1.d.).

There were no reports of political prisoners.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

Privacy of the individual and the home generally are protected by law; however, the Government uses laws that provide that authorities may interfere with mail and monitor telephone conversations in certain circumstances. In criminal cases, the law permits wiretapping under court order; in security cases, the order must be issued by the Ministry of Defense. Under emergency regulations, authorities may open and destroy mail on security grounds.

g. Use of Excessive Force and Violations of Humanitarian Law in Internal Conflicts

In May Israeli forces withdrew from southern Lebanon in compliance with UN Security Council Resolution 425. Prior to the IDF withdrawal from southern Lebanon in May, violence continued there and in northern Israel. An estimated 20 Hizballah guerrillas, and 25 Lebanese civilians were killed in southern Lebanon prior to the Israeli

Israel (for information on occupied territories, see occupied territories report.)

withdrawal. Israeli forces and the SLA responded to Hizballah, Amal, and Palestinian guerrilla attacks as all sides engaged in recurring violence. For example, on February 8, in response to Hizballah attacks, Israel conducted air strikes on electrical power transformer stations and other targets, injuring over 1 dozen civilians. In retaliation for Hizballah attacks in May, Israel shelled military and civilian targets in the south, killing two persons. Israeli forces conducted air strikes and artillery barrages on Hizballah, Amal, and Palestinian targets, including civilian infrastructure, inside Lebanon. During the May IDF withdrawal from southern Lebanon and the concurrent collapse of the SLA, at least four Lebanese civilians were killed by Israeli helicopter gunfire. In response to a Hizballah bombing in November, Israel launched airstrikes on Hizballah positions in the south, injuring one civilian.

There were over 110 Lebanese civilian injuries prior to the IDF withdrawal, with most of the injuries involving minor wounds from shrapnel and broken glass. Civilians accounted for over 70 percent of the injured.

Attacks by Hizballah, Amal, and Palestinian guerillas resulted in numerous deaths and injuries. An estimated 9 Israeli soldiers were killed in southern Lebanon and northern Israel by roadside bombs, ambushes, and cross border attacks. Additionally 40 Israeli civilians were injured in shelling and cross border attacks.

On October 7, Hizballah launched shells on IDF positions in the Sha'ba farms area in the Golan Heights; no injuries reportedly resulted from the shelling. The shelling reportedly served as cover for the kidnaping of three IDF soldiers in the north (see Section 1.b.). In May Hizballah attacks in the north of Israel killed 1 person and injured 12. On October 20, IDF fire repulsed a cross border infiltration attempt by unidentified Lebanese insurgents; two were killed and the third was injured.

On November 26, Hizballah guerillas bombed an Israeli patrol station in the Sha'ba farms area, killing 1 IDF soldier. In October Hizballah guerillas kidnaped 3 Israeli soldiers on patrol in the north of Israel, demanding that the Israeli government release all remaining Lebanese detainees in Israeli prisons (see Section 1.b.). At year's end, the soldiers were believed to be held in Lebanon.

Section 2  Respect for Civil Liberties, Including:

a.  Freedom of Speech and Press

The law provides for freedom of the press, and the Government generally respects this right in practice. The law authorizes the Government to censor any material reported from Israel or the occupied territories regarded as sensitive on national security grounds. A censorship agreement signed in 1996 between the Government and media representatives continued the trend of liberalization of the Government's censorship regime. The agreement, which now applies to all media organizations in the country, provides that military censorship is to be applied only in cases involving national security issues that have a near certainty of harming the country's defense interests. All media organizations can appeal the censor's decision to the High Court of Justice. Moreover, a clause prohibits the military censor from shutting down a newspaper for censorship violations and from appealing a court judgement against it. News printed or broadcast abroad may be reported without the censor's review, which permits the media to run previously censored stories that have appeared in foreign sources. Emergency regulations prohibit persons from expressing support for illegal organizations. On occasion in the past, the Government has prosecuted persons for speaking or writing on behalf of terrorist groups. No such cases were filed during the year. During the year, there were reports that the military censor intervened in several cases related to national defense.

One Palestinian-owned newspaper is required to submit its entire contents, including advertising, to the military censor by 4:00 p.m. each day. The editor claims that this process caused his journalists to practice self-censorship. Journalists and professional journalist groups complained about limitations placed on their freedom of movement within the occupied territories, between the West Bank and Gaza, and between the occupied territories and Israel during the violent unrest in September (see Section 2.d.). One media organization reported that more than two dozen journalists were injured or harassed while covering events in the occupied territories in October and November (see Section 2.a. of the annex). On October 5, during a demonstration in Jaffa, demonstrators acting outside of government control assaulted a foreign camera crew, injuring several journalists and breaking three cameras.

Foreign journalists are required to sign an agreement to submit certain news stories and photographs for censorship; however, they rarely are challenged for not doing so.

Individuals, groups, and the press freely address public issues and criticize government policies and officials without reprisal. Laws prohibit hate speech and incitement to violence. All newspapers are privately owned and

Israel (for information on occupied territories, see occupied territories p.   )

managed.  Newspaper licenses are valid only for Israel; separate licenses are required to distribute publications in areas in the occupied territories still under Israel's authority.  Sixteen daily newspapers are published in Israel.  There are about 90 weekly local newspapers and more than 250 periodical publications.

Directed by a government appointee, the quasi-independent Israel Broadcast Authority (IBA) controls television Channel 1 and Kol Israel (Voice of Israel) radio, both major sources of news and information.  The privately operated Channel 2, the country's first commercial television station, is operated by three franchise companies and supervised by the Second Television and Radio Authority, a public body that also supervises 14 private radio stations.  There are five cable television companies that carry both domestic and international networks.

The Government continued to attempt to close down the estimated 150 pirate radio stations operating out of Israel and the West Bank.

The Government respects academic freedom.

b.  Freedom of Peaceful Assembly and Association

The law provides for the right of assembly, and the Government generally respects this provision in practice.

During the year, there were a number of peaceful demonstrations against withdrawal from the Golan Heights and for and against peace negotiations with the Palestinians.

In early October, thousands of Arab citizens throughout the country participated in demonstrations.  In some cases demonstrators threw stones and Molotov cocktails.  The demonstrators were reacting to events in Jerusalem, the West Bank, and Gaza, as well as against government and police discrimination against Arab citizens (see Section 5).  Police killed 13 Arab citizens and injured over 300 others during demonstrations in several towns and villages in the north (see Sections 1.a. and 1.c.).  Human rights groups noted that the only fatalities and serious injuries occurred in the north and criticized the Northern Police Commander for authorizing the use of excessive force.

The law provides for the right of association, and the Government generally respects this provision in practice.  After the Hebron massacre in 1994, the Cabinet invoked the 1948 ordinance for the prevention of terror to ban the ultranationalist Kach and Kahane Chai organizations, a ban that remains in effect.  The decision provides for imprisonment for anyone belonging to, or expressing support for, either organization.

c.  Freedom of Religion

The law provides for freedom of religion, and the Government generally respects this right.  Approximately 80 percent of citizens are Jewish.  Muslims, Christians, Druze, and members of other religions make up the remaining 20 percent.  Each recognized religious community has legal authority over its members in matters of marriage and divorce.  Secular courts have primacy over questions of inheritance, but parties, by mutual agreement, may bring cases to religious courts.  Jewish and Druze families may ask for some family status matters, such as alimony and child custody in divorces, to be adjudicated in civil courts as an alternative to religious courts.  Christians only may ask that child custody and child support be adjudicated in civil courts as an alternative to religious courts.  Muslims have no recourse to civil courts in family-status matters.  Legislation passed in 1996 allows the rabbinical courts to sanction either party who is not willing to grant a divorce.

Many citizens object to the Orthodox Jewish religious authorities' exclusive control over Jewish marriage, divorce, and burial.  These authorities do not recognize marriages or conversions to Judaism performed in Israel by Conservative or Reform rabbis.  These issues have been a source of serious controversy within society, particularly in recent years, as thousands of Jewish immigrants from the former Soviet Union have brought with them family members not recognized as Jewish by Orthodox authorities.

Many Jews who wish to be married in secular or non-Orthodox religious ceremonies do so abroad.  The Ministry of Interior recognizes such marriages.

Under the Government's current interpretation and implementation of Jewish personal status law, a Jewish woman is not allowed to initiate divorce proceedings without her husband's consent; consequently there are hundreds of so-called "agunot" in the country who cannot remarry or have legitimate children because their husbands either have disappeared or refused to grant a divorce.

Israel (for information on occupied territories, see Occupied ...

In August Prime Minister Barak announced his plans to "separate religion from politics" by promoting a "civil-social revolution" consisting of a number of measures including: Drafting a constitution, folding the Ministry of Religious Affairs into the Ministry of Justice, lifting restrictions on transportation during the Sabbath, allowing for some form of civil marriages, eliminating the nationality clause from identification cards, and introducing a new core curriculum in all state-funded schools. These proposals triggered a national debate on religion and society. By year's end, none of these proposed reforms had been implemented.

A January 1999 High Court ruling enabled Reform and Conservative rabbis to hold seats on the powerful municipal and religious councils. In 1998 the High Court ruled that draft exemptions for yeshiva students was illegal; however, it delayed implementation of the ruling several times and gave the Knesset until December 21 to pass legislation on the matter. On December 20, an 11-justice panel of the High Court rejected the Government's request for another extension; however, it stated that it would grant the IDF a "reasonable period" of time in which to implement the ruling.

The Government provides proportionally greater financial support to institutions in the Jewish sector compared with those in the non-Jewish sector, i.e., Muslim, Christian, and Druze. For example, only 2.4 percent of the Ministry of Religious Affairs budget for 1999 was allocated to the non-Jewish sector, although Muslims, Christians, and Druze constitute 20 percent of the population. In 1998 the High Court of Justice ruled that the budget allocation constituted "prima facie discrimination" but that the plaintiff's petition did not provide adequate information about the religious needs of the various communities. The court refused to intervene in the budgetary process on the grounds that such action would invade the proper sphere of the legislature. However, during the year, the court ordered the Government to allocate resources equitably to cemeteries of the Jewish and Arab communities.

The status of a number of Christian organizations with representation in Israel heretofore has been defined by a collection of ad hoc arrangements with various government agencies. Several of these organizations seek to negotiate with the Government in an attempt to formalize their status.

Missionaries are allowed to proselytize, although the Church of Jesus Christ of Latter-Day Saints voluntarily refrains from doing so under an agreement with the Government. A 1977 anti-proselytizing law prohibits anyone from offering or receiving material benefits as an inducement to conversion; however, there have been no reports of its enforcement. On December 6, a law prohibiting some missionary activity and the dissemination of some missionary material passed a first reading in the Knesset.

Jehovah's Witnesses suffered verbal abuse, assaults, theft, and vandalism; however, they reported that the police response to their complaints improved significantly during the year.

The Government has recognized only Jewish holy places under the 1967 Protection of Holy Sites Law. The Government states that it also protects the holy sites of other faiths, and that it has provided funds for some holy sites of other faiths.

A group of more than 100 Orthodox, Conservative, and Reform women continued a long legal battle to hold women's prayer services at the Western Wall during the year. In May the High Court ruled that women may read from the Torah and wear prayer shawls at the Western Wall. Both legislators and the state prosecutor's office sought to overturn the ruling; however, they were not successful as of year's end.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The law provides for these rights, and the Government respects them in practice for citizens, except with regard to military or security zones or in instances where citizens may be confined by administrative order to their neighborhoods or villages. However, following the outbreak of violence in late September, the Government imposed some restrictions on the movement of persons within the country as well as between Israel, the West Bank and Gaza, and between cities inside the West Bank and Gaza (also see Section 2.d. of the annex). The Government continued to restrict the movements of two Jewish settlers living in the occupied territories who belonged to extremist Kach or Kahane Chai groups, through the use of administrative orders issued by the IDF central command (see Section 2.d. of the annex).

Citizens are free to travel abroad and to emigrate, provided they have no outstanding military obligations and are not restricted by administrative order. During the year, the Government generally continued to permit Muslim citizens to make the Hajj. However for security reasons, the Government imposes some restrictions on its

Israel (for information on occupied territories, see cover)

Muslim citizens who perform the Hajj, including requiring that they be over the age of 30. The Government does not allow persons to return if they leave the country without formal permission. The Government justifies these restrictions on the grounds that Saudi Arabia remains officially at war with Israel and that travel to Saudi Arabia therefore is considered subject to security considerations.

The Government states that non-Jewish female citizens who marry non-citizen men may retain their citizenship. The Government also asserts that the male spouses of non-Jewish citizens may acquire citizenship under the family reunification program, except in cases where the man has a criminal record or is suspected of posing a threat to security. However, Christian, Muslim, or Druze women who have married men from Arab states or the West Bank and Gaza have complained about losing their Israeli citizenship and right to reenter Israel.

During the demonstrations and disturbances in late September, police reportedly closed roads and entrances to some Arab villages and cities around the country. According to human rights groups, police also sometimes delayed ambulances and medical personnel from entering Arab villages to treat persons who were injured during the clashes (see Section 1.c.). Journalists complained about limitations placed on their freedom of movement during the violence in Israel and the occupied territories (see Section 2.a.).

The Government welcomes Jewish immigrants, their Jewish or non-Jewish family members, and Jewish refugees, on whom it confers automatic citizenship and residence rights under the Law of Return. This law does not apply to non-Jews or to persons of Jewish descent who have converted to another faith. Other than the Law of Return and the family reunification statutes there is no immigration law that provides for immigration to the country, or for political asylum or refugee status. The law does allow individuals to live in the country as permanent residents.

The Government cooperates with the office of the U.N. High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting refugees. The Government does not provide asylum to refugees from states with which the country remains in a state of war. The issue of first asylum did not arise during the year. There were no reports of the forced return of persons to a country where they feared persecution. Six Iraqis who had been held in detention found asylum in Europe during the year (see Section 1.d.).

Section 3  Respect for Political Rights: The Right of Citizens
    To Change Their Government

The law provides citizens with the right to change their government peacefully, and citizens exercise this right in practice through periodic, free, and fair elections held on the basis of universal suffrage for adult citizens. The last national elections were held in May 1999. On December 9, Ehud Barak resigned as Prime Minister; the next prime ministerial elections were scheduled to be held on February 6, 2001.

Israel is a parliamentary democracy with an active multiparty system in which a wide range of political views are represented. Relatively small parties, including those whose primary support is among Israeli Arabs, regularly win seats in the Knesset. Elections are by secret ballot.

There are no legal impediments to the participation of women and minorities in government; however, they are underrepresented. Women hold 15 of 120 Knesset seats, compared with 9 female members in the previous Knesset. There are 11 Arabs and 2 Druze in the Knesset; most represent parties that derive their support largely or entirely from the Arab community. Of the Knesset's 12 committees, 2 (including the Committee on the Status of Women) are chaired by a woman. There are two women in the Cabinet, but no Arab ministers. However, there is an Arab Deputy Foreign Minister. Four women, but no Arab or Druze citizens, serve on the 14-member High Court of Justice. During the year, the Government appointed an Arab to a 6-month term on the High Court; the Government did not renew his appointment at the end of his term.

Section 4  Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A wide variety of human rights groups operate without government restriction, investigating and publishing their findings on human rights cases. Government officials generally cooperate with investigations.

Section 5  Discrimination Based on Race, Sex, Religion, Disability, Language, or Social Status

The law prohibits discrimination on the basis of sex or marital status. The law also prohibits discrimination by both government and nongovernmental entities on the basis of race, religion, political beliefs, and age. Local

Israel (for information on occupied territories, see occupied territories...)

human rights groups are concerned that these laws often are not enforced, either as a result of institutionalized discrimination, or because resources for implementing those laws, or mechanisms for their enforcement, sometimes are lacking.

Women

Violence against women is a problem. There continued to be action, both in and out of Government, to reduce violence against women in Jewish and Arab communities. Funding to combat such violence increased significantly in 1998 and has remained level since. In 1998 the Government appointed a commission to address the subject of domestic violence; on the basis of the commission's recommendations, the Government allotted a supplementary budget allocation to combat domestic violence during the year. Groups that focus on domestic violence include a committee established by the Ministry of Labor and Social Affairs that includes Jewish and Arab NGO's as well as government representatives, and a coalition of human rights organizations; however, women's rights activists reported that most of the groups are funded privately. Twenty-three women were killed by their husbands or other male relatives during the year. According to one prominent women's group, between 150,000 and 200,000 women suffer from domestic violence each year, and some 7 percent of these are abused on a regular basis. According to women's organizations, approximately 2,800 women were assaulted sexually and approximately 1,200 were victims of incest during the year; about 44 percent of the women were under age 18. Only a small percentage of the victims complained to the police.

Arab human rights advocates also have formed a coalition to raise public awareness of so-called family "honor killings," a term commonly used for the murder of a female by a male relative for alleged misconduct. At least 5 of the 23 women killed during the year by male relatives were killed in family "honor" cases; families often attempt to cover up the cause of such deaths.

The Government provides partial funding for 12 shelters for battered women, including 1 exclusively for Arab women and 1 for ultra-Orthodox Jewish women. Women's rights advocates consider this number inadequate. The Government also provides funding for 13 rape crisis centers. There are 25 domestic violence prevention and treatment centers, which mainly are funded privately.

According to the 1991 Domestic Violence Law, a district or magistrate court may prohibit access by violent family members to their property. Women's groups cooperate with legal and social service institutions to provide women's rights education. While sentences handed down to men convicted of rape have increased in recent years, women's rights activists argue that the penalties are not sufficiently harsh.

Unlike in past years, there were no reports that Jewish religious extremists attacked physically women whom they considered to be dressed immodestly in public.

Prostitution per se is not illegal; however, the operation of brothels and organized sex enterprises is outlawed.

Trafficking in women has become a significant problem in recent years. According to recent studies, every year hundreds of women from the former Soviet Union are brought to Israel by well-organized criminal networks and forced to work illegally as prostitutes (see Section 6.f.).

In 1998 Israel adopted a comprehensive sexual harassment prevention law; since that time several prominent cases have increased public awareness of the issue. For example, in July the Government lifted the immunity of then Transportation Minister Yitzhak Mordecai following complaints that he had sexually harassed three women. As of July, the Civil Service Commission had received 55 complaints of sexual harassment in the Ministry of Defense.

Women's advocacy groups report that women routinely receive lower wages for comparable work, are promoted less often, and have fewer career opportunities than their male counterparts. Despite 1996 legislation that provides for class action suits and requires employers to provide equal pay for equal work, including important side benefits and allowances, women's rights advocates charged that deep gaps remained. For example, the wage gap between men and women for year-round, full-time employment is about 30 percent, and only 2 percent of women serve in positions of senior management in large companies. According to recent reports, 51 percent of doctoral students are women, but women compose only 23 percent of the senior faculty members at universities and only 9.5 percent of full professors.

Legislation in 1993, reinforced by a 1994 ruling of the High Court of Justice, has increased the percentage of women on the boards of government-owned companies. Women currently occupy 39 percent of director slots, up from 28.8 percent in 1997.

The adjudication of personal status law in the areas of marriage and divorce is left to religious courts, where

Israel (for information on occupied territories, see occupied...

Jewish and Muslim women are subject to restrictive interpretations of their rights (see Section 2.c.). Under personal status law, a Jewish woman is not allowed to initiate divorce proceedings without her husband's consent; consequently there are estimated to be thousands of so-called "agunot" who cannot remarry or have legitimate children because their husbands either have disappeared or have refused to grant a divorce.

The 1995 Rabbinical Courts Law allows rabbinical tribunals to impose sanctions on husbands who refuse to divorce wives who have ample grounds for divorce, such as abuse. However, in some cases rabbinical courts have failed to invoke these sanctions. In addition, there have been cases in which a wife has failed to agree to a divorce, but a husband has been allowed to remarry; this permission is not given to wives. Such imbalances have been used by husbands to extort concessions from their wives in return for agreeing to a divorce. Rabbinical courts also may exercise jurisdiction over and issue sanctions against non-Israeli persons present in Israel.

Religious law can be even more restrictive for Muslims: some Islamic law courts have held that Muslim women may not request a divorce, but that women may be forced to consent if a divorce is granted to a man.

Jewish women are subject to the military draft; however, they have been barred from combat positions. In 1997 the Knesset passed legislation that opens all military professions, including combat positions, to women; however, the legislation was not implemented by year's end. In response to a High Court of Justice ruling, the Israeli Air Force (IAF) since 1996 has permitted women to enter pilot training. At year's end, three women were operating as navigators in F-4's and F-16's and one woman was nearing completion of pilot training. Recent IAF rulings allow female flight surgeons to participate in combat rescue missions and permit women to serve as flight mechanics for combat helicopter patrols.

In March the Knesset passed the Equality of Women Law, which provides for equal rights for women in the workplace, the military, education, health, housing, and social welfare, and entitles women to protection from violence, sexual harassment, sexual exploitation, and trafficking (see Section 6.f.).

Children

The Government is committed to the rights and welfare of children. However, in practice resources sometimes are insufficient, particularly with respect to low-income families. Government spending is proportionally lower in predominantly Arab areas than in Jewish areas, which adversely affects children in Arab villages and cities. Education is compulsory to age 15, or until the child reaches the 10th grade, whichever comes first. Government ministries, children's rights groups, and members of the legislature often cooperate on children's rights issues. The Government provides an extensive health care program for children. There is a broad network of mother and child clinics, which provide prenatal care as well as postnatal follow-up.

The Government has legislated against sexual, physical, and psychological abuse of children and has mandated comprehensive reporting requirements. Although there has been a sharp increase in reported cases of child abuse in recent years, activists believe that this is largely due to increased awareness of the issue rather than a growing pattern of abuse. There are five shelters for children at risk. The Ministry of Justice formed a committee with police and NGO representatives that is attempting to assess the scope of child prostitution. Children's rights activists estimate that there may be several hundred prostitutes among the nation's children, and they warn that the phenomenon is unlikely to be eradicated until the social problems that give rise to it-- including child abuse and schools that give up too readily on dropouts--are addressed.

NGO's in the field of children's welfare concentrate their efforts on public education, on promoting the concept of children's rights as citizens, on improving legal representation for minors, and on combating the problems of poverty, which are most notable for the Bedouin children of the south. There has been concern about the children of the country's growing population of foreign workers, many of whom reside in the country illegally. Children of such families, believed to number in the thousands, exist in a legal and social limbo, without access to schools or adequate health services.

Privately funded children's rights information centers have been established in some communities, and the Government assists in funding additional centers in other cities.

People with Disabilities

The Government provides a range of benefits, including income maintenance, housing subsidies, and transportation support for disabled persons, who constitute about 10 percent of the population. Existing antidiscrimination laws do not prohibit discrimination based on disability, and these citizens continue to

Israel (for information on occupied territories, see occupied territories report)

encounter difficulties in areas such as employment and housing. A law requiring access for the disabled to public buildings is not widely enforced. There is no law providing for access to public transportation for the disabled. A 1996 law extended disability assistance for deaf children from the age of 14 to maturity. Extended protests by disabled organizations 1999 led to an increase in government spending in support of the disabled.

During the year, the Government implemented a law seeking to rehabilitate and integrate the mentally disabled into the community; however, government discrimination against the mentally disabled remained a problem. According to the Ministry of Health, there are between 60,000 to 80,000 mentally disabled persons in the country; however, only 4 percent of the Ministry of Health's $5 billion (20 billion NIS) budget is allocated for mental health services. Additionally, 80 percent of the mental health budget is allocated to psychiatric hospitals where less than 6,000 of the mentally disabled reside; the remaining tens of thousands of mentally disabled persons live on their own with little or no government support to help them integrate into the community.

Religious Minorities

Tensions between secular and religious elements of society continued to grow during the year. The non-Orthodox Jewish community in particular has complained of discrimination and intolerance (see Section 2.c.).

Evangelical Christians, Jehovah's Witnesses, and Reform and Conservative Jews complained of incidents of harassment, threats, and vandalism directed against their buildings, and other facilities, many of which were committed by two ultraorthodox groups Yad L'Achim and Lev L'Achim. In civic areas where religion is a determining criterion, such as the religious courts and centers of education, non-Jewish institutions routinely receive less state support than their Jewish counterparts.

During the demonstrations and disturbances in October, there were several incidents involving attacks on synagogues and mosques. In October Arab protesters attacked a synagogue in Shafar'am. Jewish protesters attacked mosques in Acco and Tiberias.

National/Racial/Ethnic Minorities

The Government does not provide Israeli Arabs, who constitute approximately 20 percent of the population, with the same quality of education, housing, employment, and social services as Jews. In addition, government spending is proportionally far lower in predominantly Arab areas than in Jewish areas; on a per capita basis, the Government spends two-thirds as much for Arabs than for Jews. According to the National Insurance Institute, 42 percent of Israeli Arabs live below the poverty line, compared with 20 percent of the total population. The Government also follows a disproportionately restrictive policy on issuing building permits to Arab citizens, resulting in the issuance of proportionately more building demolition orders against Arab-built structures. Ministers in the Barak Government publicly acknowledged the continuing disparities in government funding for Israel's non-Jewish citizens. Following the demonstrations and disturbances in September and October (see Sections 1.a. and 1.c.), the Government approved a $975 million (4 billion NIS) economic assistance plan for the country's Arab citizens to be phased in over 4 years. Most of the money included in the plan is allocated for education and new infrastructure development. Israeli Arab leaders and human rights groups criticized the plan because it was not based on a comprehensive survey of the economic and development needs of the country's Arab population and was considered inadequate to meet that population's needs. Critics also pointed out that only half of the total sum represented newly allocated money. The Government did not implement the plan by year's end, and according to newspaper reports, the Government's 2001 budget proposal did not include details about funding for the plan.

The Government appointed an Arab citizen to the board of the Israel land authority in November 1999. This marked the first representation of non-Jews on this body, half of whose members represent organizations forbidden by statute to transfer land to non-Jews. In March the High Court of Justice ruled on an October 1995 petition brought by an Arab couple that was barred from buying a home in Katzir, a Jewish municipality, which was built on state-owned land. The High Court ruled that the Government's use of the Jewish National Fund to develop public land was discriminatory, since the fund's by-laws prohibit the sale or lease of land to non-Jews. The High Court noted that its ruling in the case would not affect previous land allocations and that differentiating between Jews and non-Jews in land allocation might be acceptable under unspecified "special circumstances." Following the High Court's decision, the Government established an interministerial committee to examine the issues involved in implementing the decision. The Israel Lands Administration had not implemented the ruling in this case by year's end and the Ka'adan family still was not allocated a plot of land in Katzir. Israeli Arab organizations have challenged the 1996 "Master Plan for the Northern Areas of Israel," which listed as priority goals increasing the Galilee's Jewish population and blocking the territorial contiguity of Arab villages and towns, on the grounds that it discriminates against Arab citizens; the Government continues to use this document for planning in the Galilee.

Relative to their numbers, Israeli Arabs are underrepresented in the student bodies and faculties of most universities and in higher level professional and business ranks. Arabs constitute only 8.7 percent of the students at major universities in the country. Well-educated Arabs often are unable to find jobs commensurate with their level of education. Arab citizens hold only 50 of the country's 5,000 university faculty positions. The Government states that it is committed to granting equal and fair conditions to Israeli Arabs, particularly in the areas of education, housing, and employment. A small number of Israeli Arabs have risen to responsible positions in the civil service, generally in the Arab departments of government ministries. In 1994 a civil service commission began a 3-year affirmative action program to expand that number, but it has had only modest results. Arab citizens compose 6.2 percent of the civil service and less than 2 percent of the positions in the four senior-most civil service grades. In October the Knesset passed a bill that minorities and underrepresented populations must be granted "appropriate representation" in the civil service, and on the boards of government corporations.

In practice, few Israeli Arabs serve in the military or work in companies with defense contracts or in security-related fields. The Israeli Druze and Circassian communities are subject to the military draft, and although some have refused to serve, the overwhelming majority accepts service willingly. Some Bedouin and other Arab citizens who are not subject to the draft serve voluntarily. Those who do not serve in the army have less access than other citizens to those social and economic benefits for which military service is a prerequisite or an advantage, such as housing, new-household subsidies, and government or security-related industrial employment. Under a 1994 government policy decision, the social security child allowance for parents who did not serve in the military and did not attend a yeshiva (including Arabs) was increased to equal the allowance of those who had done so.

Israeli Arab groups allege that many employers use the prerequisite of military service to avoid hiring non-Jews. For example, a September 1999 survey revealed that 40 percent of employment ads in one weekend newspaper listed "army service necessary." Jobs included ice cream sales, typist, bus driver, and customer service.

There are approximately 130,000 Bedouin in the Negev; of this number about half live in 7 state planned communities and the other half live in 45 settlements that are not recognized by the Government. The recognized Bedouin villages receive basic services from the Government; however, they are among the poorest communities in the country. The unrecognized villages were declared illegal by the National Planning and Building Law of 1965 when the lands on which they sit were rezoned as nonresidential and the Government claimed ownership. According to the Government, recognizing these villages would conflict with its attempts to establish new villages in "an orderly manner, and would leave disputes over the land unresolved." Residents of the unrecognized villages pay taxes to the Government; however, they are not eligible for government services. Consequently, such villages have none of the infrastructure, such as electricity, water, and sewers, provided to recognized communities. The lack of basic services has caused difficulties for the villagers in regard to their education, health care, and employment opportunities. New building in the unrecognized villages is considered illegal and subject to demolition. Private efforts have supplied some unrecognized villages with water, and the courts have ordered the provision of limited health and education services. The Government has yet to fulfill its commitment to resolve the legal status of unrecognized Arab villages. Eight villages have been recognized officially since 1994, but nearly 100 more, of varying size and with a total population of nearly 70,000 persons, remain in limbo. Of the eight villages that have been recognized, the Government has yet to actually implement the decisions. In 1998 the High Court of Justice ordered the Ministry of Education to provide electricity to schools in several unrecognized villages in the Negev. In March 1999, the High Court ordered the Ministry of Health to provide within 2 months six permanent health clinics to serve the unrecognized villages; however, the clinics had not been built by year's end. In November the High Court ruled that the Government must build a school for the children in the unrecognized village of Beer Hadaj within 4 months. During the year, the Ministry of Interior and the Attorney General declared that residents of Husseinya, an unrecognized village, could list their village's name as their place of residence on their identification cards.

Arab children make up about a quarter of the public school population, but Government resources for them are less than proportionate to those for Jewish children. Many schools in Arab communities are dilapidated and overcrowded, lack special education services and counselors, have poor libraries, and have no sports facilities. According to a report issued during the year, only 54 percent of Arab students finish high school compared with 89 percent of Jewish students. According to 1998 statistics, 58 percent of the teachers in Jewish schools had university degrees compared with 39 percent of the teachers in Arab schools. The disparity in government resources for education also affects Bedouin children from the unrecognized villages. Currently, preschool attendance for Bedouin children is the lowest in the country, and the dropout rate for Bedouin high school students is the highest. Arab groups also note that the public school curriculum stresses Israel's Jewish culture and heritage.

Israeli Arab students also are not eligible to participate in a special education program to provide academic

Israel (for information on occupied territories, see occupied territories report.)

assistance to students from disadvantaged backgrounds.  A petition was filed with the High Court of Justice in May 1997 charging that the Ministry of Education's refusal to provide this program to Israeli Arab students was discriminatory.  The Attorney General's office agreed that the policy constituted impermissible discrimination but asked for 5 years to expand the program to Israeli Arab students.  The petitioners rejected this proposal as being too slow.  The court held hearings in the case twice in 1999; however, it still had not ruled on the proper implementation period by year's end.

Unresolved problems of many years' standing also include claims by Arab groups that land expropriation for public use has affected the Arab community disproportionately; that Arabs have been allowed too little input in planning decisions that affect their schools and municipalities; that mosques and cemeteries belonging to the Islamic Waqf (religious endowment) have been neglected or expropriated unjustly for public use; and that successive governments have blocked the return to their homes of citizens displaced in the early years of the country's history.  The Government has yet to agree with the pre-1948 residents of the northern villages of Bir Am and Ikrit, and their descendants, regarding their long-term demand to be allowed to rebuild their houses.  In 1997 a special interministerial panel recommended that the Government allow the villagers to return to Bir Am and Ikrit.  The High Court has granted the Government several extensions for implementing the recommendation, including 2 extensions during the year.  The Government stated that a special interministerial panel currently is examining economic aspects of the issue.

In early October, there were many instances of societal violence between Arab and Jewish citizens which coincided with violent events in Israel and the occupied territories (see Sections 1.a., 1.c., and the annex).  For example, on October 3, an Israeli Arab shot and killed an Israeli Jew on a road in the north of the country.  On October 7, a group of about 200 Israeli Jews attacked Arab Israeli homes in predominantly Jewish Upper Nazareth.  On October 8, a group of about 1,000 Israeli Jews attacked Arab Israeli homes in Nazareth.  Two persons were killed and approximately 50 persons were injured in these attacks (see Sections 1.a. and 1.c.).  Jewish citizens also attacked Arab homes, businesses that employed Arabs, and two mosques in other areas of the country.  During the October disturbances, Arab protesters also attacked Jewish-owned businesses throughout the country, and in at least one case Arab crowds attacked a synagogue.

In 1991 the Government launched Operation Solomon, which airlifted 14,000 Ethiopian immigrants to the country.  There were occasional reports of societal discrimination during the year.

Section 6    Worker Rights

a.    The Right of Association

Workers may join and establish labor organizations freely.  Most unions belong to Histadrut (the General Federation of Labor in Israel), or to a much smaller rival federation, the Histadrut Haovdim Haleumit (National Federation of Labor).  These organizations are independent of the Government.  Histadrut members democratically elect national and local officers, and officials of its affiliated women's organization Na'amat, from political party lists of those already in the union.  Plant or enterprise committee members are elected individually.  About 650,000 workers are members of Histadrut, and much of the non-Histadrut work force is covered by Histadrut's collective bargaining agreements.

The right to strike is exercised regularly.  Unions must provide 15 days' notice prior to a strike unless otherwise specified in the collective bargaining agreement.  However, unauthorized strikes occur.  Strike leaders--even those organizing illegal strikes--are protected by law.  If essential public services are affected, the Government may appeal to labor courts for
back-to-work orders while the parties continue negotiations.  There were a number of strikes in both the public and private sectors during the year by employees protesting the effects of privatization.  Worker dismissals and the terms of severance arrangements often were the central issues of dispute.

Palestinians from the West Bank and Gaza Strip who worked in Israel were not able to join Israeli trade unions or organize their own unions in Israel.  Palestinian trade unions in the occupied territories are not permitted to conduct activities in Israel (see Section 6.a. of the annex).  However, nonresident workers in the organized sector are entitled to the protection of Histadrut work contracts and grievance procedures.  They may join, vote for, and be elected to shop-level workers' committees if their numbers in individual establishments exceed a minimum threshold.  Palestinian participation in such committees is minimal.

Labor laws apply to Palestinians in East Jerusalem and to the Syrian Druze living on the Golan Heights.

Unions are free to affiliate with international organizations.

b. The Right to Organize and Bargain Collectively

Citizen workers fully exercise their legal rights to organize and bargain collectively. While there is no law specifically prohibiting antiunion discrimination, the law against discrimination could be cited to contest discrimination based on union membership. No antiunion discrimination has been reported.

Nonresident workers may not organize their own unions or engage in collective bargaining, but they are entitled to be represented by the bargaining agent and protected by collective bargaining agreements. They do not pay union membership fees, but are required to pay a 1 percent agency fee, which entitles them to union protection by Histadrut's collective bargaining agreements. The Ministry of Labor may extend collective bargaining agreements to nonunionized workplaces in the same industrial sector. The Ministry of Labor also oversees personal contracts in the unorganized sectors of the economy.

There are no export processing zones.

c.    Prohibition of Forced or Compulsory

The law prohibits forced or compulsory labor, specifically including child forced labor, and neither citizens nor nonresident Palestinians working in Israel are generally subject to this practice; however, women are trafficked for the purpose of prostitution (see Section 6.f.). Civil rights groups charge that unscrupulous employers often take advantage of illegal workers' lack of status to hold them in conditions amounting to involuntary servitude (see Section 6.e.).

d.  Status of Child Labor Practices and Minimum Age for
  Employment

Children who have attained the age of 15 years, and who are liable to compulsory education under the compulsory education law, may not be employed unless they work as apprentices under the Apprenticeship Law. Notwithstanding these provisions, children who are 14 years old may be employed during official school holidays. Employment of those 16 to 18 years of age is restricted to ensure time for rest and education.

There are no reliable data on illegal child workers. They are concentrated among the country's Arab population and its most recent Jewish immigrants. Illegal employment is found primarily in urban, light-industrial areas. Children's rights groups have called for more vigorous enforcement of child labor laws, combined with a parallel effort to deal with the causes of illegal child labor. The Government specifically prohibits forced child labor, and it generally does not occur.

e.  Acceptable Conditions of Work

Legislation in 1987 established a minimum wage at 45 percent of the average wage, calculated periodically and adjusted for cost of living increases. At year's end, the minimum wage was about $700 (2,800 NIS) per month. The minimum wage often is supplemented by special allowances and generally is sufficient to provide a worker and family with a decent standard of living. Union officials have expressed concern over enforcement of minimum wage regulations, particularly with respect to employers of illegal nonresident workers, who sometimes pay less than the minimum wage.

By law the maximum hours of work at regular pay are 47 hours a week, 8 hours per day, and 7 hours on the day before the weekly rest, which must be at least 36 consecutive hours and include the Sabbath. By national collective agreements, the private sector established a maximum 45-hour workweek in 1988. The public sector moved to a 5-day, 42-plus hour workweek in 1989, while the military adopted it in 1993.

Employers must receive a government permit to hire nonresident workers from the occupied territories, certifying that no citizen is available for the job. All Palestinians from the occupied territories are employed on a daily basis and, unless they are employed on shift work, are not authorized to spend the night in Israel. The Government has in the past considered, but not acted on, a change in this provision to allow Palestinian workers to remain overnight for a week at a time. Palestinians without valid work permits are subject to arrest. Due to security concerns, the Government stopped issuing permits for Palestinian workers following the outbreak of violence in October.

Nonresident workers are paid through the employment service of the Ministry of Labor, which disburses wages

Israel (for information on occupied territories, see occupied territories report)

and benefits collected from employers. The Ministry deducts a 1 percent union fee and the workers' required contributions to the National Insurance Institute (NII), the agency that administers the Israeli social security system, unemployment benefits, and other benefits. Despite these deductions, Palestinian workers are not eligible for all NII benefits. They continue to be insured for injuries occurring in Israel and the bankruptcy of a worker's employer. They do not have access to unemployment insurance, general disability payments, low-income supplements, or child allotments. By contrast, Israeli settlers in the occupied territories who work in Israel have the same benefits as other Israeli workers. The International Labor Organization (ILO) has long criticized this inequality in entitlements. Since 1993 the Government has agreed to transfer the NII fees collected from Palestinian workers to the Palestinian Authority, which is to assume responsibility for all the pensions and social benefits of Palestinians working in Israel.

There was increased public debate over the role in the workplace and society of foreign workers, who are estimated to number at least 180,000, perhaps half of them undocumented and employed illegally. The majority of such workers come from Eastern Europe and Southeast Asia, and most are employed in the construction and agricultural sectors. The law does not allow such workers citizenship or permanent residence. As a result, they and their families live in a legal and social limbo. Government deportations of such workers take place without benefit of due process. In August press reports stated that the Government ordered an increase in deportations of undocumented foreign workers; however, the deportations were not carried out. Human rights groups argue that since foreign worker residency permits are tied to specific employment, workers have little leverage to influence their work conditions. In May the Ministry of Interior acknowledged that it had prevented labor organizations from distributing pamphlets on labor rights to foreign workers who arrived at the airport. Following the outbreak of violence in September, the Government implemented a closure policy, which prevented thousands of Palestinians from getting to their jobs in Israel (see Section 2.d.). On December 17, in response to pressure for additional workers from the construction and agricultural sectors, the Government announced that it would grant temporary permits to several thousand additional foreign workers.

Along with union representatives, the Labor Inspection Service enforces labor, health, and safety standards in the workplace, although resource constraints affect overall enforcement. Legislation protects the employment rights of safety delegates elected or appointed by the workers. In cooperation with management, these delegates are responsible for safety and health in the workplace.

Workers do not have the legal right to remove themselves from dangerous work situations without jeopardy to continued employment. However, collective bargaining agreements provide some workers with recourse through the work site labor committee. Any worker may challenge unsafe work practices through government oversight and legal agencies.

f.  Trafficking in Persons

Trafficking in women for the purpose of prostitution is a continuing problem. According to Amnesty International (AI), every year hundreds of women from the former Soviet Union are brought to Israel by well-organized criminal networks and forced through violence and threats to work illegally as prostitutes. According to some local NGO's, thousands of women are trafficked into the country annually.

In June the Government enacted a law that prohibits the trafficking of persons for the purpose of prostitution. Prostitution per se is not illegal; however, the operation of brothels and organized sex enterprises is outlawed, as are many of the human rights abuses perpetrated by traffickers and pimps, such as assault, rape, abduction, and false imprisonment. Section 201 of the Penal Code stipulates that it is a criminal offense, punishable by between 5 and 7 years' imprisonment, to force or coerce a person to engage in prostitution. Section 202(b) of the Penal Code makes it a criminal offense to induce a woman to leave Israel with the intent to "practice prostitution abroad." In March the Knesset passed the Equality of Women Law (see Section 5); Section 6(b) of the law stipulates that every woman is entitled to protection from violence, sexual harassment, sexual exploitation, and trafficking.

Traffickers reportedly often lure women into coming to the country by offering them jobs in the service industry. In many cases, traffickers meet women at the airport and confiscate all of their official documents. Many trafficked women are forced to live and work under extremely harsh conditions and to give most of the money they earn to their bosses. The women reportedly often are raped and beaten, and often are afraid to report their situation to the police because they are in the country illegally.

According to press reports, brothels are ubiquitous despite being illegal, and police officials estimate that there are 25,000 paid sexual transactions every day. Police often detain trafficked women following raids on brothels. The Minister of Interior has broad powers to deport illegal aliens and to hold them in detention pending deportation. The Ministry may issue deportation orders against any person who is in the country without a

residence permit and may hold the deportee in detention following the issuance of a deportation order. The deportee can appeal the deportation order to the Ministry within 3 days of its issuance and also can challenge the order in the High Court. However, trafficked women often do not challenge a deportation order due to language barriers or a lack of information about the appeals procedure. Many trafficked women are detained for extended periods of time because of government orders that they stay in the country to testify in the criminal proceedings against their traffickers. Many women are reluctant or afraid to testify in trials due to threats and intimidation by their traffickers. According to AI, women refuse to testify in court in about 90 percent of all the cases that are prosecuted. Since 1997 police have arrested and deported approximately 1,200 women who were trafficked to the country for prostitution. According to AI, the Government does not attempt to determine whether or not a trafficked woman would be at risk for persecution if she is deported to her country of origin, even in cases in which the woman or girl has testified in criminal proceedings.

1/ The human rights situation in the occupied territories is discussed in the annex appended to this report.

[End.]

Occupied territories (for information on Israel, see Israel...



## U.S. DEPARTMENT OF STATE

Home | Contact Us | FOIA | Privacy Notice | Archive | Search

About the State Department | Press & Public Affairs | Travel & Living Abroad
Countries & Regions | International Topics & Issues | History, Education & Culture
Business Center | Other Services | Employment



### Occupied territories (for information on Israel, see Israel report)

### Country Reports on Human Rights Practices -2000
**Released by the Bureau of Democracy, Human Rights, and Labor**
**February 2001**

The Occupied Territories (Including Areas Subject To The Jurisdiction Of The Palestinian Authority)

Israel occupied the West Bank, Gaza Strip, Golan Heights, and East Jerusalem during the 1967 War. The West Bank and Gaza Strip are now administered to varying extents by Israel and the Palestinian Authority (PA). Pursuant to the May 1994 Gaza-Jericho Agreement and the September 1995 Interim Agreement, Israel transferred most responsibilities for civil government in the Gaza Strip and parts of the West Bank to the PA while retaining responsibility for external security; foreign relations; the overall security of Israelis, including public order in the Israeli settlements; and certain other matters.

An historic process of reconciliation between Israel and the Palestinians began with the Madrid Conference in 1991 and continued with the September 1993 signing of the Israeli-Palestinian Declaration of Principles (DOP). In September 1995, Israel and the Palestine Liberation Organization (PLO) signed the Interim Agreement on the West Bank and the Gaza Strip. In January 1997, the parties concluded the Hebron Agreement and in October 1998, Israel and the PLO signed the Wye River Memorandum. In September 1999, the Israeli Government and the PLO signed the Sharm el-Sheikh Memorandum. The parties held intensive working-level talks between March and June and met at Camp David in July; however, the Israeli Government and the PLO did not reach an agreement. On September 28, Israeli opposition leader Ariel Sharon visited the Temple Mount (Haram al-Sharif) in Jerusalem. On September 29, Palestinians held large demonstrations and threw stones at police in the vicinity of the Western Wall. Police used rubber-coated metal bullets and live ammunition to disperse the demonstrators, killing 4 persons and injuring approximately 200. Following this incident, Palestinians began violent demonstrations against IDF soldiers, settlers, and other Israeli civilians throughout the occupied territories; these demonstrations and ensuing clashes--known to Palestinians and many Israelis as the "al-Aqsa Intifada"--between Palestinians and IDF soldiers occurred daily through the end of the year.

Israel and the Palestinian Authority have varying degrees of control and jurisdiction over the Gaza Strip and the West Bank. Israel continues to control certain civil functions and is responsible for all security in portions of the occupied territories categorized as Area C, which includes the Israeli settlements and 4 percent of the total West Bank Palestinian population. In areas known as Area B, which includes 41 percent of the West Bank Palestinian population, the PA has jurisdiction over civil affairs and shares security responsibilities with Israel. The PA has control over civil affairs and security in Area A, which includes 55 percent of the West Bank Palestinian population. The PA also has jurisdiction over some civil affairs in Area C, as specified in the Interim Agreement. Accordingly, this report discusses the policies and practices of both the Israeli Government and the PA in the areas in which they exercise jurisdiction and control.

Israel continues to exercise civil authority in parts of the West Bank and Gaza through the Israeli Ministry of Defense's Office of Coordination and Liaison, known by the Hebrew acronym MATAK, which replaced the now defunct Civil Administration (CIVAD) in 1995. The approximately 175,000 Israeli settlers living in Area C of the West Bank and in the Gaza Strip are subject to Israeli law and, as citizens, receive preferential treatment from Israeli authorities in terms of protection of personal and property rights and of legal redress. The body of law governing Palestinians in the territories derives from Ottoman, British Mandate, Jordanian, and Egyptian law, and Israeli military orders. Certain laws and regulations promulgated by the PA also are in force. The

international community considers Israel's authority in the occupied territories to be subject to the Hague Regulations of 1907 and the 1949 Geneva Convention relating to the Protection of Civilians in Time of War. The Israeli Government considers the Hague Regulations applicable and states that it observes the Geneva Convention's humanitarian provisions.

In January 1996, Palestinians chose their first popularly elected Government in democratic elections that generally were well-conducted; the 88-member Palestinian Council (PC) and the Chairman of the Executive Authority were elected. The PA also has a cabinet of 30 ministers. Chairman Yasir Arafat continues to dominate the affairs of government and to make major decisions. Most senior government positions in the PA are held by individuals who are members of, or loyal to, Arafat's Fatah faction of the PLO. The Council meets regularly and discusses a range of issues significant to the Palestinian people; however, it does not have significant influence on policy or the behavior of the executive. In Gaza the legal code derives from British Mandate law, Egyptian law, and PA directives and laws. In the West Bank, pre-1967 Jordanian law and PA laws apply. The PA states that it is undertaking efforts to unify the Gaza and West Bank legal codes; however, it has made little progress to date. The PA courts are perceived as inefficient and the PA executive and security services frequently ignore or fail to carry out court decisions.

Israeli security forces in the West Bank and Gaza Strip consist of the Israeli Defense Forces (IDF); the Israel Security Agency (the ISA—formerly the General Security Service, or GSS, and also known as Shin Bet, or Shabak); the Israeli National Police (INP); and the paramilitary border police. Israeli military courts try Palestinians accused of committing security crimes in Israeli-controlled areas. Members of the Israeli security forces committed numerous serious human rights abuses, particularly following the outbreak of violence in late September.

The Palestinian Police Force (PPF) was established in May 1994 and includes the Palestinian Public Security Force; the Palestinian Civil Police; the Preventive Security Force (PSF); the General Intelligence Service, or Mukhabarat; the Palestinian Presidential Security Force; and the Palestinian Coastal Police. Other quasi-military security organizations, such as the military intelligence organization, also exercise de facto law enforcement powers. Palestinian police are responsible for security and law enforcement for Palestinians and other non-Israelis in PA-controlled areas of the West Bank and Gaza Strip. Israeli settlers in the occupied territories are not subject to PA security force jurisdiction. Members of the PA security forces committed numerous serious human rights abuses throughout the year.

The economy of the West Bank and Gaza Strip is small, poorly developed, and highly dependent on Israel. The economy relies primarily on agriculture, services, and, to a lesser extent, light manufacturing. Especially during periods of tension, Israel restricts the movement of persons and products into Israel and Jerusalem from the West Bank and Gaza, which frequently affects the ability of Palestinians to reach their jobs in Israel. Since 1993 Israel has required Palestinians and their vehicles to have Israeli permits to cross from the West Bank or Gaza into Israel and Jerusalem. Approximately 125,000 West Bank and Gazan workers, representing roughly 20 percent of the Palestinian work force, normally are employed at day jobs in Israel, Israeli settlements, and Jerusalem, making their employment subject to disruption. Since 1993 Israel has applied closures," or enhanced restrictions, on the movement of persons and products, often for lengthy periods, in response to terrorist attacks or other changes in the security environment. During periods of violent protest in the West Bank or Gaza, or when it believes that there is an increased likelihood of such unrest or of terrorist attacks, Israel imposes a tightened version of closure. Comprehensive, tightened closures also are instituted regularly during major Israeli holidays. During such closures, Israel cancels all travel permits and prevents Palestinians--even those with valid work permits--from entering Israel or Jerusalem. Due to the ongoing unrest in the occupied territories, Israel imposed 88 days of tightened, comprehensive closure during the year, compared with 15 days in 1999. In periods of extreme unrest in the West Bank and Gaza, the Israeli Government also prohibits most travel between towns and villages within the West Bank--an "internal" closure--impeding the flow of goods and persons. During such internal closures, the Government also bans travel on the safe passage route between the West Bank and Gaza. Israel imposed at least 81 days of internal closure during the year, compared with no days of internal closure in 1999. In the past, Israel rarely imposed internal closure within Gaza; however, during much of November and December the Israeli Government imposed internal closure in Gaza. The prolonged periods of closure had a significant impact on the economy of the West Bank and Gaza.

Israel's overall human rights record in the occupied territories was poor; although the situation improved slightly during the first 9 months of the year, it worsened in several areas late in the year, mainly due to the sustained violence that began in September. Israeli security forces committed numerous serious human rights abuses during the year. Security forces killed 307 Palestinians and four foreign nationals and injured at least 11,300 Palestinians and other persons during the year. Israeli security forces targeted for killing a number of Palestinians whom the Israeli Government stated had attacked or were planning future attacks on Israeli settlements or military targets; a number of bystanders reportedly also were killed during these incidents. Since the violence began, Israeli security units often used excessive force against Palestinian demonstrators. Israeli

security forces sometimes exceeded their rules of engagement, which provide that live fire is only to be used when the lives of soldiers, police, or civilians are in imminent danger. IDF forces also shelled PA institutions and Palestinian civilian areas in response to individual Palestinian attacks on Israeli civilians or settlers; 7 Palestinians and 1 foreign national were killed, and 131 Palestinians were injured in these attacks. Israeli security forces abused Palestinians in detention suspected of security offenses. However, a September 1999 landmark decision by the Israeli High Court of Justice prohibited the use of a variety of abusive practices, including violent shaking, painful shackling in contorted positions, and prolonged exposure to extreme temperatures. Since the September 1999 ruling, domestic and international nongovernmental organizations (NGO's) have been unable to substantiate sporadic allegations that security forces tortured detainees. There were numerous credible allegations that police beat persons in detention. Three Palestinian prisoners died in Israeli custody under ambiguous circumstances during the year. Prison conditions are poor. Prolonged detention, limits on due process, and infringements on privacy rights remained problems. Israeli security forces sometimes impeded the provision of medical assistance to Palestinian civilians. Israeli security forces destroyed Palestinian-owned agricultural land. Israeli authorities censored Palestinian publications, placed limits on freedom of assembly, and restricted freedom of movement for Palestinians.

The PA's overall human rights record was poor, and it worsened in several areas during the year mainly due to the sustained violence that began in late September. Palestinian security forces reportedly killed several Israeli security force members during violent clashes with Israeli soldiers or settlers. Members of Palestinian security services and Fatah's Tanzim participated in violent attacks. Armed Palestinians, some of them members of Palestinian security forces, fired at Israeli civilians or soldiers from within or close to the homes of Palestinian civilians; residents of the homes consequently bore the brunt of IDF retaliation for these attacks. Palestinian security forces also failed to prevent armed Palestinians from opening fire on Israelis in places in which Palestinians were present. The extent to which senior PLO or PA officials authorized such incidents is not clear. Palestinian security forces in October reportedly impeded the provision of medical assistance to an injured Israeli border policeman, who later died.

One Palestinian died in PA custody under ambiguous circumstances. PA prison conditions are very poor. PA security forces arbitrarily arrest and detain persons, and prolonged detention is a problem. Lack of due process also is a problem. The courts are perceived as inefficient, lack staff and resources, and do not ensure fair and expeditious trials. The PA executive and security services frequently ignore or fail to enforce court decisions. Lack of due process also is a serious problem in the PA's state security courts. PA security forces infringed on citizens' rights to privacy and restricted freedom of speech and of the press. The PA continued to harass, detain, and abuse journalists. PA harassment contributed to the practice of self-censorship by many Palestinian commentators, reporters, and critics. The PA placed some limits on freedom of assembly and association. In February the PA police announced a ban on unlicensed public gatherings, but this action was invalidated by the Palestinian High Court 2 months later. Violence against women and "honor killings" persist. Societal discrimination against women and the disabled is a problem. Child labor is a problem.

Israeli civilians, especially settlers, harassed, attacked, and occasionally killed Palestinians in the occupied territories. There were credible reports that settlers killed at least 14 Palestinians during the year. In one case, an Israeli civilian killed a Palestinian who previously had attacked a settlement and killed an IDF soldier. Settlers also caused economic damage to Palestinians by attacking and damaging greenhouses and agricultural equipment, uprooting olive trees, and damaging other valuable crops. The settlers did not act under government orders in the attacks; however, the Israeli Government did not prosecute the settlers for their acts of violence. In general settlers rarely serve prison sentences if convicted of a crime against Palestinians.

Palestinian civilians in the occupied territories harassed, attacked, and occasionally killed Israelis, especially settlers. Palestinians killed at least 18 Israeli civilians during the year. A number of extremist Palestinian groups and individuals, including the militant Islamic Resistance Movement (HAMAS) and the Palestine Islamic Jihad (PIJ), continued to kill and injure Israelis. Five attacks and roadside bombings were carried out in Israel and the occupied territories. The PA made no arrests in any of these killings.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including
      Freedom From:

a. Political and Other Extrajudicial Killing

Israeli security forces killed numerous Palestinians in response to a sustained violent uprising late in the year. Most of the Palestinians were killed during demonstrations and other violent clashes, and others were targeted specifically by Israeli security forces.

In May Israeli security forces killed six Palestinians and wounded up to 700 at demonstrations in which Palestinian demonstrators were protesting the continued incarceration of Palestinian prisoners in Israeli jails. Some protesters threw stones and Molotov cocktails, and some demonstrators shot at Israeli settlers (see Section 1.c.).

Deaths due to political violence increased significantly during the year due to the "al-Aqsa Intifada." At least 365 persons were killed between late September and the end of December in demonstrations, violent clashes, and military and civilian attacks, including 325 Palestinians, 36 Israelis, 3 Jordanian citizens, and 1 German citizen. Additionally, at least 10,962 persons were injured during this period, including 10,600 Palestinians and 362 Israelis (see Sections 1.c. and 1.g.). On September 28, Israeli opposition leader Ariel Sharon visited the Temple Mount (Haram al-Sharif) in Jerusalem. On September 29, Palestinians held large demonstrations and threw stones at police in the vicinity of the Western Wall. Police used rubber-coated metal bullets and live ammunition to disperse the demonstrators, killing 4 persons and injuring approximately 200. Following this incident, Palestinians began violent demonstrations against IDF soldiers, settlers, and other Israeli civilians throughout the occupied territories; these demonstrations and ensuing clashes between Palestinians and IDF soldiers occurred daily through the end of the year.

Between late September and the end of the year, Israeli security forces killed 227 Palestinians and 4 foreign nationals, and injured over 10,600 Palestinians during violent demonstrations. Palestinian demonstrators frequently threw stones and Molotov cocktails at IDF soldiers. In some demonstrations, Palestinians also used firearms. According to the IDF, Palestinians used firearms in about 30 percent of the demonstrations between late September and mid-November. In response, Israeli security forces used a variety of means to disperse demonstrators, including tear gas, rubber-coated metal bullets, and live ammunition. In many instances, Israeli security forces used excessive force against demonstrators in contravention of their official rules of engagement (see Section 1.g.).

Israeli Defense Force soldiers targeted for killing a number of Palestinians during the year. A senior Israeli official stated to the domestic press that the IDF deliberately targeted 10 Palestinians since the beginning of the "al-Aqsa Intifada." According to the IDF, the targeted persons were PA security officers or Fatah's Tanzim who previously had attacked or were planning future attacks on Israeli settlements or military targets. The Israeli Government stated that it only targeted persons against whom it had overwhelming evidence and only with the authorization of senior political leaders. PA officials and some human rights organizations claimed that a number of the targeted persons were not involved in the ongoing violence. IDF forces also killed 6 Palestinian bystanders and injured over a dozen others during these incidents (see Section 1.c.).

On November 9, Israeli helicopters fired rockets at a car in Beit Sahour, killing Hussein Mohamed Salim Ubayyat, a Fatah official. Two Palestinian women walking on the road nearby were killed and seven other civilian bystanders were injured in the attack (see Section 1.c.). An IDF spokesman later announced that Ubayyat had been targeted because of his prior involvement in a number of attacks against Israeli military and civilian targets.

On December 31, IDF soldiers killed Dr. Thabet Ahmad Thabet, a high-ranking member of Fatah, while he was in his car near his home.

There also were a number of instances in which was unclear whether Israeli security forces targeted their victims. On November 17, IDF soldiers killed two Palestinian National Security Forces officers in Jericho. The IDF stated that the officers were part of a terrorist cell that previously had attacked IDF positions and some settlements. The PA stated that the two officers were killed while on duty and working to prevent Palestinian gunmen at a nearby refugee camp from shooting at Israeli positions.

On November 22, IDF forces fired at 2 cars in Gaza, killing a senior Tanzim member, Jamal Abdel Raziq, and 3 other Tanzim members. The Israeli press reported that the 4 were terrorists who were attempting to infiltrate the Morag settlement and that security forces fired at the 2 cars when the drivers refused to stop at a road blockade. According to press reports, Israeli security sources later stated that the incident was an "IDF-initiated operation" against Raziq, who reportedly had been involved in attacks on Israelis in Gaza.

On November 23, HAMAS member Ibrahim Abdel Karim Bani was killed when a bomb exploded in the borrowed car he was driving. Israeli security officials stated to the press that Bani Odeh was transporting explosives to carry out a terrorist attack that detonated prematurely. However, according to the PA and the Palestinian press, Bani Odeh was on a list of 10 Palestinians that the IDF planned to target for killing. PA security forces arrested Bani Odeh's cousin, who reportedly confessed to having provided information to the IDF about Odeh's

whereabouts on the day he was killed.

On November 26, IDF soldiers fired on nine Palestinian youths, killing five and injuring two. The Israeli press reported that the IDF refused an International Committee of the Red Cross (ICRC) request to allow medical personnel access to the injured. Palestinian sources stated that the IDF subsequently fired on the injured persons with helicopter gunships. On November 27, Israeli radio, citing IDF sources, described the incident as a "proactive" IDF-initiated action that targeted known terrorists who had participated in previous attacks against Israeli civilian and military targets, including two attacks that took place earlier that day. The Israeli Government also stated that it had reason to believe that the Palestinian youths were planning an additional terrorist attack. Palestinian sources stated that the youths were on their way to visit friends when they were fired upon by the IDF.

On December 10, IDF soldiers fired on two Palestinians who reportedly were planting a roadside bomb near Bethlehem, killing Mahmoud Mugrabi, a member of Fatah. According to press reports quoting a senior IDF official, Mugrabi's name was on a list of ten reputed terrorists that the IDF had targeted for killing.

Israeli security force personnel killed several Palestinians in unclear circumstances. According to eyewitnesses and a credible Palestinian human rights organization, on October 6, an IDF soldier shot an unarmed 14-year-old boy on the porch of his home near Hebron; he later died. On December 11, Israeli security forces shot and killed Anwar Hmeiran, a member of Palestinian Islamic Jihad. According to Palestinian eyewitnesses, there were no clashes taking place at the time of the shooting. On December 16, Mohammad Fahed Maali was killed while reportedly walking past a clash between Israeli security forces and Palestinian demonstrators in Jenin; according to the Palestinian press, the Palestinian demonstrators did not use firearms in the demonstration. IDF soldiers killed Abbas Othman Ewaywi, a member of HAMAS. According to the IDF, Ewaywi was caught in crossfire between Israeli and Palestinian security forces. However, Palestinian media and eyewitnesses stated that there was no such exchange of gunfire when Ewaywi was shot. HAMAS issued a leaflet the same day vowing revenge for his death.

On September 30, a journalist videotaped and broadcast internationally an exchange of fire between Israeli and Palestinian security forces at Netzarim junction that resulted in the killing of 12-year Muhammad al-Dura. Many observers stated that the boy was killed by IDF fire; however, the IDF conducted an investigation and reported that it was not clear whether it was Israeli or Palestinian gunfire that killed al-Dura.

The IDF generally did not investigate incidents in which security forces killed and injured Palestinians. The IDF stated that it did not investigate such incidents because of technical problems; because Israel does not have full control over the occupied territories, and the PA reportedly would not cooperate in investigations in Areas B and C, the IDF stated that it could not conduct such investigations. However, in certain high profile cases, such as the killing of Muhammad al-Dura and the injuring of a foreign journalist, the IDF agreed to investigate.

In several incidents, following attacks on Israeli civilians, including settlers, IDF helicopters fired tank rounds and rockets from helicopters on towns and cities in the West Bank and Gaza, killing and injuring a number of persons and causing significant damage to buildings (see Section 1.g.).

Prior to the outbreak of violence in late September, members of the Israeli security forces killed three Palestinians at military checkpoints and roadblocks inside the occupied territories. In these instances, Israeli authorities stated that the individuals were shot after failing to obey orders to halt. Palestinian eyewitnesses disputed these accounts and charged that Israeli soldiers used excessive and unnecessary force. On March 20, Israeli soldiers killed Halima al-Aloul at the Kharas checkpoint near Hebron; al-Aloul was riding with her husband, who allegedly failed to stop at the checkpoint. On March 30, Murad al-Zaro was shot and killed by Israeli police officers near the Shufat refugee camp in Jerusalem. Israeli police maintained that al-Zaro failed to stop when ordered to do so; however, Palestinian eyewitnesses claimed that police shot al-Zaro after he already had stopped the car. On July 8, IDF soldiers killed a Palestinian woman in Gaza while she was riding in a car. According to the IDF, the soldiers fired because they believed that they heard shots fired from the car.

On August 16, IDF security forces mistakenly killed Mahmoud Assad Abdullah al-Bazar in Surda village. According to the IDF, security forces surrounded his house in the mistaken belief that a wanted HAMAS terrorist was inside. According to his family members, al-Bazar went to his roof to investigate noises and fired one shot in the air to frighten presumed thieves. The IDF soldiers reportedly heard the shot and opened fire on al-Bazar.

According to credible human rights organizations, Israeli security forces sometimes impeded the provision of medical assistance to sick and injured Palestinians (see Section 2.d.); Palestinians claim that seven Palestinians died as a result. For example, on October 6, Israeli security forces delayed an ambulance from reaching a

Palestinian who was wounded in a clash in Jerusalem; the Palestinian died later the same day. On October 14, IDF soldiers did not allow a father to bring his daughter into Nablus for medical treatment; she died the same day of a ruptured appendix. On October 16, IDF soldiers refused to allow a man into Nablus for kidney dialysis; he later died of kidney failure. According to the Israeli Government, Palestinian medical personnel sometimes used ambulances as shelter for Palestinians who had fired at Israeli civilians and soldiers (see Section 1.c.).

In May Mohamad Abdel Jalil Fayez Saed from Askar refugee camp in Nablus died from wounds sustained in a 1991 confrontation with the IDF in which soldiers reportedly beat Saed for throwing stones at an IDF foot patrol, which left him paralyzed.

Three Palestinian security detainees reportedly died in Israeli custody during the year (see Section 1.c.). On January 14, Lafi al-Rajabi died in a detention center near Nablus; his body reportedly bore cuts and bruises. On June 19, Sami As'ad reportedly hanged himself in Kishon prison; according to newspaper reports he previously had attempted suicide. On August 11, Ramez Fayez Mohammed Rashing Elrizi died in al-Nafha prison under ambiguous circumstances. The Israeli Government did not publish official autopsies in these deaths.

Palestinian security forces reportedly killed several Israeli security force members during violent clashes with Israeli soldiers or settlers. Members of Palestinian security services and Fatah's Tanzim participated in violent attacks. Armed Palestinians, some of them members of Palestinian security forces, fired at Israeli civilians or soldiers from within or close to the homes of Palestinian civilians; residents of the homes consequently bore the brunt of IDF retaliation for these attacks. Palestinian security forces also failed to prevent armed Palestinians from opening fire on Israelis in places in which Palestinians were present. The extent to which senior PLO or PA officials authorized such incidents is not clear. Palestinian security forces reportedly impeded the provision of medical assistance to an injured Israeli border policeman, who later died.

On September 29, a Palestinian policeman killed one Israeli border policeman and injured a second. The three police personnel were part of a joint patrol.

On October 1, PA security forces shot a border policeman at Joseph's Tomb, and then delayed an ambulance from reaching him in a timely manner; the soldier bled to death.

One Palestinian died in PA custody during the year. On June 6, Khalid Bahar was found dead in his prison cell; family members claim that the prisoner died after being tortured (see Section 1.c.). The PA publicized the results of its autopsy report, which stated that the prisoner had choked to death.

More than 35 Israelis and Palestinians died in politically related violence perpetrated by individuals and groups during the year. Israeli settlers harassed, attacked, and occasionally killed Palestinians in the West Bank and Gaza Strip (see Section 1.c.). There were credible reports that settlers killed at least 14 and injured a number of Palestinians during the "al-Aqsa Intifada," usually by stoning their vehicles, which caused fatal accidents, shooting them, or hitting them with moving vehicles. For example, on October 1, unidentified Israeli settlers opened fire on a car holding Palestinians, killing an 18-month-old baby. On October 17, two settlers from Itamar opened fire with machine guns on a group of Palestinians harvesting olives in a field near Nablus, killing one person and injuring four. The perpetrators of the attack were identified and taken into Israeli police custody, but subsequently were released because the police determined that the PA was not cooperating sufficiently with the investigation. The PA denied this charge. The settlers did not act under government orders in the attacks; however, the Israeli Government did not prosecute the settlers for their acts of violence. In general, settlers rarely serve prison sentences if convicted of a crime against Palestinians.

Palestinian civilians harassed, attacked, and occasionally killed Israelis, especially settlers. During the year, Palestinians killed 18 Israeli civilians and injured numerous others (see Section 1.c.). Palestinians frequently threw stones and fired guns at Israeli civilians during the "al-Aqsa Intifada." On October 8, Palestinian civilians killed Israeli settler Hillel Lieberman from Elon Moreh. Lieberman had been missing since the morning of October 7, when he told a relative that he was going to "pay a final visit" to Joseph's Tomb in Nablus, after the IDF had announced that it would withdraw from the site. An unknown extremist group took responsibility for the killing.

On October 12, a Palestinian mob killed two IDF reservists in a brutal attack in Ramallah. The mob attacked the soldiers' car until Palestinian police intervened and brought the soldiers to the civil police station. The mob followed, broke down the gate of the police station, and kicked, burned, and beat to death the two reservists. There were reports that Palestinian police personnel also participated in the beating.

On October 30, unknown Palestinian gunmen killed one security guard and injured another at the National

Insurance Office in Jerusalem.  On November 9, Palestinian gunmen killed one woman and injured one man in their car.  On November 13, Palestinian gunmen killed a settler and two IDF soldiers near Ramallah.

Several Palestinian officials made public statements justifying Palestinian attacks on Israeli civilians, and the PA made no arrests in any of these killings.  Additionally, Tanzim leaders made public statements urging Palestinians to continue the violence.  Following Chairman Arafat's announcement on November 17 to stop firing on Israeli civilians or security forces from Area A, there was a short-lived significant decrease in the number of such incidents.  Israeli observers noted that Arafat's statement did not address attacks in Areas B and C.

Seven Israeli civilians were killed in bomb attacks and roadside bombs for which several Palestinian extremist groups claimed responsibility.  For example, a roadside bomb near Kfar Darom settlement in Gaza was detonated on November 20 as a settler schoolbus passed.  A teacher and a school maintenance worker were killed, and nine passengers were wounded, including several children (see Section 1.c.).  Two Palestinian extremist groups claimed responsibility for the attack.  On November 23, two IDF soldiers were killed and three were injured in 2 separate bomb attacks in Gaza.

b. Disappearance

There were no reports of politically motivated disappearances during the year.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment
    or Punishment

Israeli laws and administrative regulations prohibit the physical abuse of detainees; however, security forces abused in detention Palestinians suspected of security offenses.  A landmark decision by the Israeli High Court of Justice in September 1999 prohibited the use of a variety of abusive practices, including violent shaking, painful shackling in contorted positions, sleep deprivation for extended periods of time, and prolonged exposure to extreme temperatures.  Prior to the High Court's decision, Israeli laws and administrative regulations prohibiting the physical abuse of detainees were not enforced in security cases (see Section 1.c. of the Israel report).  The head of the then-GSS was empowered by government regulation to authorize security officers to use "moderate physical and psychological pressure" (which included violent shaking) while interrogating detainees.  These practices often led to excesses.  Since the September 1999 ruling, domestic and international NGO's have been unable to substantiate sporadic allegations that security forces tortured detainees.

Most convictions in security cases before Israeli courts are based on confessions.  A detainee may not have contact with a lawyer until after interrogation, a process that may last days or weeks.  The Government does not allow ICRC representatives access to detainees until the 14th day of detention.  This prolonged incommunicado detention contributes to the likelihood of abuse.  Detainees sometimes claim in court that their confessions are coerced, but judges rarely exclude such confessions.  According to Palestinian human rights groups, some Palestinian detainees fail to make complaints either due to fear of retribution or because they assume that such complaints would be ignored.  During the year, there were no known cases in which a confession was thrown out because of improper means of investigation or interrogation.

Israeli security forces injured at least 11,300 Palestinians during violent demonstrations during the year (see Sections 1.a., 2.b., and 1.g.).  In May IDF soldiers and Israeli police injured up to 700 Palestinians during protests in support of a hunger strike declared by Palestinian prisoners in Israeli jails.  During the "al-Aqsa Intifada," Israeli security forces injured about 10,600 Palestinian demonstrators.

The IDF injured several bystanders at demonstrations, including journalists (see Section 2.a.).  According to a November report by the Committee to Protect Journalists, at least 10 journalists were hit by IDF gunfire during the "al-Aqsa Intifada", and 3 other journalists were hit by gunfire from an unknown source.  In at least one case, a foreign photographer was hit by live ammunition during a demonstration in which no IDF personnel were under fire.

Israeli authorities also frequently treat Palestinians in an abusive manner at checkpoints, subjecting them to verbal and physical harassment.  According to press reports, on September 6, Israeli border policemen physically abused three Palestinian workers near the village of Abu Dis outside of Jerusalem.  The officers took photos of themselves with their victims; their trial was ongoing by year's end.

The PA does not prohibit by law the use of torture or force against detainees, and PA security forces reportedly were responsible for torture and widespread abuse of Palestinian detainees. Such abuse generally took place after arrest and during interrogation. In 1995 the Gaza civil police commander issued to police officers in the West Bank and Gaza a directive forbidding torture during interrogation, and directing the security forces to observe the rights of all detainees. However, the directive does not have the force of law; Palestinian security officers have not been issued formal guidelines on the proper conduct of interrogations. The PA lacks adequate equipment to collect and use evidence, and convictions are based largely on confessions. The importance of obtaining confessions heightens the possibility of abuse.

PA security officials torture and abuse prisoners by threatening, hooding, beating, and tying detainees in painful positions, forcing them to stand for long periods of time, depriving them of sleep and food, and burning detainees with cigarettes and hot instruments. Palestinians also alleged that they had been shaken violently while in PA custody. International human rights monitoring groups have documented widespread arbitrary and abusive conduct by the PA. These organizations state that use of torture is widespread and not restricted to those persons detained on security charges. Human rights groups state that Palestinians who are suspected of belonging to radical Islamic groups are more likely to be treated poorly. In February and March, the General Intelligence Service arrested, detained, and physically abused dozens of Bir Zeit University students who were arrested on charges of throwing stones at a foreign head of state during a campus demonstration (see Section 2.b.). Several human rights groups claimed that the students were tortured during detention.

During the year, one Palestinian died in PA custody. Family members claim that the prisoner died after being tortured (see Section l.a.). The PA publicized the results of its autopsy report, which stated that the prisoner had choked to death.

Palestinian police and Tanzim members with firearms participated in violent demonstrations and attacks. Palestinian security forces sometimes fired at Israeli civilians or soldiers from within or close to the homes of Palestinian civilians; residents of the homes consequently bore the brunt of IDF retaliation for these attacks. Palestinian security forces also sometimes failed to prevent armed Palestinians from opening fire on Israeli civilians, soldiers, or military targets.

In February Palestinian police failed to prevent an attack by a Palestinian crowd against PA judges and prosecutors in Bethlehem. A crowd of about 300 persons, mainly family members of one of the criminal suspects on trial, stormed the courthouse, locked the judge and prosecutors inside, threw stones, and demanded that the court revoke sentences against two defendants in a murder trial. Police officials were at the courthouse; however, they did not disperse the crowd or make any arrests.

Israeli settlers harass, attack, and occasionally kill (see Section 1.a.) Palestinians in the West Bank and Gaza Strip. There were credible reports that settlers injured a number of Palestinians during the "al-Aqsa Intifada," usually by stoning their vehicles, which at times caused fatal accidents, shooting them, or hitting them with moving vehicles. Human rights groups received several dozen reports during the year that Israeli settlers in the West Bank beat Palestinians and destroyed the property of Palestinians living in or farming near Israeli settlements. For example, according to Palestinian eyewitnesses, a group of Israeli settlers beat a 75-year-old Palestinian woman in April. At least five settlers from Brakha near Nablus reportedly assaulted the woman, who was picking wild herbs near the settlement; a passerby reportedly intervened and took the woman to a hospital. During the "al-Aqsa Intifada," there were numerous incidents in which Israeli settlers physically attacked Palestinians or threw stones at their homes and cars. Settlers also attacked and damaged crops, olive trees, greenhouses, and agricultural equipment, causing extensive economic damage to Palestinian-owned agricultural land. The settlers did not act under government orders in the attacks; however, the Israeli Government did not prosecute the settlers for their acts of violence. In general settlers rarely serve prison sentences if convicted of a crime against a Palestinian.

According to human rights organizations, Israeli settlers sometimes attacked Palestinian ambulances and impeded the provision of medical services to injured Palestinians (see Section 2.d.).

Palestinians harassed, attacked, and occasionally killed (see Section 1.a.) Israelis, especially settlers. During demonstrations in support of the Palestinian prisoner hunger strike in May, Palestinian demonstrators shot Israeli settlers in Beit El and Jenin in the West Bank. On May 21, an unknown Palestinian threw a Molotov cocktail at a car of Jewish settlers, critically injuring a child. Palestinians injured a number of Israeli settlers in attacks during the "al-Aqsa Intifada." For example, on October 19, unidentified Palestinian gunmen shot at a large group of Israeli settlers who were hiking in an area near Joseph's Tomb in Nablus, where there had been fierce fighting the week before. One settler and one Palestinian were killed, and four Israelis and a dozen Palestinians were injured in an exchange of gunfire. Unidentified Palestinian gunmen fired on homes in Gilo, a

Jewish neighborhood in Jerusalem, for at least 13 nights between October and November, injuring seriously two persons. A number of Israeli civilians were injured in armed attacks or bombings, for which several Palestinian extremist groups claimed responsibility (also see Section 1.a.).

Palestinian civilians attacked Israeli medical teams on several occasions. For example, on October 2, Palestinian civilians reportedly fired on an ambulance that was evacuating 4 IDF soldiers who had been injured in a violent clash; the ambulance reportedly was delayed for about 1 hour. Palestinian civilians also prevented the evacuation of injured Israelis in several incidents; in one such case, the injured person did not receive medical treatment and died from his wounds (see Section 1.a.). According to the Israeli Government, Palestinian medical personnel sometimes allowed ambulances and medical facilities to be used as shelter for Palestinians who had fired at Israeli civilians and soldiers (see Section 1.a.).

Conditions for Palestinians in Israeli prisons are poor. Facilities are overcrowded, sanitation is poor, and medical care is inadequate. Palestinian inmates held strikes and protests in support of a number of causes and to protest prison conditions throughout the year. On May 1, Palestinian prisoners in Israeli prisons began a hunger strike to protest prison conditions and their continued incarceration. Following negotiations with PA and Israeli government officials, the prisoners agreed to suspend the hunger strike on May 31. The Israeli Government agreed to remove prisoners from solitary confinement and to allow family members to visit inmates, and the prisoners agreed to refrain from planning terrorist attacks from prison. Three Palestinian prisoners died in Israeli custody under ambiguous circumstances during the year (see Section 1.a.).

Israel permits independent monitoring of prison conditions, although human rights groups sometimes encounter difficulties gaining access to specific detainees.

Prison conditions in PA facilities continue to be very poor. In many cases, facilities are overcrowded, old, dilapidated, and neglected. Food and clothing for prisoners are inadequate and must be supplemented by donations from families and humanitarian groups. Palestinian inmates held periodic strikes and protests throughout the year in support of a number of causes and to protest prison conditions and the practice of administrative detention. In some PA prisons, an effort is made to house religious prisoners together. Male and female inmates are housed separately. During the year, one Palestinian died in PA custody under ambiguous circumstances (see Section 1.a.).

In August detainees held by the PSF in Ramallah staged a hunger strike demanding an improvement in detention conditions. The PSF agreed to meet the prisoners' demands. Prisoners in the PA-run Jneid Prison also staged a hunger strike to protest being held for an extended period of time without charge or trial (see Section 1.c.).

The PA permits independent monitoring of its prisons, although human rights groups, humanitarian organizations, and lawyers reported difficulties arranging visits or gaining access to specific detainees. Human rights organizations state that their ability to visit PA jails and detention centers varies depending on which security organization controls the facility. Human rights organizations state that the police, Preventive Security Force, and Mukhabarat generally were cooperative in allowing them to inspect facilities and visit prisoners and detainees. However, they said that the Military Intelligence Organization was less responsive to such requests. Human rights monitors state that prison authorities sometimes are capricious in permitting them access to PA detention facilities and they rarely are permitted to see inmates while they are under interrogation. Pursuant to an agreement signed in September 1996, the ICRC conducts prison visits but may be denied access to a detainee for 14 days. If abuses occur, they frequently happen during this 2-week period.

Some PA security organizations, including the General Intelligence Organization in the West Bank and the police, have appointed officials to act as liaisons with human rights groups. These officers meet with human rights organizations and members of the diplomatic community to discuss human rights cases.

d. Arbitrary Arrest, Detention, or Exile

Israeli security personnel may arrest without warrant or hold for questioning a person suspected of having committed a criminal or security offense in the occupied territories. Most of these arrests and detentions are for alleged security offenses. Persons arrested for common crimes usually are provided with a statement of charges and access to an attorney, and may apply for bail. However, these procedures sometimes are delayed.

Israeli authorities intermittently issued special summonses for those suspected of involvement in or knowledge of security offenses. There were reports that some such summonses were issued immediately before and during the "al-Aqsa Intifada." Israeli military order 1369 stipulates a 7-year prison term for anyone who does not

respond to a special summons delivered to a family member or posted in the MATAK office nearest the suspect's home address. There were no reports during the year that anyone was convicted of failing to respond to a summons. Bail rarely is available to those arrested for security offenses. Although Israeli law does not allow Israelis under the age of 16 to be tried as adults, Israeli courts treat Palestinians over the age of 12 as adults. Defense for Children International (DCI) reported that over 420 Palestinian minors (below the age of 18 years) were arrested and detained in Israeli prisons during the year, and that at year's end, there were 200 minors in Israeli prisons. The IDF stated that 44 minors were held in Israeli security facilities at year's end.

Israeli authorities may hold persons in custody without a warrant for 96 hours; they must be released unless a warrant is issued. Prearraignment detention may last up to 11 days for Palestinians arrested in the occupied territories and up to 8 days for minors and those accused of less serious offenses. Authorities must obtain a court order for longer administrative detentions—up to 6 months from the date of arrest. At hearings to extend detention for interrogation purposes, detainees are entitled to be represented by counsel, although the defense attorney often is not allowed to see or hear the evidence against his client. Detainees either are released at the end of the court-ordered detention or sent to administrative detention if they are not indicted. If there is an indictment, a judge may order indefinite detention until the end of the trial. Israeli regulations permit detainees to be held in isolation during interrogation. Detainees have the right to appeal continued detention.

Although a detainee generally has the right to consult with a lawyer as soon as possible, in security cases authorities may delay access to counsel for up to 15 days. Higher-ranking officials or judges may extend this period. Access to counsel is denied routinely while a suspect is being interrogated, which sometimes can last several weeks. Authorities must inform detainees of their right to an attorney and whether there are any orders prohibiting such contact.

A number of factors hamper contacts by Palestinians in Israeli prison and detention facilities with their lawyers, families, and human rights organizations. Israeli authorities claim that they attempt to post notification of arrest within 48 hours; however, Palestinian suspects often are kept incommunicado for longer than 48 hours. Even if an arrest becomes known, it is often difficult to obtain information on where a detainee is being held or whether the detainee has access to an attorney. Palestinians generally locate detained family members through their own efforts. Palestinians may check with a local ICRC office to determine whether it has information on the whereabouts of a family member. A senior officer may delay for up to 12 days notification of arrest to immediate family members and attorneys. A military commander may appeal to a judge to extend this period in security cases for an unlimited period of time.

The Israeli Government routinely transfers Palestinians arrested in the occupied territories to facilities in Israel, especially the prison in Ashkelon and the military detention center in Megiddo. Israeli authorities have been known to schedule appointments between attorneys and their detained clients, only to move the clients to another prison prior to the meetings. Authorities reportedly use such tactics to delay lawyer-client meetings for as long as 90 days. Palestinian lawyers also have difficulty traveling to meet with their clients during Israeli-imposed closures. Israel requires Palestinian attorneys to acquire permits to enter Israel to see their clients held in prisons there. Human rights groups say that Palestinian lawyers from the Gaza Strip have a harder time obtaining these permits than their West Bank counterparts and that they are denied entry into Israel more frequently than West Bank lawyers.

Male family members between 16 and 40 years of age, and any family members with security records, generally are barred from visiting relatives in facilities in Israel. Relatives of Palestinian prisoners also complain that sometimes they only learn that visitation rights have been canceled when they arrive at the prison following a trip of many hours from the occupied territories. Following the outbreak of violence in late September, the Israeli Government banned all family visits for Palestinian prisoners in Israeli jails. In November there were negotiations between the Israeli Government, the ICRC, and the Palestinian Prisoners' Society to restore visitation rights to Palestinian prisoners. The Government of Israel offered to allow spouses, children under the age of 10, and parents to apply for one-day visitation passes; however, Palestinian prisoners rejected these conditions.

Evidence used at hearings for administrative detentions is secret and unavailable to the detainee or his attorney during the hearings; the detainee and defense lawyer are required to leave the courtroom when secret evidence is presented. Israeli authorities maintain that they are unable to present evidence in open court because doing so would compromise the method of acquiring the evidence. In July 1998, the High Court of Justice ruled that only judges, rather than military officials, may renew administrative detention orders beyond a 6-month period. Detainees may appeal detention orders, or the renewal of a detention order, before a military judge, but their chances for success are very limited. During the year, some succeeded in persuading the courts to shorten their detentions.

The overall number of Palestinian prisoners and administrative detainees in Israeli jails declined for the fourth

straight year until mid-October, when the number increased. Human rights organizations attributed the decrease to the absence of major terrorist attacks; in the past, Israeli officials arrested Palestinians suspected of terrorist connections after major terrorist attacks. The Israeli Government released 16 Palestinian prisoners in March as a goodwill gesture. According to the IDF, in mid-October there were 1,307 Palestinian security prisoners in Israeli prisons, military detention centers, and holding centers, compared with 1,354 at the end of 1999. According to the IDF, there were 1,402 Palestinian security prisoners in Israeli prisons and detention centers as of
mid-December. According to human rights groups, 10 Palestinians were in administrative detention at year's end, compared with 18 at the end of 1999. Several have been held for more than 1 year. Many Palestinians under administrative detention during the past 3 years have had their detention orders renewed repeatedly without meaningful opportunity to appeal.

PA security forces arbitrarily arrested and detained persons. The PA does not have a uniform law on administrative detention, and security officials do not always adhere to the existing laws in the West Bank and Gaza Strip. Laws applicable in Gaza, which do not apply to the West Bank, stipulate that detainees held without charge be released within 48 hours. These laws allow the Attorney General to extend the detention period to a maximum of 90 days during investigations. Human rights organizations and the PA Ministry of Justice assert that PA security officials do not always adhere to this regulation. Prevailing law in the West Bank allows a suspect to be detained for 24 hours before being charged. The Attorney General may extend the detention period.

The PA Chairman has not signed the Basic Law, which was designed to limit executive branch abuses and to delineate safeguards for citizens, since it was passed by the Palestinian Council (PC) in 1996. The lack of safeguards has contributed to the tendency of PA security forces to refuse to carry out High Court of Justice orders to release detainees. In some cases, the High Court ordered the release of prisoners detained for years without trial, and PA security forces released the prisoners several months or a year later. In November 1997, the High Court ordered the release of HAMAS activist Mahmud Muslah; Muslah remained in detention at year's end. In February 1999, the High Court ordered the release of Wa'el Farraj, who has been detained without charges since 1996; Farraj remained in detention at year's end. According to the Palestinian Independent Commission for Citizens Rights, the High Court ordered 9 detainees released during the year, compared with approximately 60 detainees in 1999. The PA released approximately 60 security prisoners during the "al-Aqsa Intifada;" however, human rights groups estimate that the PA has held approximately 150 prisoners for more than a year without charge. The total number of Palestinians in PA jails reached between 500 and 900 prisoners by year's end, including approximately 50 political and security detainees.

In past years, Palestinian security forces sometimes detained or placed under house arrest the relatives of alleged security criminals. In the past, lawyers and PA judicial officials acknowledged that, in contravention of the law, PA security services sometimes arrested and detained persons without informing judicial officials.

PA authorities generally permit prisoners—except those held for security offenses—to receive visits from family members, attorneys, and human rights monitors. PA security officials do not always permit lawyers to see their clients. In principle detainees may notify their families of their arrest, but this is not always permitted.

Human rights organizations reported in the past that lawyers sometimes were denied access to their clients.

PA security services have overlapping or unclear mandates that often complicate the protection of human rights. Under existing law in the West Bank, only the PA's civil police force is authorized to make arrests. In practice all security forces are known to detain persons at various times. The operating procedures and regulations for the conduct of PA security personnel in the various services still are not well developed and have not yet been made fully available to the public.

There are many detention facilities in the West Bank and Gaza Strip administered by the overlapping PA security services, a situation that complicates the ability of families, lawyers, and even the Ministry of Justice to track detainees' whereabouts and to determine their numbers. Security services, including Preventive Security, General Intelligence, Military Intelligence, and the Coast Guard have their own interrogation and detention facilities. In general these services do not, or only sporadically, inform families of a relative's arrest. Most PA security officers remain unaware of proper arrest, detention, and interrogation procedures, as well as basic human rights standards. Human rights groups have provided basic human rights training to a number of PA security services. During the year, at least 36 PA security officials participated in human rights courses, bringing the total number of security officials who have graduated from human rights courses to nearly 1,600 since the PA's establishment in 1994.

PA security forces continued to harass and arbitrarily arrest and detain journalists, political activists, and human

rights advocates who criticized the PA and its policies. A number of journalists were arrested and detained and television stations were shut down for expressing views or covering topics unacceptable to the Palestinian Authority (see Section 2.a.).

In January PA security forces rearrested Abdel Sattar Qassem. Security forces had arrested Qassem and seven other signatories of a petition that accused the PA of corruption in November 1999. The PA released Qassem in July.

On February 26, PA police arrested and detained for 1 week approximately 30 Bir Zeit University students who reportedly threw stones at a foreign head of state during a demonstration (see Section 2.b.). In May PA security forces arrested 20 persons for participating in an anti-PA rally in Ramallah organized by the Popular Front for the Liberation of Palestine (PFLP) following the funeral of one of its members who died during clashes with the IDF near Ramallah (see Section 2.b.).

Neither the Israeli Government nor the PA forcibly deported anyone from the occupied territories during the year.

e. Denial of Fair Public Trial

Israeli law provides for an independent judiciary, and the Government respects this provision. Palestinians accused by Israel of security offenses in the occupied territories are tried in Israeli military courts. Security offenses are defined broadly and may include charges such as membership in outlawed organizations. Charges are brought by military prosecutors. Serious charges are tried before three-judge panels; lesser offenses are tried before one judge. Defendants have the right to counsel and to appeal verdicts to the Court of Military Appeals, which may accept appeals based on the law applied in the case, the sentence, or both. The right of appeal does not apply in all cases and sometimes requires court permission. The Israeli military courts rarely acquit Palestinians of security offenses, but sentences sometimes are reduced on appeal.

Trials sometimes are delayed for several reasons: Witnesses, including Israeli military or police officers, do not appear; the defendant is not brought to court; files are lost; or attorneys fail to appear, sometimes because they have not been informed of the trial date or because of travel restrictions on Palestinian lawyers. These delays add pressure on defendants to plead guilty to minor offenses; if they do, an "expedited" trial may be held, in which a charge sheet is drawn up within 48 hours and a court hearing scheduled within days.

By law most Israeli military trials are public, although access is limited. Most convictions in military courts are based on confessions. Evidence that is not available to the defendant or his attorney may be used in court to convict persons of security offenses. There frequently is no testimony provided by Palestinian witnesses either for or against Palestinians on trial. Israeli authorities maintain that this is due to the refusal of Palestinians to cooperate with the authorities. Physical and psychological pressures and reduced sentences for those who confess may induce security detainees to sign confessions. Confessions usually are given in Arabic but translated into Hebrew for the record because, authorities maintain, many Israeli court personnel speak Arabic but few read it. Palestinian detainees seldom read Hebrew and therefore often sign confessions that they are unable to read.

Crowded facilities and poor arrangements for attorney-client consultations in prisons hinder legal defense efforts. Appointments to see clients are difficult to arrange, and prison authorities often fail to produce clients for scheduled appointments.

Israeli settlers in the West Bank and Gaza Strip accused of security and ordinary criminal offenses are tried under Israeli law in the nearest Israeli district court. Civilian judges preside, and the standards of due process and admissibility of evidence are governed by the laws of Israel, not military orders. Settlers convicted in Israeli courts of crimes against Palestinians regularly receive lighter punishment than Palestinians convicted in Israeli courts of similar crimes against either Israelis or other Palestinians. In December the Jerusalem magistrates court ordered an Israeli settler to pay compensation of $17,500 to the family of a young Palestinian boy who reportedly was killed by the settler's negligence about a decade earlier.

There were no reports that the Israeli Government held political prisoners.

The PA courts are inefficient, lack staff and resources and, as a result, often do not ensure fair and expeditious trials, and the PA executive and security services frequently ignore or fail to carry out court decisions.

The PA inherited a court system largely based on structures and legal codes predating the 1967 Israeli

occupation. In the civil court system, cases initially are tried in courts of first instance. There are two appeals courts, one located in Gaza City and the other in Ramallah, which handle appeals from the lower courts. The appeals courts also function as the Palestinian High Court of Justice. The PA executive at times does not respect decisions of the High Court, and the Palestinian security agencies do not always enforce its rulings (see Section 1.d.). In 1995 the PA established state security courts in Gaza and the West Bank to try cases involving security issues. Three military judges preside over each court. A senior police official heads the state security court in Jericho, and three judges preside over it. There is no right of appeal, but the PA Chairman reviews the court's findings and he may confirm or reject the decision. The PA Ministry of Justice has no jurisdiction over the state security courts, which are subordinate only to the Chairman.

The Gaza legal code derives from British Mandate law, Egyptian law, and PA directives and laws. Pre-1967 Jordanian law applies in the West Bank. Bodies of law in the Gaza Strip and West Bank have been modified substantially by Israeli military orders. According to the Declaration of Principles and the Interim Agreement, Israeli military decrees issued during the occupation theoretically remain valid in both areas and are subject to review pursuant to specific procedure. The PA has stated that it was undertaking efforts to unify the Gaza and West Bank legal codes, but it has made little progress. Human rights advocates claim that the PA's judiciary does not operate consistently.

The court system in general is recovering from years of neglect; many of the problems predate PA jurisdiction. Judges and staff are underpaid and overworked and suffer from a lack of skills and training. Court procedures and record keeping are archaic and chaotic. The delivery of justice often is slow and uneven. The ability of the courts to enforce decisions is extremely weak, and there is administrative confusion in the appeals process. A heavy caseload exacerbates these systemic problems. The PA closed all civil courts in late September for several weeks.

The PA Ministry of Justice appoints all civil judges for 10-year terms. The Attorney General, an appointed official, reports to the Minister of Justice and supervises judicial operations in both the Gaza Strip and the West Bank. In the past, the Chief Justice had the authority to appoint all judges in the West Bank. Human rights organizations and judicial officials criticized the decision, saying that it contravened existing law, which stipulated that a higher judicial council should be responsible for appointing judges. During the year, the Chairman authorized the establishment of the High Judicial Council in accordance with legislation passed by the Council in 1998. Human rights advocates and lawyers believe that this step may enhance the judicial system.

The PA's state security courts often fail to afford defendants due process. The PA usually ignores the legal limits on the length of prearraignment detention of detainees suspected of security offenses. Defendants often are brought to court without knowledge of the charges against them or sufficient time to prepare a defense. They typically are represented by
court-appointed lawyers, who often are not qualified. Court sessions often take place on short notice in the middle of the night, and without lawyers present. In some instances, security courts try cases, issue verdicts, and impose sentences in a single session lasting a few hours.

During the year, the state security courts sentenced three persons to death for committing murder. In two of the cases, the trials reportedly were hasty, and the defendants did not have adequate representation. For example, a state security court sentenced Raji Saqir to death on July 3 after a 1-day trial, which occurred 1 day after Saqir allegedly committed murder. Although no executions were carried out during the year, in February 1999, a Palestinian colonel was executed after the PA's state security court convicted him of raping a young boy. Human rights groups criticized the decision; they complained that the trial lasted for less than 2 hours, the defendant did not have sufficient time to prepare his defense, there was no appeals process, and the charges were ill-defined.

The state security courts adjudicated cases that fell far outside the scope of the courts' original mandate. In addition to "security" cases, the courts have on occasion dealt with tax cases and economic crimes, such as smuggling. In February the Chairman decreed that "serious" crimes, including homicide, rape, and drug trafficking, be referred to state security courts. The decision prompted human rights organizations to issue statements requesting the abolition of state security courts and the referral of all cases to the regular civil courts.

There were no reports during the year that persons were convicted for their political beliefs. A credible Palestinian human rights organization estimated that the PA held approximately 100 political prisoners before the beginning of the "al-Aqsa Intifada" in late September. In October the PA released most of the political prisoners. The PA stated that this action was in response to Israeli warnings that it would be bombing PA police facilities following the brutal killing of two Israeli reserve soldiers in Ramallah (see Section 1.a.). A Palestinian human rights organization estimated that the PA held 10 political prisoners at year's end.

f. Arbitrary Interference with Privacy, Family, Home, or
   Correspondence

Israeli military authorities in areas of the West Bank under their control may enter private Palestinian homes and
institutions without a warrant on security grounds when authorized by an officer of the rank of lieutenant colonel
or above. In conducting searches, the IDF has forced entry and sometimes has beaten occupants and
destroyed property. Israeli authorities state that forced entry may occur lawfully only when incident to an arrest
and when entry is resisted. Authorities state that beatings and arbitrary destruction of property during searches
are punishable violations of military regulations, and that compensation is due to victims in such cases. The
Israeli Government states that it does not keep consolidated information on the claims against the Ministry of
Defense for damages resulting from IDF actions. In February IDF soldiers raided an elderly Palestinian woman's
home, reportedly searching for stone throwers; the woman, who had been suffering from heart problems, died of
a heart attack.

Israeli security forces may demolish or seal the home (owned or rented) of a Palestinian suspected of terrorism
without trial. The decision to seal or demolish a Palestinian's house is made by several high-level Israeli
officials, including the coordinator of the MATAK and the Defense Minister. Residents of houses ordered
demolished have 48 hours to appeal to the area commander; a final appeal may be made to the Israeli High
Court. A successful appeal generally results in the conversion of a demolition order to sealing. After a house is
demolished military authorities prohibit the owner from rebuilding or removing the rubble. Israelis suspected of
terrorism are subject to Israeli law and do not face the threat of home demolition. In August Israeli security
forces demolished the home of Nidal Daghlas near Nablus, claiming that a HAMAS fugitive, Mahmoud Abu
Hanoud, previously had hidden in Daghlas' home. Human rights groups stated that the home demolition was an
arbitrary measure. On November 2, Israeli security forces demolished two homes in Gaza following a nearby
explosion.

In November 1999, the Israeli Government expelled 300 Bedouin farmers from their homes in caves near the
Jewish settlement of Ma'on, stating that the area was a closed military zone. On March 29, the Israeli High
Court of Justice ordered that the farmers be allowed to return to their homes. In April the IDF issued new
deportation orders to returnees who were not party to the original legal suit.

From late September through the end of the year, the IDF destroyed numerous citrus orchards, olive and date
groves, and irrigation systems on Palestinian-owned agricultural land in both the West Bank and Gaza. The IDF
generally destroyed agricultural land following clashes at demonstrations, shootings aimed at settlers, or
bombings. The IDF stated that it destroyed this land because Palestinian snipers reportedly were using it for
purposes of concealment.

The PA requires the Attorney General to issue warrants for entry and searches of private property; however,
Palestinian security services frequently ignore these requirements. Police searched homes without the consent
of their owners. In some cases, police forcibly entered premises and destroyed property.

PA security forces sometimes detained or placed under house arrest the relatives of alleged security criminals
(see Section 1.d.).

g. Use of Excessive Force and Violations of Humanitarian
   Law in Internal Conflicts

Between late September and the end of the year, Israeli security forces killed 227 Palestinians and 4 foreign
nationals, and injured over 10,600 Palestinians during violent demonstrations. Palestinian demonstrators
frequently threw stones and Molotov cocktails at the IDF. In some demonstrations, Palestinians also used
firearms. According to the IDF, Palestinians used firearms in about 30 percent of the demonstrations between
late September and mid-November. In response Israeli security forces used a variety of means to disperse
demonstrators, including tear gas, rubber-coated metal bullets, and live ammunition. In many instances, Israeli
security forces used excessive force against demonstrators in contravention of their official rules of engagement
(see Section 1.a.). According to the IDF, it does not have a policy of indiscriminate or excessive use of force,
and its rules of engagement establish a framework to deal with threats faced by Israeli civilians and armed
forces.

IDF regulations permit the use of both rubber-coated metal bullets and live ammunition only when a soldier's life
is in immediate danger, to halt fleeing suspects, to disperse a violent demonstration, or to fire on an individual
unlawfully carrying firearms. According to human rights organizations, a number of Palestinian deaths and

injuries reportedly occurred during demonstrations at which protesters did not use live firearms.

According to IDF policy, soldiers are to direct fire at the legs only, and may fire at a fleeing suspect only if they believe that a serious felony has occurred and that they have exhausted other means to apprehend the suspect. It is forbidden to open fire in the direction of children or women, unless in cases of severe public disorder, unless there is an immediate and obvious danger to a soldier's life. Palestinian medical relief organizations reported that 59.5 percent of the gunshot wounds inflicted by Israeli security forces during demonstrations were in the head or torso, and estimated that about one-sixth of the Palestinians wounded during the "al-Aqsa Intifada" likely would be disabled permanently. According to human rights organizations, a total of 82 Palestinians under the age of 18 years were killed in the demonstrations. During some demonstrations, bystanders, including journalists, medical personnel, and Palestinian civilians were killed or injured by IDF fire (see Sections 1.a. and 2.a.).

The IDF fired tank rounds and rockets from helicopters on cities and towns in the West Bank and Gaza, killing and injuring a number of persons and causing significant property damage (see Section 1.a.). For example, on October 12, in retaliation for the brutal killing by a Palestinian mob of two IDF reservists (see Section 1.a.), IDF helicopters attacked over 10 PA targets in Ramallah and Gaza, injuring more than 20 bystanders and destroying buildings. On October 23, the IDF shelled a neighborhood in Hebron, killing 1 person, in retaliation for an earlier shooting incident in the Israeli-controlled area of Hebron.

For at least 13 nights between October and December, Palestinian gunmen from Beit Jala shot at homes in Gilo, a Jewish neighborhood in East Jerusalem (see Section 1.c.). Two Israelis were injured seriously in these attacks. In retaliation for these attacks, the IDF launched a series of counterattacks on residential neighborhoods in Beit Jala, Beit Sahour, and Bethlehem. One foreign national was killed and 36 Palestinians were injured in these counterattacks.

On October 31, in retaliation for the Palestinian killing of two Israeli security guards, the IDF attacked with helicopters PA offices in Ramallah, Nablus, and Gaza. On November 15, the IDF responded with force to many incidents involving Palestinian gunfire directed at Gilo from Beit Jala, killing a foreigner and injuring a number of Palestinians. On October 19, in response to Palestinians shooting at a group of Israeli visitors at Joseph's Tomb, the IDF used helicopters to attack a nearby Palestinian refugee camp, killing 1 person and injuring several others. On November 20, IDF helicopters launched a series of retaliatory attacks in the Gaza Strip in response to a bomb attack in Gaza that killed 2 persons and injured 9; 50 persons reportedly were injured in the IDF attacks and significant damage was done to a number of PA buildings. On November 24, the IDF fired two tank rounds at the town of Kufr Qalil in retaliation for shots fired on a nearby IDF post by unidentified Palestinian gunmen; two Palestinians were killed by the tank rounds.

The Israeli Government's imposition of external and internal closures during the "al-Aqsa Intifada" contributed to intermittent shortages of basic food, medical supplies, and gasoline in the West Bank and Gaza.

Section 2 Respect for Civil Liberties, including:

a. Freedom of Speech and Press

The Israeli Government generally respects freedom of speech in the occupied territories; however, it maintains a low level of censorship and prohibits public expressions of support for Islamic extremist groups such as HAMAS and other groups dedicated to the destruction of Israel. In March during the Pope's visit to the region and in October during the "al-Aqsa Intifada," the Israeli Government reportedly selectively enforced its standing prohibition on the display of Palestinian political symbols, such as flags, national colors, and graffiti in Jerusalem for the first time since 1994. Such displays are punishable by fines or imprisonment, and Israeli security forces reportedly detained and temporarily barred from Jerusalem several Palestinian youths for waving the Palestinian flag. Overall, Israeli censorship of specific press articles continued at a low level; however, the Israeli Government did censor some articles during the year. Israeli authorities monitor Arabic newspapers based in East Jerusalem for security-related issues. Military censors review Arabic publications for material related to the public order and security of Israel. Reports by foreign journalists also are subject to review by Israeli military censors for security issues, and the satellite feed used by many foreign journalists is monitored. The Israeli Government often closes areas to journalists when it imposes a curfew or closure. Israeli authorities have

denied entry permits to Palestinian journalists traveling to their place of employment in Jerusalem during closures of the territories; however, the journalists' Israeli-issued press credentials have not been revoked.

The IDF requires a permit for publications sold in the occupied territories still under its control. Publications may be censored or banned for content deemed anti-Semitic or anti-Israeli. Possession of banned materials is punishable by a fine and imprisonment. During the year, the Israeli Government refused to allow publications, including newspapers, into the Gaza Strip on the Jewish holiday of Yom Kippur.

At least 10 journalists reportedly were hit by IDF gunfire during the "al-Aqsa Intifada," and 3 other journalists were hit by gunfire from an unknown source (see Section 1.c.). The IDF reportedly restricted the free movement of mainly Palestinian journalists (see Section 2.d.).

On October 13, in retaliation for the mob lynching of two Israeli reserve soldiers (see Section 1.a.), the IDF launched rockets at the PA's Voice of Palestine radio transmitter in Ramallah. In November the IDF launched rockets against a
PA-owned television transmitter in Gaza.

The PA restricted freedom of speech and of the press. In a number of instances during the year, the PA took steps to limit free expression, particularly regarding human rights issues and allegations of corruption. Press freedom is subject to a 1995 press law that does not protect the press adequately. PA security services further stifle the independence of the press by closing down media outlets, banning publications or broadcasts, and periodically harassing or detaining members of the media (see Section 1.d.). Palestinian commentators and human rights groups state that, as a result, the practice of self-censorship by journalists is widespread.

On May 5, PA officials arrested one of the leaders of a teachers' strike and temporarily closed down the radio station that broadcast an interview in which the leader accused the PA of inefficiency. The PA continued to detain the strike leader at year's end. On May 21, the PA closed the Watan and al-Naser television stations and the al-Manara Radio station in Ramallah for nearly 4 days, after the stations broadcast live coverage of an anti-PA demonstration in al-Bireh. On May 31, the PA arrested Samir Qumsiah, chairman of the Union of Private Radio and Television Stations because he had issued a statement criticizing the closing of the stations; the PA released Qumsiah 3 days later.

On May 27, PA officials arrested Fathi Barqawi, a director general of the news department at the Public Broadcasting Corporation in Ramallah after he criticized Chairman Arafat publicly. Barqawi was released a week later following intervention by prominent PA officials.

On June 20, Palestinian police arrested Abd al-Fattah Ghanem, a presidential advisor on refugees, after he criticized the PA for failing to solve the Palestinian refugee problem. Police held Ghanem incommunicado for 7 days and denied him access to legal counsel for the 3 weeks that he was in detention.

During the year, the Palestinian Bar Association (PBA) stripped 31 lawyers of their membership in the association, their right to practice law, and their ability to run in PBA elections. The lawyers reportedly all were outspoken critics of the PA. In May the Palestinian High Court temporarily reversed the decision to strip the lawyers of their PBA membership and their right to practice law. However, on May 17 the PBA placed the director of a West Bank NGO and candidate in the PBA elections on the "non-practicing" register of lawyers, purportedly because he worked for an NGO and not a law office (see Section 4).

In June PA police officials in Ramallah detained Maher Alami, a West Bank journalist, for approximately 1 week. The PA police reportedly warned Alami against writing articles critical of the PA.

After the October 12 brutal killing of two IDF reserve soldiers at a Ramallah police station (see Section 1.a.), Palestinian police confiscated film from several journalists who were at the scene. On October 4, a foreign journalist filmed three members of the Palestinian security forces distributing Molotov cocktails to several children. The security forces detained the journalist and his crew for several hours and destroyed the roll of film.

On November 21, PA security officials detained a Palestinian 2 days after he criticized the peace process. After 21 days of detention, security officials asked him to agree not to speak out against the PA; he did not agree, but was released the same day.

Israeli-imposed closures disrupted the operations of West Bank and Gaza universities, colleges, and schools during the year. Students and staff had difficulty traveling to educational institutions in cities and towns that were

closed or placed under curfew by Israeli authorities (see Sections 2.d. and 5). The November 1999 opening of the southern safe passage route between Gaza and the West Bank afforded Gazan students greater ability to pursue their education at West Bank educational institutions. However, during the "al-Aqsa Intifada" the Israeli Government closed the safe passage route, which impeded the ability of Gaza students to attend West Bank universities.

The PA generally has authority over all levels of education in the West Bank and Gaza Strip and it controls the budgets of all public colleges. The PA did not interfere with education in the West Bank and Gaza Strip during the year.

b. Freedom of Peaceful Assembly and Association

The Israeli Government placed limits on freedom of assembly for Palestinians in the occupied territories, largely through the imposition of internal closures and curfews (See Section 2.d.). Israeli military orders ban public gatherings of 10 or more persons without a permit. Since the 1993 signing of the Declaration of Principles, Israel has relaxed enforcement of this rule, except in cases of Palestinian demonstrations against land seizures or settlement expansions.

Israeli security forces killed more than 225 Palestinian demonstrators and injured more than 11,000 during the year often in the context of violent demonstrations (see Sections 1.a. and 1.c.).

There were several large, peaceful demonstrations of Jewish settlers in the West Bank and Jerusalem during the year.

The PA imposes some formal limits on freedom of assembly; however, while it requires permits for rallies, demonstrations, and large cultural events, these permits rarely are denied. In Gaza police approval is required for "political" meetings at several specific large meeting halls. Written permission also is required for buses to transport passengers to attend political meetings. In West Bank cities, the PA requires permits for outdoor rallies and demonstrations and prohibits calls for violence, displays of arms, and racist slogans, although this is not always enforced.

On February 29, students at Bir Zeit University staged a large protest against PA policies and practices at which several demonstrators threw stones at a foreign head of state. Following the protest, PA police arrested about 30 students (see Section 1.d.). The PA police commissioner also banned unlicensed public gatherings. Several human rights groups and political factions filed a petition with the Palestinian High Court protesting the action. On April 29, the Court suspended the police order and gave the police commissioner 8 days to clarify the reasons for issuing the order. The police order had not been enforced by year's end. In March hundreds of Palestinians demonstrated in Ramallah to demand the release of the Bir Zeit university students.

In May a number of persons participated in a PFLP rally in Ramallah following the funeral of one of its members who died in clashes with the IDF; Palestinian security forces arrested 20 demonstrators (see Section 1.d.).

The Israeli Government generally respected freedom of association.

The PA placed some limits on freedom of association. However, the PA permits Palestinian charitable, community, professional, and self-help organizations to operate. There were periodic complaints during the year from Palestinian political parties, social and professional groups, and other NGO's that the PA attempted to limit their ability to act autonomously. On April 21, the Preventive Security Force ordered the closure of a democratization group office in Gaza because the organization's by-laws reportedly were not in compliance with the NGO law. The office remained closed at year's end (see Section 4).

The armed wings of several Palestinian political groups, including Islamic opposition groups, were outlawed. While it is not illegal to belong to the nonmilitary components of such groups, during times of heightened security concern the PA has harassed and even detained members of the political wings of these organizations.

c. Freedom of Religion

Israeli law provides for freedom of worship, and the Government generally respects this right in practice; it does not ban any group on religious grounds. It permits all faiths to operate schools and institutions. Religious publications are subject to the Publications Laws. However, Israel's imposition of an internal closure on the West Bank and Gaza for 81 days during the "al-Aqsa Intifada" and total curfew on many Palestinian towns

Case 1:00-cv-01460-XK    Document 18    Filed 04/08/2004    Page 41 of 47

significantly impeded freedom of worship for Muslims and Christians. During periods of closure, Palestinians from the occupied territories were prevented from traveling to pray on the Temple Mount (Haram al-Sharif) in Jerusalem, Islam's third holiest site. On several occasions the Israeli Government prevented worshippers under the age of 45 from attending Friday prayers on the Temple Mount; the Israeli Government stated that it did so due to security concerns.

No PA law protects religious freedom; however, the PA generally respects freedom of religion. In past years, there were allegations that several converts from Islam to Christianity at times are subject to societal discrimination and harassment by PA officials. However, there was no pattern of PA discrimination and harassment against Christians (see Section 5).

On October 7, following the IDF evacuation from the Jewish religious site of Joseph's Tomb, about 1,000 Palestinian protesters entered the religious site, burned it, and damaged the roof and an outer wall in an unsuccessful attempt to demolish the tomb (see Section 5). Some Israeli Government officials criticized the PA for failing to prevent the attack. The PA began to refurbish the tomb the following day.

d. Freedom of Movement Within the Occupied Territories,
   Foreign Travel, Emigration, and Repatriation

The Israeli Government restricted freedom of movement for Palestinians. Since March 1993, Israel has required that all West Bank and Gaza residents obtain permits to enter Israel and Jerusalem. However, Israel often denies applicants permits with no explanation, and does not allow effective means of appeal. In the past, Palestinian officials with VIP passes, including PA cabinet members and members of the Palestinian Council, were subjected to long delays and searches at Israeli checkpoints in the West Bank, despite the fact that they were traveling on special passes issued by Israel. Prior to the beginning of the "al-Aqsa Intifada" in September, there was only one report that this occurred; however, in October and November Palestinian officials were delayed and searched frequently. In general Palestinians in the West Bank and Gaza Strip find it difficult to obtain permits to work, visit, study, or obtain medical care in Israel. Palestinian residents of Jerusalem sometimes are prohibited by Israeli officials from entering the West Bank, and they require written permits from Israel to travel to the Gaza Strip. Prior to the November 1999 opening of the safe passage route, residents of the Gaza Strip rarely were able to obtain permission to travel to the West Bank, or residents of the West Bank to enter the Gaza Strip; this was even true of residents of the West Bank and Gaza Strip who regularly received permission to enter Israel. The PA permits Palestinian charitable, community, professional, and self-help organizations to operate. Israeli authorities permit only a small number of Gazans to bring vehicles into Israel and sometimes do not permit West Bank vehicles to enter Jerusalem or Israel. Except for senior PA officials, and those using the safe passage to the West Bank, Palestinians of all ages crossing between the Gaza Strip and Israel are not permitted to travel by car across the main checkpoint. Instead, they must travel along a narrow walkway almost a mile long. Israelis moving into and out of the Gaza Strip are permitted to use their cars.

In November 1999, Israel and the PA implemented arrangements in the 1995 Interim Agreement to establish a safe passage route across Israel between the Gaza Strip and the southern West Bank. A northern safe passage route, also called for by the Interim Agreement, never was established, despite several rounds of negotiations. The southern safe passage route facilitated the movement of Palestinians between the West Bank and the Gaza Strip to work, study, and visit, and alleviated some of the problems associated with freedom of movement for Palestinians. However, some Palestinian human rights groups criticized the safe passage agreement because it maintains significant limits on freedom of movement. The safe passage route was closed in October in response to the ongoing violence. As of the end of November, a total of 15,000 Palestinians received approval to use the safe passage route and 2,900 applicants were refused permits to use the route.

Since March 1993, Israel also has applied varying levels of "closure," or enhanced restrictions, on the movement of Palestinians and their goods, often for lengthy periods, in response to terrorist attacks and other changing security conditions. During periods of violent protest in the West Bank or Gaza, or when it believes that there is an increased likelihood of such unrest, the Israeli Government imposes a tightened version of closure, called "comprehensive, external" closure. Comprehensive closures also are instituted regularly during major Israeli holidays. During such closures, the Israel Government cancels travel permits and prevents Palestinians—even those with valid work permits—from entering Israel or Jerusalem. During comprehensive closures, the authorities restrict severely the movement of goods between Israel and the occupied territories and between the West Bank and Gaza. On October 8, in response to increased violence, Israel imposed a prolonged comprehensive closure on the occupied territories. Israel imposed 88 days of tightened, comprehensive closure during the year, compared with 15 days in 1999.

During periods of extreme unrest in the West Bank and Gaza, the Israeli Government also prohibits most travel

between towns and villages within the West Bank. These "internal" closures impede the flow of goods and persons. Israel imposed at least 81 days of total or near-total internal closure during the year, compared with no days of internal closure during 1999. In the past, Israel rarely imposed internal closure within Gaza; however, for much of November and December, the IDF closed major roads in central Gaza, which blocked transit from the north to the south and stranded thousands of workers and students. Beginning in October, the Israeli Government further constrained the movement of Palestinians in the West Bank and Gaza by imposing total closures on specific areas or villages, sometimes for weeks at a time, and by intermittently closing the Gaza Airport and the Allenby and Rafah crossing points to Jordan and Egypt. Israel also imposed a curfew in the Israeli-controlled part of Hebron. During the curfews, Palestinians generally were confined to their homes for all but a few hours per week during which they were allowed to buy food and other provisions. The IDF did not impose a curfew on the Jewish settlers in Hebron. On December 10, the IDF further restricted freedom of movement by banning private Palestinian cars that contained only men (but no women) from traveling on main roads in Areas B and C. The prolonged closures and curfews imposed by Israel on Palestinian cities and towns during the year had a significant negative impact on every sector of the Palestinian economy. Israel's Ministry of Finance estimates that since the beginning of the "al-Aqsa Intifada," there has been a 30 to 50 percent decline in economic output in the occupied territories. Unemployment of Palestinians nearly has quadrupled, the poverty rate has doubled, and income losses were estimated at over $500 million.

The prolonged closure also affected students' ability to attend school and university. In areas under curfew, all classes were cancelled (see Section 5). Furthermore, teachers were unable to reach their schools in different villages and towns, and university students were unable to travel between Gaza and the West Bank due to the closure of the safe passage route.

Human rights groups reported that between late September and the end of the year, the IDF delayed or prohibited at least 94 ambulances from crossing checkpoints (see Sections 1.a. and 1.c.). According to the Israeli Government, Israeli ambulances and medical personnel reportedly facilitated the medical evacuation of over 180 Palestinians to Israel, Jordan, and other countries during the violent unrest.

In 1998 the Israeli Government established a "continuous employment program" that allows selected Palestinian workers who have been approved by the Ministry of Defense and who are married, are over 28 years old, and have worked in Israel for a long period of time, to enter Israel to work in the event of a tightened closure. The program was not implemented during the periods of tightened closure during the year.

The Israeli Government continued to restrict the movements of several Jewish settlers living in the occupied territories who belonged to the extremist Kach or Kahane Chai groups, through the use of administrative orders issued by the IDF central command.

The Israeli Government requires all Palestinian residents to obtain permits for foreign travel and has restricted the travel of some political activists. Bridge-crossing permits to Jordan may be obtained at post offices without a screening process. These restrictions on residence, reentry, and family reunification only apply to Palestinian residents of the occupied territories.

Palestinians who live in East Jerusalem, which Israel occupied during the 1967 War, generally do not accept Israeli citizenship. Therefore, they are issued a residence permit or Jerusalem identification card by the Israeli Government. Israel applies the 1952 Law of Permanent Residency and its 1974 amendments to Jerusalem identification card holders. This law stipulates that a Jerusalem resident loses the right of residence if the resident leaves Israeli territory for more than 7 years, acquires the nationality of another country, or acquires permanent residence in another country. Such persons are permitted to return only as tourists and sometimes are denied entry. The Israeli Government does not apply these same restrictions to Israeli citizens. In the past, invoking the 1952 law as legal justification, the Israeli Interior Ministry stripped residency rights from hundreds of East Jerusalem Palestinians. In the late 1990's, the pace of revocations increased as the Ministry applied restricted policies, including a "center of life" test, which required extensive documentation of continuous residence within Jerusalem for the previous 7 years, to determine whether Palestinians were eligible to retain their identification cards. The Ministry's policy was the subject of numerous lawsuits, including one considered by the High Court of Justice in 1999. In October 1999, then Minister of Interior, Natan Sharansky announced that the Ministry no longer would apply the "center of life" criteria used previously to revoke the residency rights of East Jerusalem Palestinians. During the year, there were 7 identity card revocations, compared with 394 revocations in 1999. In February the Israeli Ministry of Interior also published new instructions regarding residency rights in Jerusalem. According to these instructions, residents of Israel, whose identity cards had been revoked since 1995 and who returned to live in Israel since 1998 and had "maintained proper contact" were entitled to restoration of their identity cards. During the year, 67 identity cards were restored.

Israeli authorities also place restrictions on family reunification. Most Palestinians who were abroad before or

during the 1967 War, or who have lost their residence permits for other reasons since then, are not permitted to reside permanently with their families in Jerusalem or the occupied territories. Foreign-born spouses and children of Palestinian residents also experience difficulty in obtaining permission to reside with their family members. For example, a Palestinian with a West Bank identification card must apply to the Israeli Government for permission to live with his or her
Jerusalem-resident spouse in Jerusalem. The Israeli Government occasionally issues limited-duration permits and also issues a limited number of Jerusalem identification cards as part of its family reunification program. Israeli security authorities single out young (often unmarried) Palestinian males for more stringent restrictions than other Palestinians, citing them as more likely to be security risks. They generally are prohibited from working in Israel.

The PA issues passports and identification cards for Palestinians residing in the West Bank and Gaza. Bearers of Palestinian passports do not need special exit permits from the PA; however, when leaving Israel from Ben Gurion Airport they require permits in order to transit Israel to reach the airport.

Palestinians who hold Jerusalem identification cards, issued by the Israeli Government, must obtain travel documents from the Israeli Government to travel abroad. Human rights groups report that Palestinian residents of East Jerusalem often do not apply for Israeli travel documents because they fear that the application might prompt a reexamination of their residency status and lead to the revocation of their identity cards. On request, the Jordanian Government also issues travel documents to Palestinians in the West Bank and East Jerusalem. Palestinians who wish to travel to Jordan must leave their Israeli identification documents with Israeli authorities at the Allenby Bridge. There also is a requirement that Palestinians from East Jerusalem obtain a special permit to cross the Allenby Bridge, which may be purchased from the Ministry of Interior for $40 (125 NIS). Palestinians who are residents of the West Bank or the Gaza Strip are not allowed to cross between Israel and Jordan at the Sheikh Hussein or Arava crossings.

Palestinians who reside in the West Bank or Gaza are required by the Israeli Government to exit and enter with a Palestinian passport. When Israel tightened its closure of the West Bank and Gaza Strip during the year, the Government at times restricted the entry and departure of Palestinians, even those with passports from other countries.

The PA generally does not restrict freedom of movement.

Section 3 Respect for Political Rights: The Right of Citizens to
Change Their Government

Palestinian residents of the West Bank, Gaza Strip, and East Jerusalem chose their first popularly elected government in 1996. They elected an 88-member Palestinian Council and the Ra'iis (President or Chairman) of the Executive Authority of the Council. Yasir Arafat won almost 89 percent of the vote in a two-person race for Chairman. Some 700 candidates ran for Council seats. Council members were elected in multimember electoral districts. As many as 35 of the elected members were independent candidates. International observers concluded that the election could reasonably be regarded as an accurate expression of the will of the voters, despite some irregularities. During the year, the Council debated numerous draft laws and resolutions. Some members of the Council complained of its relative lack of power in relation to the executive branch of government.

The last municipal elections took place in 1986. Municipal elections were planned for June 1999; however, they did not take place. On August 22, the Fatah Central Committee (FCC) appointed a committee to devise a plan for holding local elections before year's end; however, the PLO Central Council did not ratify the plan.

Most Palestinians in East Jerusalem do not recognize the jurisdiction of the municipality of Jerusalem. Only a very small percentage of Jerusalem's Palestinian population vote in the municipal council elections. No Palestinian resident of Jerusalem sits on the city council.

Women are underrepresented in government and politics. There are 5 women in the 88-member Council, and 1 woman serves in a ministerial-level position.

Section 4 Governmental Attitude Regarding International and
Nongovernmental Investigation of Alleged Violations
of Human Rights

Israeli, Palestinian, and international NGO's monitor the Israeli Government's human rights practices. The

Israeli Government generally cooperates with human rights and humanitarian NGO's; officials normally agree to meet with human rights monitors. The Israeli Government permits human rights groups to publish and hold press conferences. On April 4, the Israeli Government refused to allow a Palestinian human rights activist to travel to Cairo, Egypt for a regional meeting on human rights; however, several months later the Government allowed the activist to attend a meeting outside of the country (see Section 2.d.).

On October 17, pursuant to the meeting in Sharm al-Sheikh, a fact-finding committee was established to examine the causes of the violent events that began in late September, and to recommend ways to prevent their recurrence. The committee began its work in December.

Local human rights groups, most of which are Palestinian, and several international organizations monitor the PA's human rights practices. The PA generally cooperates with these organizations, and PA officials usually meet with their representatives; however, there were instances in which it did not. Several Palestinian human rights organizations work privately with the PA to overcome abusive practices in certain areas. They also publish criticism if they believe that the PA is not responding adequately to private encouragement. Human rights groups state that the PA generally is cooperative when dealing with certain types of human rights issues. Human rights organizations reported that they sometimes were denied access to detainees in Palestinian prisons during the year (see Section 1.d.).

The ICRC operates in the West Bank and Gaza under the terms of a memorandum of understanding signed in September 1996 between the ICRC and the PLO. The memorandum accords the ICRC access to all detainees held by the PA and allows regular inspections of prison conditions. In accordance with the agreement, the ICRC conducts routine visits of PA-run prison facilities and sees
PA-held prisoners throughout the year. Other human rights groups, including the Palestinian Independent Commission for Citizens' Rights and the Mandela Institute, also visited PA prisons and detention centers on a regular basis. Some human rights and international humanitarian organizations reported that they occasionally were denied access to detainees in Palestinian prisons during the year (see Section 1.d.). PA officials reportedly are less responsive to queries regarding the PA's policies toward and treatment of members of Islamist opposition groups than to queries on other detainees.

In 1999 Palestinian NGO's repeatedly called on the PA to ratify a law passed by the Council in December 1998, which would govern the activities of NGO's and their relations with the PA. Ratification of the law was delayed due to the PA's attempts to replace the Ministry of Justice with the Ministry of Interior as the agency responsible for the administration of NGO's. In January Chairman Arafat approved the NGO law. At least 150 NGO's had been issued with registration certificates by year's end.

On April 21, PSF officials closed a democratization group office in Gaza because the NGO was not yet registered with the Ministry of Interior (see Section 2.b.). After repeated unsuccessful attempts to reopen the office, board members decided to close the office permanently.

On May 17, the PBA placed the director of a West Bank NGO on the "non-practicing" register of lawyers reportedly because he worked for an NGO and not a law office.

Section 5 Discrimination Based on Race, Sex, Religion,
      Disability, Language, or Social Status

Under the complex mixture of laws and regulations that apply to the occupied territories, Palestinians are disadvantaged under Israeli law and practices compared with the treatment received by Israeli settlers. This includes discrimination in residency and land use.

Women

The problems of rape, domestic violence, and violence related to "family honor" have gained greater attention in the Palestinian community as a result of a significant effort by Palestinian women's groups; however, public discussion generally remains muted. Victims often are encouraged by relatives to remain quiet and are punished themselves or blamed for the "shame" that has been brought upon them and their families. The brother of a 14-year-old girl who reportedly was raped and killed by her uncle and brother in 1998 still was awaiting trial at year's end. Women's groups seek to educate women on these problems, but women's rights advocates claim that few resources are available to shelter the victims of violence because women's shelters are not accepted culturally in Palestinian society. They also maintain that society has not been receptive to providing counseling or outreach services to victims of violence, which these advocates see as more widespread than is acknowledged. According to women's groups, there are no reliable data on the incidence of violence

against women.  Spousal abuse, sexual abuse, and "honor killings" occur, but societal pressures prevent most incidents from being reported and most cases are handled within the families concerned, usually by male family members.  In prior years, leaders of HAMAS threatened and tried to intimidate Palestinian women who were involved in programs aimed at empowering women and helping abused women; there were no reports that this occurred during the year.

Palestinian women endure various forms of social prejudice and repression within their own society.  Because of early marriage, girls frequently do not finish the mandatory level of schooling.  Cultural restrictions sometimes prevent women from attending colleges and universities.  While there is an active women's movement in the West Bank, serious attention has shifted only recently from nationalist aspirations to issues that greatly affect women, such as domestic violence, equal access to education and employment, and laws concerning marriage and inheritance.  Women who marry outside of their faith, particularly Christian women who marry Muslim men, often are disowned by their families and sometimes are harassed and threatened with death by members of their community.  Local officials sometimes attempt to convince such women to leave their communities in order to protect themselves.

A growing number of Palestinian women work outside the home, where they tend to encounter discrimination.  There are no special laws that provide for women's rights in the workplace. Women are underrepresented in most aspects of professional life. Despite the fact that there is a small group of women who are prominent in politics, medicine, law, teaching, and NGO's, women for the most part are seriously underrepresented in the decisionmaking positions in these fields.

Personal status law for Palestinians is based on religious law. For Muslim Palestinians, personal status law is derived from Shari'a (Islamic law), and the varied ecclesiastical courts rule on personal status issues for Christians.  In the West Bank and Gaza, Shari'a pertaining to women is part of the Jordanian Status Law of 1976, which includes inheritance and marriage laws.  Under the law, women inherit less than male members of the family do.  The marriage law allows men to take more than one wife, although few do so.  Women are permitted to make "stipulations" in the marriage contract to protect them in the event of divorce and questions of child custody.  However, only an estimated 1 percent of women take advantage of this section of the law, leaving most women at a disadvantage when it comes to divorce or child custody.  Ecclesiastical courts also often favor men over women in divorce and child custody cases.

Children

The PA requires compulsory education up to 12 years of age. However, early marriage in certain sectors of society frequently prevents girls from completing the mandatory level of schooling. Currently British Mandate, Jordanian, and military laws, from which West Bank and Gaza law is derived, offer protection to children under the Labor and Penal Codes. Existing laws designed to protect children, such as a law that sets the minimum employment age, are not always enforced. While there is no juvenile court system, judges specializing in children's cases generally sit for juvenile offenders. In cases in which the child is the victim, judges have the discretion to remove the child from a situation deemed harmful. However, the system is not advanced in the protection it affords children.

The sustained closure imposed by Israel affected students' ability to attend school during the year.  In areas under curfew, all classes were cancelled.  Furthermore, teachers were unable to reach their schools in different villages and towns (see Section 2.d.).

People with Disabilities

There is no mandated accessibility to public facilities in the occupied territories under either Israeli or Palestinian authority.  Approximately 130,000 Palestinians in the West Bank and Gaza are disabled.  Additionally, medical relief organizations estimated that approximately one-sixth of the 10,600 Palestinians injured during the "al-Aqsa Intifada" would be disabled permanently.  Some Palestinian institutions care for and train disabled persons; however, their efforts are chronically underfunded.  Many Palestinians with disabilities are segregated and isolated from Palestinian society; they are discriminated against in most spheres, including education, employment, transportation, and access to public buildings and facilities.

Religious Minorities

In the past, there were reports that a small number of Muslim converts to Christianity in the Palestinian community sometimes were subject to societal discrimination and harassment by PA officials.  However, there

was no pattern of PA discrimination and harassment against Christians (see Section 2.c.).

On October 7, following the IDF withdrawal from the Jewish religious site of Joseph's Tomb, about 1,000 Palestinian protesters entered the religious site, burned it, and damaged the roof and an outer wall in an unsuccessful attempt to demolish the tomb (see Section 2.c.). On October 12, Palestinian civilians reportedly burned a synagogue in Jericho.

On November 21, Israeli settlers set a mosque on fire in Huwara, reportedly in reaction to the killing of an Israeli settler by a settler earlier in the day.

Section 6 Worker Rights

a. The Right of Association

Labor affairs in the West Bank came under Palestinian responsibility with the signing of the Interim Agreement in September 1995. Until a new law being drafted by PA authorities comes into effect, labor affairs in the West Bank are governed by Jordanian Law 21 of 1965, as amended by Israeli military orders, and in Gaza by PA decisions. The law permits workers to establish and join unions without government authorization. The previous Israeli requirement that all proposed West Bank unions apply for a permit is no longer is enforced. Israeli authorities previously licensed about 35 of the estimated 185 union branches now in existence. Following a process to consolidate trade unions in the West Bank, there now are 12 trade unions there.

Palestinian workers in Jerusalem are governed by Israeli labor law. They are free to establish their own unions. Although the Government restricts Jerusalem unions from joining West Bank trade federations, this restriction has not been enforced. Palestinian workers in Jerusalem may belong simultaneously to unions affiliated with West Bank federations and the Israeli Histadrut Labor Federation.

West Bank unions are not affiliated with the Israeli Histadrut Federation. Palestinians from the West Bank and Gaza who work in Israel or Jerusalem are not full members of Histadrut, but they are required to contribute 1 percent of their wages to Histadrut. Negotiations between Histadrut and West Bank union officials to return half of this fee to the Palestinian Union Federation were completed in 1996, but funds have yet to be transferred.

Palestinians who work in Israel are required to contribute to the National Insurance Institute (NII), which provides unemployment insurance and other benefits. Palestinians from the West Bank and Gaza are eligible for some, but not all, NII benefits. According to the Interim Agreement, Palestinians working in Israel and Jerusalem continue to be insured for injuries occurring in Israel, the bankruptcy of a worker's employer, and allowances for maternity leave.

There are outstanding cases of Palestinian workers who have attempted to sue their Israeli employers for non-payment of wages but are unable to travel to the relevant courts because they are unable to receive the proper permits.

The great majority of West Bank unions belong to the Palestinian General Federation of Trade Unions (PGFTU). The PGFTU was involved in the completion of the negotiations with Histadrut regarding workers' fees. The reorganization of unions under the PGFTU is intended to enable the West Bank and Gaza unions to better represent the union members' interests; the reorganization had not been finalized by year's end.

An estimated 92,000 workers in the West Bank are members of the PGFTU, the largest union bloc, which consists of 12 trade unions in the West Bank and 8 in Gaza. The organization has about 46,500 members in Gaza. The PGFTU estimates actual organized membership, i.e., dues-paying members, at about 30 percent of all Palestinian workers.

No unions were dissolved by administrative or legislative action during the year. Palestinian unions that seek to strike must submit to arbitration by the PA Ministry of Labor. If the union disagrees with the final arbitration and strikes, a tribunal of senior judges appointed by the PA decides what, if any, disciplinary action is to be taken. There are no laws in the territories that specifically protect the rights of striking workers. In practice, such workers have little or no protection from an employer's retribution.

For several months, teachers throughout the West Bank held a strike. On May 5, PA officials arrested one of the strike leaders and closed down the radio station that broadcast an interview in which the leader accused the PA of inefficiency (see Sections 1.d. and 2.a.). The teachers suspended their strike on May 17, despite the fact that

Case 1:00-cv-01400-WJE   Document 18   Filed 04/03/2001   Page 47 of 47

none of their demands were met.

The PGFTU has applied for membership in the International Confederation of Free Trade Unions (ICFTU).

b. The Right to Organize and Bargain Collectively

A majority of workers in the occupied territories are self-employed or unpaid family helpers in agriculture or commerce. Only 35 percent of employment in the territories consists of wage jobs, most with the U.N. Relief and Works Agency (UNRWA), the PA, or municipalities. Collective bargaining is protected. Labor disputes are adjudicated by committees of 3 to 5 members in businesses employing more than 20 workers.

Existing laws and regulations do not offer real protection against antiunion discrimination.

c. Prohibition of Forced or Compulsory Labor

PA law does not prohibit specifically forced or compulsory labor, including by children, but there were no reports of such practices during the year.

d. Status of Child Labor Practices and Minimum Age for
   Employment

The minimum working age in the West Bank and Gaza is 14 years. Most observers agree that a significant number of Palestinian children under the age of 16 years work. Many children under the age of 12 are engaged in some work activities. Most such employment is believed to involve work on family farms, in family shops, or as urban street vendors. Some employment of children also is reported to occur in small manufacturing enterprises, such as shoe and textile factories. The law does not prohibit specifically forced or compulsory labor by children, but there were no reports of its use (see Section 6.c.).

The PA's capacity to enforce existing laws is limited. It has only 40 labor inspectors to inspect an estimated 65,000 enterprises. The International Labor Organization and UNICEF are working with the PA to study the nature and extent of the problem and to develop the capacity to enforce and update child labor laws.

e. Acceptable Conditions of Work

There currently is no minimum wage in the West Bank or Gaza Strip. The average wage for full-time workers appears to provide a worker and family with a decent standard of living.

In the West Bank, the normal workweek is 48 hours in most areas; in Gaza the workweek is 45 hours for day laborers and 40 hours for salaried employees. There is no effective enforcement of maximum workweek laws.

The PA Ministry of Labor is responsible for inspecting workplaces and enforcing safety standards in the West Bank and Gaza. The Ministry of Labor states that new factories and workplaces meet international health and safety standards but that older ones fail to meet minimum standards. There is no specific legal protection afforded workers that allows them to remove themselves from an unhealthy or unsafe work setting without risking loss of employment.

f. Trafficking in Persons

The law does not prohibit trafficking in persons; however, there were no reports that persons were trafficked in, to, through, or from the occupied territories.

[End.]